## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| AMY CANDELET, | : |
| PLAINTIFF, | : |
| | : Civil Action No.  2:14-cv-01442-AB |
| V. | : |
| | : Filed Electronically |
| MIKE ROTH D/B/A AUTO PROS; | : |
| SANTANDER CONSUMER USA, INC.; | : |
| JOHN DOES 1-10, | : |
| DEFENDANTS. | : |

### CERTIFICATION OF THOMAS M. BRODOWSKI, ESQUIRE

I, Thomas M. Brodowski, hereby certify as follows:

1.      I am counsel for Defendant Santander Consumer USA, Inc. ("SCUSA"), in connection with the above-captioned action.  As such, I am familiar with the facts set forth herein.

2.      Attached hereto as Exhibit A is a true and correct copy of the Retail Purchase Agreement, dated May 4, 2012 (the "Purchase Agreement"), which was executed by Aimee Candelet ("Plaintiff").

3.      Attached hereto as Exhibit B is a true and correct copy of the Retail Installment Sale Contract, dated May 4, 2012 (the "RISC"), which was executed by Aimee Candelet ("Plaintiff").

4.      Attached collectively hereto as Exhibit C are true and correct copies of the following unreported decisions:

- Gilmour v. Bohmueller, No. Civ.A. 04-2535, 2005 WL 241181 (E.D.Pa. Jan. 27, 2005)

- <u>Grant v. Kingswood Apts.</u>, No. Civ. A. 01–1523, 2001 WL 1876343, at *3 (E.D.Pa. Oct 15, 2001)

- <u>Heller v. Shaw Indus.</u>, Civ. A. No. 95–7657, 1997 WL 535163, at *20 (E.D.Pa. Aug.18, 1997)

- <u>Kane v. Equity One, Inc.</u>, Civ. A. No. 03-3931, 2003 WL 22939377 (E.D. Pa. Nov. 21, 2003)

- <u>McMaster v. CIT Group</u>, Civ. A. No. 04-339, 2006 WL 1314379 (E.D. Pa. May 11, 2006)

- <u>Ricciardi v. Ameriquest Mortgage Co.</u>, Civ. A. No. 03-2995, 2004 WL 739965, at *2 (E.D. Pa. Mar 15, 2004)

- <u>Soslau v. PHH Mortg. Corp.</u>, Civ. A. No. 06-1422, 2008 WL 2805606 (E.D.Pa. July 18, 2008)

- <u>In Re Washington</u>, Civ.A.No. 06-CV-1625, 2007 WL 846658 (E.D. Pa. March 19, 2007)

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

s/ Thomas M. Brodowski
Thomas M. Brodowski

Dated: May 9, 2014

EXHIBIT A



6250 HARBISON AVE,
PHILADELPHIA PA 19149-
215-533-3334

## RETAIL PURCHASE AGREEMENT

Purchaser's Name(s): AIMEE CANDELET

| Field | Value | Field | Value |
|---|---|---|---|
| Address: | PHILADLEPHIA, PA 19134 | Deal Number: | ████38 |
| | | Date: | 05/04/2012 |
| | | County: | |
| Home Telephone: | Work Telephone: ████ | DOB: | 02/04/78 |
| Driver's License/State I.D. # ████ | Issuing State: PA | Exp. Date: | |

The above information has been requested so that we may verify your identity in accordance with the USA Patriot Act. By signing below, you represent that you are at least 18 years of age and have authority to enter into this Agreement. The Odometer Reading for the Used Vehicle you are purchasing is accurate unless indicated otherwise. Please refer to the Federal Mileage Statement for full disclosure.

| YEAR | MAKE | MODEL | COLOR | STOCK NO. |
|---|---|---|---|---|
| 2009 | Dodge | Journey | Silver | 5850 |

| SERIAL NO. | ODOMETER READING | SALESPERSON: |
|---|---|---|
| 3D4GH57V19T559954 | ☐ Not Accurate   66488 | |

**WARRANTY STATEMENT**

Any warranties by a manufacturer other than our Dealership are theirs, **not ours**, and only such manufacturer or supplier shall be liable for performance under such warranties. We neither assume nor authorize any other person to assume for us any liability in connection with the sale of the Vehicle and the related goods and services. If we enter into a service contract with you at the time of, or within 9 days of, the date of this transaction, we may not limit or modify the implied warranties. **CONTRACTUAL DISCLOSURE STATEMENT (USED VEHICLES ONLY)** The information you see on the window form for this Vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.

☐ **AS-IS: THIS MOTOR VEHICLE IS SOLD AS-IS** *WITHOUT ANY WARRANTY EITHER* EXPRESS OR IMPLIED.   THE PURCHASER WILL BEAR THE ENTIRE EXPENSE OF REPAIRING OR CORRECTING ANY DEFECTS THAT PRESENTLY EXIST OR THAT MAY OCCUR IN THE VEHICLE. We expressly disclaim all express or implied warranties, including any implied warranties of merchantability or fitness for a particular purpose.

☐ **Used Vehicle Limited Warranty Applies.** A copy will be provided with this Agreement. Any implied warranties apply for the duration of the Limited Warranty. We hereby disclaim any other express warranties.

☐ **Balance of Manufacturer's Limited Warranty Applies.** We will provide a copy of the Manufacturer's Limited Warranty to you or instruct you on how to obtain a copy.

☐ If this box is marked, you have entered into a Service Contract with_____
We will provide a copy of the Service Contract to you or instruct you on how to obtain a copy.

**TRADE-IN VEHICLE INFORMATION**

Year:   Make:   Model:   Color:

| | | |
|---|---|---|
| Serial No. | Odometer Reading Not Accurate | |
| Trade-In Allowance  N/A | N/A | Balance Owed & Lienholder  N/A |

☐ DEPOSIT: The sum of $_____ was received from you as a Deposit. It is non refundable.

X_____

**\*DOCUMENTARY FEE:** This fee is charged to compensate the Dealership for providing administrative and documentary services and for costs incurred in carrying out the requirements of applicable federal and state laws. This is NOT a state mandated fee.

**OTHER MATERIAL UNDERSTANDING AND INTEGRATED DOCUMENTS**

| | |
|---|---|
| CASH PRICE OF USED VEHICLE | 15655.00 |
| OTHER GOODS/SERVICES: | X |
| GAP | N/A |
| SERVICE CONTRACT | N/A |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL SELLING PRICE | 15655.00 |
| LESS TRADE-IN ALLOWANCE | N/A |
| | |
| | |
| SUBTOTAL - TAXABLE PRICE | 15655.00 |
| SALES TAX | 1252.40 |
| PLUS BALANCE OWED ON TRADE-IN | N/A |
| DOCUMENTARY FEE | 81.50 |
| REGISTRATION FEE | 56.50 |
| LIEN FEE | 5.00 |
| ONLINE REGISTRATION FEE | |
| ONLINE DEALER FEE | |
| MESSENGER FEE | |
| NOTARY FEE | N/A |
| TOTAL DUE | 17052.40 |
| LESS DEPOSIT (Non-refundable) | N/A |
| LESS REBATE | N/A |
| LESS CASH | 6500.00 |
| UNPAID BALANCE DUE | 10552.40 |

I have read and accept the terms and conditions of this Agreement, and hereby acknowledge that this Agreement is complete and accurately reflect the Agreements between the Dealership and myself. I further acknowledge receipt of a copy of this Agreement. This Agreement is not binding upon either Dealer or Purchaser until signed by an Authorized Dealership Representative. YOU, THE PURCHASER, MAY CANCEL THIS AGREEMENT AND RECEIVE A FULL REFUND ANY TIME BEFORE RECEIPT OF A COPY OF THIS AGREEMENT SIGNED BY AN AUTHORIZED DEALERSHIP REPRESENTATIVE BY GIVING WRITTEN NOTICE OF CANCELLATION TO THE DEALERSHIP.

_Aimee Candelet_
Purchaser

_____
Accepted by Authorized Dealership Representative

EXHIBIT B

PENNSYLVANIA
MOTOR VEHICLE INSTALLMENT SALE CONTRACT,   Dated _____05/04/2012_____                SIMPLE INTEREST

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all scheduled payments | Total Sale Price The total cost of your purchase on credit, including your down payment of $ ____6500.00____ |
|---|---|---|---|---|
| 19.24 % | $ 5955.40 | $ 10552.40 | $ 16507.80 | $ 23007.80 |

Your Payment Schedule will be:

| No. of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 60 | $ 275.13 | Monthly, beginning 06/03/2012 |

Filing Fees: $ _____         N/A

Security: You are giving a security interest in the motor vehicle being purchased.

Prepayment: If you pay off early, you will not have to pay a penalty.

Late Charge: If a payment is late, you will be charged 2% of the portion of the payment which is late for each month, or part of a month greater than 10 days, that it remains unpaid.

See below and any other Contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.

Filing Fees: $ _____ 5.00

IF YOU DO NOT MEET YOUR CONTRACT OBLIGATIONS, YOU MAY LOSE THE MOTOR VEHICLE AND PROPERTY THAT YOU BOUGHT WITH THIS CONTRACT, AND/OR MONEY OR DEPOSIT WITH THE ASSIGNEE.

In this Contract we are the SELLER. 
Name: AUTO PROS   6250 HARBISON AVE.   Address: PHILADELPHIA PA 19149-   Zip Code:

You are the BUYER(S): AIMEE CANDELET   PHILADELPHIA, PA 19134-
Name(s)            Address(es)            Zip Code(s)

If there is more than one Buyer, each promises, separately and together, to pay all sums due us and to perform all agreements in this Contract.

This Contract is between Seller and Buyer. All disclosures have been made by Seller. Seller intends to assign this Contract to the Assignee.

### Itemization of Amount Financed

| | |
|---|---|
| Cash Price | 15655.00 |
| Cash Downpayment | 6500.00 |
| Trade-In | |
| Value of Trade-In | N/A |
| Lien Payoff to + | N/A |
| Unpaid Cash Price Balance | 9155.00 |
| To Credit Insurance Company | |
| To Public Officials for: | |
| License, Taxes and Registration | 50.00 |
| Lien Fee | 5.00 |
| To AUTO PROS | 81.50 |
| To STATE SALES TAX | 1252.40 |
| To | N/A |
| To | N/A |
| To | N/A |
| Amount Financed | 10552.40 |
| Finance Charge | 5955.40 |
| Total of Payments | 16507.80 |

TRADE-IN:
You have traded in
the following vehicle:
_____ Year and Make _____ Description _____

If a balance is still owing on the vehicle you have traded in, the Seller will pay off this amount on your behalf. You warrant and represent to us that any trade-in is free from lien, claim, encumbrance or security interest, except as shown in the Itemization of Amount Financed as the "Lien Payoff".

PROPERTY INSURANCE: You may choose the person through whom insurance is obtained against loss or damage to the Vehicle and against liability arising out of use or ownership of the Vehicle. In this Contract, you are promising to insure the Vehicle and keep it insured.

CREDIT INSURANCE IS NOT REQUIRED: Credit Life Insurance and Credit Accident & Health (Disability) Insurance are not required to obtain credit, and will not be provided unless you sign below and agree to pay the additional costs. Please read the NOTICE OF PROPOSED CREDIT INSURANCE on the reverse side. Your insurance certificate or policy will set you the MAXIMUM amount of insurance available. All insurance purchased will be for the term of the credit. You may receive a financial benefit from your purchase of credit insurance.

By signing, you select Single Credit Life Insurance.   What is your age? ____ Years   What is your Health Insurance, which costs $ ____ N/A   What is your age? ____ Years

_____
Signature of Buyer to be insured for Single Credit Life Insurance

_____
Signature of Buyer to be insured for Single Credit Accident & Health Insurance

By signing, you both select Joint Credit Life Insurance, which costs $ ____ N/A   What is your ages? ____

By signing, you both select Joint Credit Accident & Health Insurance, which costs $ ____ N/A   What is your ages? ____   % to be insured

1. _____
2. _____
Signatures of both Buyers to be insured for Joint Credit Life Insurance

1. _____
2. _____
Signatures of both Buyers to be insured for Joint Credit Accident & Health Insurance

Insurer: _____

VEHICLE: You have agreed to purchase, under the terms of this Contract, the following motor vehicle and its extra equipment, which is called the "Vehicle" in this Contract.

| N/U | Year and Make | Series | Body Style | No. Cyl. | Truck Ton Capacity | Serial Number |
|---|---|---|---|---|---|---|
| U | 2009 Dodge Journey | | Hatch | 6 | | 3D4GH57V19TS59954 |

Equipped with: XX Radio  XX AM/FM Stereo  _ 5 Spd.  Other _____
XX A.C.  XX P.W.  AM/FM Tape  Vinyl Top

ASSIGNEE: We may assign this Contract and Security Agreement to a sales finance company which is the "Assignee." If the Assignee accepts the Contract to a subsequent assignee, the term also refers to such subsequent assignee. After the assignment, all rights and benefits of the Seller in this Contract and in the Security Agreement shall belong to and be enforceable by the Assignee. The Assignee will notify you when the Seller makes an assignment.

**Santander Consumer USA**

CO-SIGNER: Any person signing the Co-Signer's Agreement below promises separately and together with us (the Co-Signer(s) and Buyer(s), to pay all sums due and to perform all agreements in this Contract. Co-Signer will not be an Owner of the Vehicle.

CO-OWNER: Any person signing the Co-Owner's Security Agreement below gives us a security interest in the Vehicle and agrees separately and together with all the Owner(s) and Buyer(s), to perform all agreements in the Security Agreement and all other parts of this Contract except the "Promise to Pay" section.

TERMS: The terms shown in the boxes above are part of this Contract.

PROMISE TO PAY: You agree to pay us the Total Sale Price for the Vehicle by making the Cash Downpayment and assigning the Trade-In, if shown above, on or before the date of this Contract, and paying us the Amount Financed plus interest. You promise to make payments in accordance with the Payment Schedule. You promise to make payments on or before the date of each month as the first payment due date. You agree to pay all other amounts which may become due under the terms of this Contract. You agree to pay the Seller or Assignee costs of suit. You also agree to pay reasonable attorneys' fees if Seller or Assignee hires an attorney to collect amounts due under this Contract or to protect or get possession of the Vehicle. You agree to make payments at the place or to send payments to the address which the Assignee most recently specifies in the written notice to you.

ADDITIONAL TERMS AND CONDITIONS: THIS CONTRACT CONTINUES ON THE REVERSE SIDE. YOU ARE OBLIGATED TO ALL THE TERMS OF THE CONTRACT WHICH APPEAR ON THE FRONT AND REVERSE SIDES.

**The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.**

By signing below, you agree to buy the Vehicle from you under the terms of this Contract.

AUTO PROS

SELLER _____   05/04/2012

BY: _____

NOTICE TO BUYER—DO NOT SIGN THIS CONTRACT IN BLANK. YOU ARE ENTITLED TO AN EXACT COPY OF THE CONTRACT YOU SIGN. KEEP IT TO PROTECT YOUR LEGAL RIGHTS.

BUYER _Aimee Candelet_   05/04/2012

BUYER _____   Date

CO-SIGNER: YOU SHOULD READ THE NOTICE TO CO-SIGNER, WHICH HAS BEEN GIVEN TO YOU ON A SEPARATE DOCUMENT, BEFORE SIGNING THE CO-SIGNER'S AGREEMENT.

CO-SIGNER'S AGREEMENT: You, the person (or persons) signing below as "Co-Signer," promise to pay to us all sums due on this Contract and to perform all agreements in this Contract. You intend to be legally bound by all the terms of this Contract, separately and together, with the Buyer. You are making this promise to induce us to make this Contract with the Buyer, even though we will use the proceeds only for the Buyer's benefit. You agree to pay even though we may not have made any prior demand for payment on the Buyer or exercised our security interest. You also acknowledge receiving a completed copy of this Contract.

Co-Signer's Signature _____   Address _____   Date _____
Co-Signer's Signature _____   Address _____   Date _____

CO-OWNER'S SECURITY AGREEMENT: You, the person signing below as "Co-Owner," together with the Buyer or otherwise being all of the Owners of the Vehicle, give us a Security Interest in the Vehicle identified above. You agree to be bound by the terms of this Contract's Security Agreement and all other parts of this Contract except the "Promise To Pay" section. You are giving us the security interest to induce us to make this Contract with the Buyer, and to secure the payments by the Buyer of all sums due on this Contract. You will not be responsible for any deficiency which might be due after repossession and sale of the Vehicle.

Co-Owner's Signature _____   Address _____   Date _____

BUYER, CO-SIGNER AND CO-OWNER, AS APPLICABLE, ACKNOWLEDGE RECEIPT OF A COMPLETED COPY OF THIS CONTRACT AT THE TIME OF SIGNING.

BUYER _Aimee Candelet_   BUYER ____   CO-SIGNER ____   CO-SIGNER OR CO-OWNER ____

NOTICE: SEE REVERSE SIDE FOR IMPORTANT INFORMATION.

Payment Schedule - You agree to pay to us the Amount Financed plus interest in 59 payments of $ 275.13 each, and a final payment of $ 275.13, the first payment will be due on JUN 03 2012 and then payments will be due on that same day of each month following.

## ADDITIONAL TERMS AND CONDITIONS

1. **SECURITY AGREEMENT:** To secure the payment of all sums due and the performance of all required obligations under this Contract, you give a security interest in the Vehicle, in all parts (called "accessions") attached to the Vehicle at any later time, and in any proceeds of the Vehicle, including insurance proceeds. The Assignee may set-off any amounts due and unpaid under this Contract against any of your money on deposit with Assignee. This includes any money which is now or may in the future be deposited with Assignee by you. Assignee may do this without any prior notice to you.

2. **HOW THE TOTAL OF PAYMENTS IS COMPUTED:** The Total of Payments is the sum of the Amount Financed and the Finance Charge. The Finance Charge consists solely of interest computed daily on the outstanding balance of the Amount Financed. The Finance Charge shown on the front side has been computed on the assumption that we will receive all payments on their scheduled due dates.

3. **COMPUTING INTEREST:** We will charge interest on a daily basis on the outstanding balance subject to interest on each day of the loan term, including any period for which a late charge is also imposed. The daily interest rate is equal to the Annual Percentage Rate divided by the number of days in that calendar year. Buyer agrees that because interest is calculated on a daily basis, late payments will result in additional interest (and, if applicable, a late charge). Early payments will result in less interest being charged. Early and/or late payments will cause the amount of the final payment to change.

4. **LATE CHARGE:** Buyer agrees to pay a late charge for any payment not made within 10 days after its due date. The late charge will be 2% per month on the unpaid amount of the payment. We will consider any part of a month in excess of 10 days to be a full month. The late charge will be due when earned. No late charge will be due if the reason that the payment is late is because, after default, the entire outstanding balance on this Contract is due. No late charge will be due if the only reason that the payment is late is because of a late charge assessed on an earlier payment.

5. **APPLICATION OF PAYMENTS:** We will apply payments in the following order of priority: first to interest; and then to late charges, fees, principal and any other amounts you owe in the order that we choose.

6. **PREPAYMENT:** You may prepay, in full or in part, the amount owed on this Contract at any time without penalty. If you prepay the Contract in part, you agree to continue to make regularly scheduled payments until you pay all amounts due under this Contract. This will reduce the number of payments you will make.

7. **WAIVERS.**

a. **WAIVER BY SELLER AND ASSIGNEE:** We and Assignee waive the right to treat any property as security for the repayment of this Contract, except for the Vehicle and the other security specifically mentioned in this Contract.

b. **WAIVERS BY BUYER, CO-SIGNER AND CO-OWNER:** You agree to make all payments on or before they are due without our having to ask. If you don't, we may enforce our rights without notifying you in advance. You give up any right you may have to require that we enforce our rights against some other person or property before we enforce our rights against you. You agree that we may give up our rights against some other person but not against you. You waive due diligence in collection and all defenses based on suretyship and impairment of collateral or security.

8. **INTEREST AFTER MATURITY AND JUDGMENT:** Interest at the rate provided in this Contract shall continue to accrue on the unpaid balance until paid in full, even after maturity and/or after we get a judgment against you for the amounts due. This will apply even if the maturity occurs because of acceleration. If at any time interest as provided for in this paragraph is not permitted by law, interest shall accrue at the highest rate allowed by applicable law beginning at that time.

9. **YOUR PROMISES ABOUT OUR SECURITY INTEREST:** You will not permit anyone other than us to obtain a security interest or other rights in the Vehicle. You will pay all filing fees necessary for us to obtain and maintain our security interest in the Vehicle. You will assist us in having our security interest noted on the Certificate of Title to the Vehicle. You will not sell or give away the Vehicle. If someone puts a lien on the Vehicle, you will pay the obligation and clear the lien.

10. **YOUR PROMISES ABOUT THE VEHICLE:** You will keep the Vehicle in good condition and repair. You will pay all taxes and charges on the Vehicle. You will pay all costs of maintaining the Vehicle. You will not abuse the Vehicle or permit anything to be done to the Vehicle which will reduce its value, other than for normal wear and use. You will not use the Vehicle for illegal purposes or for hire or lease. You will not move the Vehicle from your address shown on the front of this Contract to a new permanent place of garaging without notifying us in advance.

11. **YOUR PROMISES ABOUT INSURANCE:** You will keep the Vehicle insured against fire, theft and collision until all sums due us are paid in full. The insurance coverage must be satisfactory to us and protect your interests and our interests at the time of any insured loss. The insurance must name us as "loss-payee" on the policy. The insurance must be written by an insurance company qualified to do business in Pennsylvania and licensed to sell insurance in the state where the Vehicle is permanently garaged. The insurance policy must provide us with at least ten (10) days prior written notice of any cancellation or reduction in coverage. On request, you shall deliver the policy or other evidence of insurance coverage to us. In the event of the loss or damage to the Vehicle, you will immediately notify us in writing and file a proof of loss with the insurer.

a. **OUR RIGHT TO FILE PROOF OF LOSS:** In the event of any loss or damage to the Vehicle, if you fail or refuse to file a claim or proof of loss with the insurance company, you agree that the Seller, Assignee, any subsequent assignee, or any authorized employee of any of them ("we") may file a proof of loss with the insurance company, in your name and acting as your agent with respect to the insured claim. You agree that you do not have the right to and will not revoke the power you have given us to file a proof of loss. You agree that we may exercise this power for our benefit and not for your benefit, except as provided in this Contract and by law.

b. **OUR RIGHT TO ENDORSE INSURANCE CHECKS:** You agree that the Seller, Assignee, any subsequent assignee, or an authorized employee of any of them ("we") may endorse your name, acting as your agent, to any check, draft or other instrument we receive in payment of an insured loss or return of insurance premiums. You agree that you do not have the right to and will not revoke the power you have given us to make your endorsement. You agree that we may exercise this power for our benefit and not for your benefit, except as provided in this Contract and by law.

c. **USE OF PROCEEDS:** We may apply any insurance proceeds we receive to repair or replace the Vehicle if, in our opinion, it is economically feasible and you are not then in default of this Contract. Otherwise, we will apply the insurance proceeds to reduce the unpaid balance due us. After the balance due us is paid, any excess will belong to you.

12. **OUR RIGHTS IF YOU BREAK YOUR PROMISES ABOUT THE SECURITY INTEREST, VEHICLE OR INSURANCE:** If you fail to keep your promises to pay filing fees, taxes, liens or the costs necessary to keep the Vehicle in good condition and repair, we may advance any money you promised to pay. If you fail to keep your promises about required insurance, we may advance money to obtain insurance to cover loss or damage to the Vehicle. We have the choice of whether or not to advance any money for these purposes. Such insurance will be limited to an amount not greater than you owe on this Contract. THE INSURANCE WE PURCHASE MAY BE SIGNIFICANTLY MORE EXPENSIVE AND PROVIDE YOU LESS COVERAGE THAN INSURANCE YOU COULD PURCHASE YOURSELF.
We will add any money we advance on your behalf to the balance on which we impose Finance Charges at the Annual Percentage Rate of this Contract. You agree to repay the money advanced as we alone may specify: (i) immediately on demand, or (ii) along with your monthly payments. If we choose to allow you to repay the money advanced along with your monthly payments, we can choose the amount of these payments and how long you have to repay. If any of our rights stated in this paragraph are not permitted by law, we still have the other rights mentioned. Our payments on your behalf will not cure your failure to perform your promises in this Contract.

13. **DEFAULT:** In this paragraph "You" means the Buyer, Co-Signer and Co-Owner, or any one of them. You will be in "Default" of the Contract if any one or more of the following things happen:

a. You do not make any payment on or before it is due; or
b. You do not keep any promise you made in this Contract; or
c. You do not keep any promise you made in another Contract, Note, Loan or Agreement with Seller or Assignee; or
d. You made any untrue statement in the credit application for this Contract; or
e. You committed any forgery in connection with this Contract; or
f. You die, are convicted of a crime involving fraud or dishonesty, or are found by a court with jurisdiction to do so to be incapacitated; or
g. You file bankruptcy or insolvency proceedings, or anyone files bankruptcy or insolvency proceedings against you; or
h. You take the Vehicle outside the United States or Canada without our written consent; or
i. You use the Vehicle or allow someone else to use it in a way that causes it not to be covered by your insurance; or
j. You do something that causes the Vehicle to be subject to confiscation by government authorities; or
k. The Vehicle is lost, stolen, destroyed or damaged beyond economical repair, and not fixed or found within a reasonable time; or
l. Another creditor tries to take the Vehicle or your money on deposit with Assignee by legal process.

14. **OUR RIGHTS IF YOU ARE IN DEFAULT OF THIS CONTRACT:** If you are in Default of this Contract, we may enforce our rights according to law. We may also do the things specifically mentioned in this Contract. We may do one of these things and at the same time or later do another. Some of the things we may do are the following:

a. **ACCELERATION:** We can demand that you pay to us the entire unpaid balance owing on the Contract and all unpaid Finance Charges and other money due. You agree that you will pay this money to us in one single payment immediately upon receiving our demand.

b. **REPOSSESSION:** We can repossess the Vehicle, unless prohibited by law. We can do this ourselves, have a qualified person do it for us, or have a government official (by replevin) do it for us. You agree that we can peaceably come on to your property to do this. We may take any other things found in the Vehicle, but will return these things to you if you ask. If you want these things back, you may reclaim them within thirty (30) days of our mailing you a Notice of Repossession. If you do not reclaim the things found in the Vehicle within that time, we may dispose of those things in the same manner as the motor vehicle. You agree that we may use your license plates in repossessing the Vehicle and taking it to a place for storage.

c. **VOLUNTARY DELIVERY:** We can ask you to give us the Vehicle at a reasonably convenient place. You agree to give us the Vehicle if we ask.

d. **DELAY IN ENFORCEMENT:** We can delay enforcing our rights under this Contract without losing any rights.

15. **SOME THINGS YOU SHOULD KNOW IF WE REPOSSESS THE VEHICLE:** If we repossess without using a government official (by replevin):

a. **NOTICE:** We will send you a Notice of Repossession to your last address we know about. This Notice will tell you how to buy back (redeem) the Vehicle. You will NOT have the right to reinstate the Contract. This means you will have to pay the total balance on the Contract and other amounts due. You may not get the Vehicle back by paying delinquent installments. This Notice will tell you other information required by law.

b. **REDEMPTION:** You have the right to buy back (redeem) the Vehicle within 15 days of the mailing of the Notice and at any later time before we sell the Vehicle. If you redeem the Vehicle, we will deliver the Vehicle to you at a place as provided by law, as soon as is reasonably possible, but in not more than ten (10) business days of our receipt of the funds required. If you do not redeem, you give up all claim to the Vehicle.

c. **SALE:** If you don't redeem, we will sell the Vehicle. The money received at sale will be used to pay costs and expenses you owe, and then to pay the amount you owe on the Contract.

d. **SURPLUS OR DEFICIENCY:** If there is money left, we will pay it to the Buyer. If there is not enough money from the sale to pay what you owe, Buyer and Co-Signer agree to pay what is still owed to us.

e. **EXPENSES:** You agree to pay the costs of repossessing, storing, repairing, preparing for sale and selling the Vehicle as may be allowed by law. These costs will only be due if:
1. Default exceeds fifteen (15) days at the time of repossession;
2. The amount of costs are actual, necessary and reasonable; and
3. We can prove the costs were paid.

16. **HEIRS AND PERSONAL REPRESENTATIVES BOUND:** After your death, this Contract shall be enforceable against your heirs and personal representatives of your estate.

17. **GOVERNING LAW:** This Contract is to be interpreted according to the law of Pennsylvania.

18. **SEVERABILITY OF PROVISIONS:** If for any reason any part of this Contract shall become illegal, void or unenforceable, that part shall not be a part of this Contract.

19. **ASSIGNMENT BY BUYER:** Buyer shall not assign this Contract.

20. **THERE ARE NO WARRANTIES BY SELLER, EXPRESSED OR IMPLIED, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, UNLESS WE HAVE GIVEN YOU A SEPARATE WRITTEN WARRANTY OR UNLESS SELLER ENTERS INTO A SERVICE CONTRACT WITH BUYER WITHIN 90 DAYS FROM THE DATE OF THIS CONTRACT.**

Buyer's Guide Window Sticker. If the Car which is described on the face of this Contract has a Buyer's Guide Window Sticker required by the Federal Trade Commission Used Car Trade Regulation Rule, the following notice applies:

> The information you see on the window form for this Vehicle is part of this Contract. Information on the window form overrides any contrary provisions in the contract of sale.

**NOTICE—ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

**NOTICE OF PROPOSED CREDIT INSURANCE**

The signer(s) of this Contract hereby take(s) notice that Group Credit Life Insurance coverage or Group Credit Accident and Disability Insurance coverage will be applicable to this Contract if so marked on the front of this Contract, and each such type of coverage will be written by the insurance company named. This insurance, subject to acceptance by the insurer, covers only the person or persons signing the request for such insurance. The amount of charge is indicated for each type of Credit Insurance to be purchased. The term of insurance will commence as of the date the indebtedness is incurred and will expire on the original scheduled maturity date of the indebtedness. Subject to acceptance by the insurer and within 30 days, there will be delivered to the insured debtor(s) a certificate of insurance more fully describing the insurance. In the event of prepayment of the indebtedness, a refund of insurance charges will be made when due.

**NOTICE: SEE OTHER SIDE FOR IMPORTANT INFORMATION.**

**THE PROVISION BELOW IS NOT PART OF THE PENNSYLVANIA MOTOR VEHICLE INSTALLMENT SALE CONTRACT BETWEEN THE BUYER AND SELLER.**

**ASSIGNMENT**

To induce you, the "Assignee" identified on the face of this Contract or as follows, Santander Consumer USA (Name) to purchase the within Contract, the Seller hereby warrants and represents, and continues to warrant and represent that: the sale has been made in strict conformity with all applicable federal, state and local laws and regulations, including, but not limited to, Article 2 of the Pennsylvania Uniform Commercial Code (13 Pa. C.S.A. §§2101 et seq); our title to the Contract and the Vehicle covered thereby is absolute, free of all liens, encumbrances and security interests, and is subject only to the rights of the Buyer as set forth therein; the Contract is genuine, the signatures thereon are not forgeries, arose from the sale of the Vehicle therein described, and all parties thereto are of full age and had capacity to contract; the description of the Vehicle and extra equipment is complete and correct; the cash downpayment and/or trade-in allowance were actually received and no part thereof consisted of notes, post-dated checks, other credit advanced by us to Buyer or rebates or similar payments from us to the Buyer (however manufacturer rebates may constitute all or a part of the downpayment); all warranties and statements therein are true; there is owing thereon the Amount Financed plus interest at the Annual Percentage Rate of the Contract set forth therein; we are duly licensed under the Pennsylvania Motor Vehicle Sales Finance Act and have duly complied with all requirements thereof with respect to the transaction and with the federal Truth-in-Lending Act and with any other federal or state law, rule or regulation applicable to this Contract; a motor vehicle title certificate showing a lien or encumbrance in favor of Assignee has been or will be applied for promptly; the registration of the Vehicle has not been suspended and the Seller knows of no facts which may result in the suspension of said registration under the *Pennsylvania Motor Vehicle Financial Responsibility Act; the Buyer(s) named in the within Contract is (are) personally known to the Seller to be the same identical person(s) whose* signature(s) is (are) affixed to this Contract; and Seller has no knowledge of facts impairing the validity or value of the Contract. If any such warranties or representations should be breached at any time, Seller shall repurchase said Contract from Assignee, on demand, and will pay therefor, in cash, the amount owing thereon, computed as set forth below, and said remedy shall be cumulative and not exclusive, and shall not affect any other right or remedy that Assignee might have at law or in equity against Seller. In the event that Buyer fails or refuses to make any payment due hereunder on the assertion, either oral or written, that the Vehicle is defective, not as represented to the Buyer by Seller, or that Seller refuses to honor any warranty or service agreement of Seller or manufacturer, Seller agrees that, on being advised by Assignee of such claim of Buyer, Seller will repurchase the Contract from Assignee and pay Assignee for same immediately in accordance with the repurchase terms set forth below, and Seller further agrees to hold Assignee harmless from any other claims of Buyer, including attorneys' fees, costs and expenses incurred in defending against claims asserted by Buyer and including claims for refund of payments made by Buyer to Assignee. If the Seller contracts to purchase property insurance on behalf of the Buyer, and that insurance is cancelled by the insurance company prior to its scheduled expiration date, Seller will attempt to place comparable coverage with another insurance company on behalf of the Buyer. If Seller is unable to do so, Seller will notify Buyer and pay to Buyer any additional costs incurred by the Buyer in obtaining replacement insurance for the unexpired period of the original insurance policy. By signing and dating the Contract, as Seller, delivering the Contract to the Assignee and accepting payment for it, Seller authorizes the Assignee to act as the Seller's agent for the purpose of completing or correcting the identification of the Assignee in this Assignment to reflect the true Assignee who purchased the Contract and/or for the purpose of signing Seller's name to this Assignment, without recourse, if the Assignment is delivered without the Seller's signature. Assignee may exercise the power given in this paragraph for the benefit of the Assignee and not for the benefit of the Seller. Seller does not have the right to and agrees not to revoke the power given in this paragraph.

In the event that Seller is required by this Assignment to repurchase the Contract and/or Vehicle, Seller shall pay to Assignee, in cash, the full unpaid balance of the Contract as of the date of repurchase, plus any then earned Finance Charge and any and all costs and expenses paid or incurred by Assignee in respect thereto, including reasonable attorneys' fees, in connection with claims by or against any Buyer, Owner or persons in possession of the Vehicle and/or by or against Seller.

For value received, Seller hereby sells, assigns and transfers unto the Assignee, its successors and assigns, the within Contract, all moneys due and to become due thereunder, and all right, title and interest in and to the Vehicle therein described, with full power in the Assignee in its or our name to take such legal or other action which we might have taken save for this Assignment. Unless Seller marks either of the endorsements below, titled "WITH FULL RECOURSE" or "WITH REPURCHASE," Seller's assignment shall, except for the provisions of the paragraph titled "Assignment," be without recourse.

☐ WITH FULL RECOURSE—Seller agrees that, in addition to the paragraph above titled "Assignment," in the event of default by Buyer in the full payment on the due date thereof of any installment payable under the Contract or in the prompt performance of any other obligation to be performed under the Contract by Buyer, Seller will, on demand by Assignee, forthwith repurchase the Contract from Assignee for a repurchase price, in cash, computed as set forth above.

☐ WITH REPURCHASE—Seller agrees that, in addition to the provisions of the paragraph above titled "Assignment," in the event of any default by Buyer which shall entitle Assignee to repossess the Vehicle, Seller will, if the Vehicle is repossessed by Assignee and delivered to Seller, and without regard to the then condition of the Vehicle, forthwith repurchase the Contract and the Vehicle from Assignee for a repurchase price, in cash, computed as set forth above.

By signing below, we agree to the terms of the Assignment.

Seller [signature] By: Michael Roth Auto Pros President Date

EXHIBIT C

Westlaw.

Page 1

Not Reported in F.Supp.2d, 2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825
**(Cite as: 2005 WL 241181 (E.D.Pa.))**

C

United States District Court,
E.D. Pennsylvania.
Walter B. GILMOUR, et al.
v.
Barry O. BOHMUELLER, et al.

No. Civ.A. 04–2535.
Jan. 27, 2005.

**Background:** Investors brought action against annuity companies and representatives, alleging scheme to target elderly persons with fraudulent investment packages. Defendants moved for dismissal.

**Holdings:** The District Court, Padova, J., held that:
(1) investors stated fraud claims with sufficient particularity;
(2) investors inadequately pleaded predicate acts; and
(3) investors adequately stated civil conspiracy claim.

Motions granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A ☞636**

170A Federal Civil Procedure
   170AVII Pleadings
      170AVII(A) Pleadings in General
         170Ak633 Certainty, Definiteness and Particularity
            170Ak636 k. Fraud, mistake and condition of mind. Most Cited Cases
   Investors who sued annuity companies and representatives, alleging scheme to target elderly persons with fraudulent investment packages, stated fraud claims with sufficient particularity under federal rules; complaint averred that representative was at all relevant times acting in concert with or for and/or as actual or apparent sales agent, emissary or charitable advisor for companies, and that representative's actions occurred within course and scope of his agency. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ☞636**

170A Federal Civil Procedure
   170AVII Pleadings
      170AVII(A) Pleadings in General
         170Ak633 Certainty, Definiteness and Particularity
            170Ak636 k. Fraud, mistake and condition of mind. Most Cited Cases
   Investors who sued annuity companies and representatives, alleging scheme to target elderly persons with fraudulent investment package, failed to allege pattern of racketeering activities and predicate acts of mail and wire fraud with requisite specificity under Racketeer Influenced and Corrupt Organizations Act (RICO) and federal rules; complaint did not aver date, place or time of alleged misrepresentations, and did not identify purported communications, their dates, senders, recipients or content. 18 U.S.C.A. § 1962(c); Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[3] Conspiracy 91 ☞18**

91 Conspiracy
   911 Civil Liability
      911(B) Actions
         91k18 k. Pleading. Most Cited Cases
   Investors who sued annuity companies and representatives, alleging scheme to target elderly persons with fraudulent investment package, properly stated claim for civil conspiracy under Pennsylvania law; complaint averred that defendants conspired and acted in concert to defraud investors of their life savings, that misrepresentations made by representative on behalf of himself and all other defendants were overt acts in furtherance of conspiracy, and that defendants intended to reap commissions, fees and other benefits from their ac-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825
**(Cite as: 2005 WL 241181 (E.D.Pa.))**

tions.

Gary P. Lightman, Lightman Manochi & Christensen, Philadelphia, PA, for Plaintiffs.

Kathleen M. Carson, Swartz Cambell and Detweiler, Walter J. Timby, Iii, Margolis Edelstein, Carol L. Press, Heather E. Rennie, Eckert, Seamans, Cherin & Mellott, Llc, Gregory T. Parks, J. Gordon Cooney, Morgan, Lewis & Bockius Llp, Jana Michelle Landon, Philadelphia, PA, for Defendants.

*MEMORANDUM*

PADOVA, J.

**\*1** Presently before the Court in this action are Motions to Dismiss the Amended Complaint filed by Defendants Barry O. Bohmueller ("Bohmueller"), Stephen A. Strope ("Strope"), The Patriot Group, Inc. ("Patriot"), American Investors Life Insurance Company ("AILIC"), and Oxford Life Insurance Company ("Oxford"), (Doc. Nos. 25, 26, 29, 31, 33 and 37). For the reasons that follow, the Motions are granted in part and denied in part.

## I. BACKGROUND

This action is brought by Walter B. Gilmour, Sr. and Suzanne Gilmour, husband and wife, who allege a total of fifteen counts against six individual and corporate Defendants for their participation in a fraudulent scheme involving investments in living trusts and annuities. The Gilmours seek injunctive relief and damages for fraudulent and negligent misrepresentation, professional negligence, civil conspiracy, breach of contract, breach of fiduciary duty, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et. seq.,* violations federal and state securities laws, violations of state consumer protection laws, tortious interference with contractual relations and prospective economic advantage, and unjust enrichment.

The Gilmours allege the following facts in the

Complaint and Amended Complaint (collectively the "Amended Complaint").[FN1] Defendants operate a "fraudulent Living Trust and Annuities Scheme" in which they target elderly persons who own their own homes and have a certain income. (Am.Compl.¶ 2.) Defendants use non-attorney sales representatives to sell inappropriate revocable living trusts and annuities to those individuals by making false, deceptive and misleading statements and representations. (*Id.* ¶¶ 2, 38.) Strope, who is an employee of Patriot, also acts as an agent for Bohmueller, an attorney, and AILIC, Oxford and New Life Corporation of America ("New Life") (collectively the "Annuity Companies"), who market and sell annuities. (*Id.* ¶¶ 15–16, 28, 34.) As agent for Bohmueller, Strope promotes, markets, and sells living trusts to elderly investors. (*Id.* ¶ 8.) As agent for the Annuity Companies, Strope markets and sells annuities to those same consumers. (*Id.* ¶ 34.) Both Bohmueller and the Annuity Companies use non-attorneys such as Strope to advise consumers regarding estate planning, exaggerate the benefits of living trusts over wills; induce consumers to purchase and sign legal documents; review provisions of legal documents with consumers; engage in the unauthorized practice of the law; hold themselves out as attorneys with Bohmuellers' law office; and mislead consumers to believe they are qualified to provide legal advice. (*Id.* ¶ 41.)

> FN1. The Amended Complaint in this action added a claim for violation of the RICO statute to the allegations of the Complaint.

The Amended Complaint alleges that Defendants defrauded the Gilmours of their retirement income through the sale of annuities and use of living trusts. The Gilmours, who are residents of Pennsylvania, accumulated approximately $2.8 million in savings over the years. (*Id.* ¶ 67.) They invested their savings in a portfolio comprised primarily of tax exempt bonds and blue chip stocks, and lived off of the interest from these investments.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825
**(Cite as: 2005 WL 241181 (E.D.Pa.))**

(*Id.* ¶ 68.) On March 22, 2001, however, Strope knocked on the Gilmour's door intending to persuade them to liquidate their securities and invest the $2.8 million in a Bohmueller revocable living trust and annuities issued by the Annuity Companies. (*Id.* ¶¶ 70, 72, 81.)

**\*2** In order to induce the Gilmours to purchase a Bohmueller living trust, Strope misrepresented the advantages of living trusts over wills and probate. (*Id.* ¶ 73.) Among other things, Strope falsely claimed that living trusts avoid probate, save taxes, save attorneys fees, assure privacy after death, permit quicker distribution of assets, avoid court challenges, or are required to avoid guardianship. (*Id.* ¶ 74.) At the same time, in order to induce the Gilmours to purchase annuities from the Annuity Companies, Strope falsely claimed that those annuities and future annuity payments would be inheritance tax free, that there would be no capital gains on the sales of any securities to fund certain annuity purchases, that in order to create three annuities which the Gilmours desired they would also have to create a fourth annuity, and that this fourth annuity would be inheritance tax free. (*Id.* ¶ 75.)

The Gilmours believed Strope's false representations. (*Id.* ¶ 76.) After Strope had completed his sales pitch, the Gilmours gave him a check for $1,895.00 made out to the Bohmueller Law Offices to purchase a Bohmueller living trust. (*Id.* ¶ 77.) Strope also induced the Gilmours to transfer $858,000 of their savings to New Life for a charitable gift annuity. (*Id.* at ¶ 80.) A short time later, Strope met with the Gilmours again and this time persuaded them to reinvest the approximately $2 million remaining in life savings in AILIC and Oxford annuities. (*Id.* at ¶¶ 102–103.)

The annuities the Gilmours received from the Annuity Companies in return for their investments were less valuable than the assets the Gilmours had transferred to them. (*Id.* at ¶¶ 109, 112.) As a result, the Defendants received higher commissions and other benefits from the Gilmours than they would otherwise have received for the asset transfers and sales of the deferred annuities. (*Id.*) As a further result of Defendants' conduct, Plaintiffs were induced to transfer their life savings of $2.8 million into the investments recommended by Strope and were damaged by adverse income and tax consequences of those transfers, as well as accounting, estate planning and legal fees and costs they incurred as a result of the transfers. (*Id.* ¶¶ 112–113.)

## II. LEGAL STANDARD

The Moving Defendants seek the dismissal of all Counts of the Amended Complaint with the exception of Count VII pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) or for a more definite statement pursuant to Rules 8(a)(2) and 12(e). [FN2] When determining a Motion to Dismiss pursuant to Rule 12(b)(6), the court may look only to the facts alleged in the complaint and its attachments. *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). The court must accept as true all well pleaded facts in the complaint and view them in the light most favorable to the plaintiff. *See Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Holder v. City of Allentown,* 987 F.2d 188, 194 (3d Cir.1993). A Rule 12(b)(6) motion will be granted when a Plaintiff cannot prove any set of facts, consistent with the complaint, which would entitle him or her to relief. *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988).

> FN2. Count VII of the Amended Complaint asserts a claim for professional negligence against Bohmueller only. Bohmueller has not moved to dismiss Count VII, and none of the other Moving Defendants separately address Count VII in their Motions to Dismiss. Accordingly, the Court concludes that none of the Moving Defendants seek dismissal of Count VII.

**\*3** Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). This rule "requires plaintiffs to plead with particularity the circumstances of the al-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825
**(Cite as: 2005 WL 241181 (E.D.Pa.))**

leged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Corp.,* 742 F.2d 786, 791 (3d Cir.1984). There is no formula for pleading fraud with particularity: "[a]llegations of 'date, place, or time' fulfill these functions, but nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.*

A. *Fraudulent and Negligent Misrepresentation: Counts I & II*

[1] AILIC and Oxford seek the dismissal of Counts I and II of the Amended Complaint which allege causes of action based on fraudulent and negligent misrepresentation for statements made by Strope on behalf of the other Defendants. Moving Defendants argue that the Amended Complaint does not aver the purportedly fraudulent statements made by them or on their behalf with the particularity required by Rule 9(b).

To establish a cause of action for fraudulent misrepresentation under Pennsylvania law, a plaintiff must plead:

(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

*Manning v. Temple Univ.,* No. Civ. A. 03–4012, 2004 WL 3019230, at *10 (E.D.Pa. Dec.30, 2004) (citing *Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882, 889 (Pa.1994). To successfully establish a cause of action for negligent misrepresentation under Pennsylvania law, a plaintiff must plead: "(1) a misrepresentation of material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an

intent to induce another to act on it; and; (4) which results in an injury to the party acting in justifiable reliance on the misrepresentation." *Bortz v. Noon,* 556 Pa. 489, 729 A.2d 555, 561 (Pa.1999) (citing *Gibbs,* 647 A.2d at 890)). Allegations of fraud must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Bristol Tp. v. Independence Blue Cross,* No. Civ. A. 01–4323, 2001 WL 1231708, at *5 (E.D.Pa. Oct.11, 2001) (citing *Seville Indus.,* 742 F.2d at 791.) However, in applying Rule 9(b) pleading requirements, "courts should be 'sensitive' to the fact that application of the Rule prior to discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud.' " *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 284 (3d Cir.1992) (citing *Christidis v. First Pa. Mortgage Trust,* 717 F.2d 96, 99 (3d Cir.1983)).

*4 Pennsylvania has adopted the Restatement (Second) of Agency regarding the liability of a principal for the tortious misrepresentations of his agents. *Bolus v. United Penn Bank,* 363 Pa.Super. 247, 525 A.2d 1215, 1223 (Pa.Super.Ct.1987). Under the Restatement (Second) of Agency, "[a] principal is subject to liability for loss caused to another by the other's reliance upon a tortious representation of a servant or other agent if the representation is: (a) authorized; (b) apparently authorized; or (c) within the power of the agent to make for the principal." Restatement (Second) Agency § 257 (1958).

The Amended Complaint alleges fraudulent and negligent misrepresentation claims against AILIC and Oxford for statements made by their agent, Strope, when he promoted, marketed and sold annuities to Plaintiffs on their behalf. (Am.Compl.¶¶ 1, 117, 118.) Among other things, the Amended Complaint states that the representations made by Strope on behalf of Moving Defendants were false for the following reasons:

(a) the estate plan of the Gilmours prior to [D]efendants' involvement was not inadequate;

(b) the estate plan and investments in the "tax free" or "tax deductible" or "tax deferred" annuit-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825
**(Cite as: 2005 WL 241181 (E.D.Pa.))**

ies of [New Life] and AILIC devised and recommended by [D]efendants for the Gilmours was not better than their existing estate plan, and was not in the Gilmours' best interests, and did not result in tax savings and benefits which the [D]efendants represented to the Gilmours, and did not result in the Gilmours being able to pass those assets, let alone pass those assets with significant tax savings and benefits, to their beneficiaries upon the deaths of the Gilmours;

(c) the annuities and investments [D]efendants sold to the Gilmours were not as represented, and the living trust created by [D]efendants for the Gilmours do not result in the tax savings and benefits to the gilmours or the shielding or reduction of [P]laintiffs' assets from further taxation;

(d) The Gilmours did not need to give any money away to New Life or to purchase any New Life annuities in order to create or effectuate the other trusts they desired as part of their estate plan;

(e) the annuities that the Gilmours were induced to purchase from New Life, AILIC, and Oxford were not inheritance tax free and income tax free, as Strope had represented;....

(g) The Gilmours did not have the right to rescind the investment whenever they wanted, let alone during three days as required by Pennsylvania's consumer protection laws; and

(h) the living trust created for the Gilmours, and the "tax free" or "tax deductible" or "tax deferred" annuities which [D]efendants induced the Gilmours to purchase, were not tailored to the needs of the Gilmours and do not shield their income and assets from further taxes, but to the contrary, the trust agreements were "canned" or form documents, and the estate plan left the Gilmours in much worse shape than they would have been in had the Gilmours never engaged in business with any of the [D]efendants.

*5 (*Id.* ¶ 118, 525 A.2d 1215.) The Amended

Complaint further alleges that these representations "were known by [D]efendants to be false, or were made recklessly and in disregard of their truth or falsity, and were made by [D]efendants to induce [P]laintiffs to trust [D]efendants and to turn over their assets and estate to [D]efendants, in order that [D]efendants could reap substantial fees...." (*Id.* ¶ 119, 525 A.2d 1215.) In addition, the Amended Complaint alleges that Plaintiffs justifiably relied on these misrepresentations, acted upon them to their detriment, and lost their entire $2.8 million in life savings. (*Id.* ¶¶ 120–122.)

The Amended Complaint states that Strope was at all relevant times "acting in concert with or for and/or as an actual or apparent sales agent or representative or 'emissary' or 'Charitable Advisor' for [D]efendants ... AILIC ... and Oxford." (*Id.* ¶ 82, 525 A.2d 1215.) In addition, the Amended Complaint alleges that Strope "was acting in the course and scope of his agency, and with authority from [D]efendants...." (*Id.* ¶ 105, 525 A.2d 1215.) The Amended Complaint thus states a cause of action against AILIC and Ocford for the fraudulent and negligent misrepresentations made on their behalf by Strope with the particularity required by Rule 9(b). *See Bolus,* 525 A.2d at 1223.

Plaintiffs also contend that their claim for fraudulent and negligent misrepresentation involves allegations that Defendants committed fraud when, after notification by a consumer agency that a fraudulent living trusts scheme existed, they continued to issue annuities in connection with that scheme. (10/28/04 NT at 56.) The Amended Complaint, however, contains no facts which would establish that Defendants were involved in some larger fraudulent living trusts scheme, much less that Defendants knowingly or negligently misrepresented a material fact in connection with that larger scheme with the intent of inducing Plaintiffs to rely on it. *See Bortz,* 729 A.2d at 560. Accordingly, AILIC and Oxford's Motions to Dismiss Count I of the Amended Complaint are granted with respect to any claim for fraud based on their notification by a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825
**(Cite as: 2005 WL 241181 (E.D.Pa.))**

consumer agency that a larger living-trust scheme existed. AILIC's and Oxford's Motions to Dismiss Counts I and II of the Amended Complaint are denied in all other respects.

*C. Civil RICO: Count III*

[2] The Moving Defendants seek the dismissal of Count III of the Amended Complaint which alleges a cause of action for civil RICO violations pursuant to 18 U.S.C. § 1962(c).[FN3] The Moving Defendants argue that the Amended Complaint fails to state a valid RICO claim because it does not allege a pattern of racketeering activities and instances of mail and wire fraud with the specificity required by Rule 9(b).[FN4]

> FN3. Section 1962(c) states as follows: "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

> FN4. Moving Defendants also argue that the RICO claim should be dismissed pursuant to 18 U.S.C. § 1964(c), which provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). It is the Court's understanding that Defendants have withdrawn such arguments in response to Plaintiffs' voluntary dismissal of their claims for violations of state and federal securities law claims. *See infra,* at 19.

In order to state a claim pursuant to Section 1962(c) a plaintiff must allege the following:

(1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was em-

ployed by or associated with the enterprise; (3) that the defendant participated, either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity that must include the allegation of at least two racketeering acts.

*6 *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1165 (3d Cir.1989) (citations omitted). Where the alleged racketeering activities consist of fraud, a plaintiff must also meet the particularity pleading requirements of Rule 9. *Rose v. Bartle,* 871 F.2d 331 (3d Cir.1989). To meet this standard, the complaint must "specify the nature of the predicate acts to a degree that will allow the defendants to comprehend the specific acts to which they are required to answer." *Id.*

The elements of the predicate act of mail fraud, in violation of 18 U.S.C. § 1341, are: "(1) the existence of a scheme to defraud; (2) the participation by the defendant in the particular scheme charged with the specific intent to defraud; and (3) the use of the United States mails in furtherance of the fraudulent scheme." *United States v. Hannigan,* 27 F.3d 890, 892 (3d Cir.1994) (footnote omitted) (citing *United States v. Burks,* 867 F.2d 795, 797 (3d Cir.1989)). The wire fraud statute, 18 U.S.C. § 1343, is virtually identical to the mail fraud statute, except that it concerns "communications transmitted by wire." *United States v. Frey,* 42 F.3d 795, 797 (3d Cir.1994); *see also* 18 U.S.C. §§ 1341, 1343. Accordingly, " 'the cases construing the mail fraud statute are applicable to the wire fraud statute as well.' " *Id.,* 42 F.3d at 797 n. 2 (quoting *United States v. Tarnpol,* 561 F.2d 466, 475 (3d Cir.1977) ). The mail and wire fraud scheme "need not be fraudulent on its face but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension. Proof of specific intent is required ... which may be found from a material misstatement of fact made with reckless disregard for the truth." *United States v. Coyle,* 63

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825
**(Cite as: 2005 WL 241181 (E.D.Pa.))**

F.3d 1239, 1243 (3d Cir.1995) (citations omitted). Use of the mails and wires does not have to be an essential part of the fraudulent scheme. Rather, "it is sufficient if the mailings are incident to an essential part of the scheme or a step in [the] plot." *Id.* at 1244 (citation omitted). It is also not necessary that the mailings and usage of the wires themselves be fraudulent: "[t]he mailings themselves need not contain any misrepresentations: 'innocent mailings—ones that contain no false information—may supply the mailing element.' " *Philadelphia Reserve Supply Co. v. Norwalk & Assoc., Inc.,* 864 F.Supp. 1456, 1470 (E.D.Pa.1994) (quoting *Schmuck v. United States,* 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989)). Moreover, liability for mail and wire fraud does not require personal use or prior knowledge of the mailing or wire content:

> [T]he defendants need not have been the actual individuals who used the mails and wires, nor need they have known of the specific communications; it is sufficient under the mail and wire fraud statutes that the use of the mails and wires by others occurred in the ordinary course of business related to the fraudulent scheme, or was foreseeable as part of the furtherance of the fraudulent scheme.

*7 *Id.* at 1471 (citing *United States v. Bentz,* 21 F.3d 37, 40–41 (3d Cir.1994)).

The Moving Defendants claim that the Amended Complaint fails to allege specific predicate acts of mail and wire fraud with the specificity required by Rule 9(b). The Moving Defendants further argue that the Amended Complaint does not allege a pattern of racketeering activities, and does not identify any use of the mails or wires by the Defendants. The Amended Complaint states:

> The mail and wire communications by which each [D]efendant perpetuated [the] scheme included, but were not limited to, those identified with particularity as aforesaid in the Complaint, and in particular:

a. letters from [D]efendants to the [P]laintiffs;

b. letters from [D]efendants to [P]laintiffs' tax advisers and accountants;

c. mailings from defendants to other defendants;

d. interstate telephone communications among [D]efendants; *and*

e. interstate telephone communications between [D]efendants and [P]laintiffs.

... Defendant's acts constitute a pattern of racketeering activity because they were related in purpose ... and have continued unabated since their first communications with the [P]laintiffs.

(Am. Compl. ¶¶ 251, 252, emphasis in original.) The Court finds that the Amended Complaint does not plead with particularity the date, place or time of the alleged misrepresentations. *See McHale,* 2002 WL at *3. Nor has the Amended Complaint, by some other means, injected the necessary "precision and some measure of substantiation into their allegations of fraud." *Id.* The Amended Complaint merely states that certain types of mail and wire communications were made by "Defendants," and does not in any way identify those communications, their dates, senders, or recipients. Similarly, the Amended Complaint fails to identify the content of the mail and wire communications. *See Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d at 658 (3d Cir.1998) (RICO allegations should contain "precise content of each particular mailing"). These deficiencies are not cured by the general statement that the "mail and wire communications by which each [D]efendant perpetuated [the] scheme included ... those identified with particularity as aforesaid in the [Amended] Complaint." (Am.Compl.¶ 251.) The Amended Complaint further fails to allege how those communications relate to the alleged RICO violations. Plaintiffs allegations are, therefore, too vague to satisfy the RICO pleading requirements. *See Allen Neurosurgical Assocs., Inc. v. Lehigh Valley Health Network,* Civ. A.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825
**(Cite as: 2005 WL 241181 (E.D.Pa.))**

No. 99–4653, 2001 WL 41143, at *3 (E.D.Pa. Jan.18, 2001) (RICO claims dismissed for failure to plead date, place, or time of alleged misrepresentations, defendant who made each misrepresentation, and contents of misrepresentations). Accordingly, the Moving Defendants' Motions to Dismiss Count III of the Amended Complaint are granted.[FN5]

> FN5. Plaintiffs may, however, file a second amended complaint correcting the deficiencies of their RICO claim.

D. *Civil Conspiracy: Count IV*
**\*8** [3] AILIC and Oxford also seek the dismissal of Count IV of the Amended Complaint which alleges a cause of action for civil conspiracy. They argue that the Amended Complaint fails to state essential elements for a valid claim for civil conspiracy because it does not set forth with the required particularity the allegedly false statements made by Defendants in furtherance of the conspiracy. In order to state a claim for conspiracy under Pennsylvania law, a plaintiff must allege: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage ." *McKeeman v. Corestates Bank, N.A.,* 751 A.2d 655, 660 (Pa.Super.Ct.2000) (citations omitted). To satisfy this pleading standard:

> [a] complaint alleging civil conspiracy must allege facts showing the existence of all the elements, and if the plaintiff is unable to allege facts that are direct evidence of the combination and its intent, [plaintiff] must allege facts that, if proved, will support an inference of the combination and its intent.

*Brown v. Blaine,* 833 A.2d 1166, 1173 n. 16 (Pa.Commw.Ct.2003) (citing *Baker v. Rangos,* 229 Pa.Super. 333, 324 A.2d 498, 506 (Pa.Super.Ct.1974)).

The Amended Complaint alleges that the De-

fendants conspired with each other to deprive Plaintiffs of their life savings through fraudulent misrepresentations. (Am.Compl.¶ 135.) As discussed, *supra,* the Amended Complaint satisfies Rule 9(b) pleading standards with regard to Plaintiffs' fraudulent and negligent misrepresentation claims. Accordingly, the inquiry must focus on whether the Amended Complaint states all remaining elements necessary to state a valid claim for civil conspiracy.

The Amended Complaint asserts that the Defendants conspired and acted in concert on their intent to defraud Plaintiffs of their life savings. (*Id.* ¶ 136, 324 A.2d 498.) The Amended Complaint also alleges that the fraudulent misrepresentations made by Strope on behalf of himself and all other Defendants were overt acts made in furtherance of the conspiracy, as was the Moving Defendants' illegal agreement to set up the living trust arrangement and reinvest Plaintiffs' savings in annuities. (*Id.* ¶ 137, 140, 142.) The Amended Complaint further states that Defendants intended, through their conspiracy, to "reap substantial commissions, fees and other benefits from the creation of the living trusts for [Plaintiffs], and from the sales or transfers of [Plaintiffs'] assets, and [Plaintiffs'] purchases of 'tax-free' or 'tax deductible' or 'tax deferred' annuities." (*Id.* ¶ 92, 324 A.2d 498.) The Amended Complaint also alleges that:

> one or more of the Annuity Company Defendants and one or more of the Attorney Defendants and one or more of the Sales Agents shared in the commissions or other payments paid by [Plaintiffs] in connection with the living trusts, and/or from commissions or other payments which ... the other Annuity Company Defendants paid to the non-attorney defendants.

**\*9** (*Id.* ¶ 97, 324 A.2d 498.) The Amended Complaint also asserts that, as a result of Defendants' conspiratorial scheme, Plaintiffs suffered damages in the amount of $2.8 million, the live savings they were induced to transfer to Defendants, as well as adverse tax consequences and professional fees

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825
**(Cite as: 2005 WL 241181 (E.D.Pa.))**

Page 9

incurred as a result of Defendants' fraudulent scheme. (*Id.* ¶¶ 143–44.) While the Amended Complaint does not identify a specific date, time or place where a conspiratorial meeting was held by Defendants, these allegations, if proved, would suffice to establish a claim of civil conspiracy. *See McKeeman,* 751 A.2d at 660. Accordingly, AILIC's and Oxford's Motions to Dismiss Count IV of the Amended Complaint are denied.

### E. *Violations of Securities Laws: Counts V & VI*

Counts V and VI of the Amended Complaint allege causes of action for violations of federal and state securities laws. Plaintiffs voluntarily withdrew these counts against all Defendants at the Hearing held on October 28, 2004. (*See* 10/28/04 N.T. at 29.) Accordingly, by agreement of the parties, Counts V and VI of the Amended Complaint are dismissed.

### F. *Breach of Contract: Count VIII*

AILIC, Oxford, Strope and Patriot seek the dismissal of Count VIII of the Amended Complaint which alleges a cause of action for breach of contract. They argue that the Amended Complaint fails to adequately allege the existence of a contract between themselves Plaintiffs. Under Pennsylvania law, a claim for breach of contract must allege the following three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Omicron Systems, Inc. v. Weiner,* 860 A.2d 554, 564 (Pa.Super.Ct.2004) (citation omitted). An enforceable contract exists where the parties reached a mutual agreement, exchanged consideration, and set forth the terms of their bargain with sufficient clarity. *See Biddle v. Johnsonbaugh,* 444 Pa.Super. 450, 664 A.2d 159, 163 (Pa.Super.Ct.1995) (citation omitted).

The Amended Complaint alleges that:

Plaintiffs entered into an agreement with [D]efendants whereby [D]efendants were specifically instructed by [P]laintiffs to provide estate planning to [P]laintiffs that would result in

(1) tax and estate benefits to [Plaintiffs]; and (2) inheritance tax free and income tax free investments to [Plaintiffs] ... and (3) a living trust that would enable the [Plaintiffs'] assets to avoid probate after their death ... Defendants breached their agreement with [P]laintiffs by failing to deliver the contracted upon services ... As a direct and proximate result of [D]efendants' breaches of contract ... [P]laintiffs have sustained damages in the amount of $2.8 million.

(Am.Compl.¶¶ 193–196.) The Amended Complaint fails to state the specific identify of the party or parties who entered into the contract, or contracts, with Plaintiffs. The Amended Complaint further fails to state the consideration for any such contract and the essential terms of any such agreement. For example, while the Amended Complaint broadly outlines some of the Defendants' responsibilities, there is no information which would suggest Plaintiffs' duties under the agreement. The allegations contained in the Amended Complaint are, therefore, insufficient to establish a cause of action for breach of contract against any of the Defendants. Accordingly, Defendants AILIC, Oxford, Strope and Patriot's Motions to Dismiss Count VIII of the Amended Complaint are granted.

### G. *Breach of Fiduciary Duty: Count IX*

*10 AILIC and Oxford also seek the dismissal of Count IX of the Amended Complaint which alleges a cause of action for breach of fiduciary duty. They argue that the Amended Complaint fails to state a claim for breach of fiduciary duty because there is no factual basis from which to infer that they owed a fiduciary duty to Plaintiffs. Under Pennsylvania law, fiduciary relationships exist "where by virtue of the respective strength and weakness of the parties, one has a power to take advantage of or exercise undue influence over the other." *eToll, Inc. v. Elias/Savion Advertising, Inc.,* 811 A.2d 10, 22 (Pa.Super.Ct.2002). Accordingly, "the critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by 'overmastering

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825
**(Cite as: 2005 WL 241181 (E.D.Pa.))**

influence' on the one side or 'weakness, dependence, or trust, justifiably reposed' on the other side." *Id.* at 23 (emphasis in original) (citing *Basile v. H & R Block,* 777 A.2d 95, 101 (Pa.Super.Ct.2001)). A fiduciary duty may attach " 'whenever one occupies toward another such a position of advisor or counsellor as reasonably to inspire confidence that he will act in good faith for the other's interest." ' *Basile,* 777 A.2d at 102 (quoting *Brooks v. Conston,* 356 Pa. 69, 51 A.2d 684, 688 (Pa.1947)). Indeed, "those who purport to give advice in business may engender confidential relations if others, by virtue of their own weakness or inability, the advisor's pretense or expertise, or a combination of both, invest such a level of trust that they seek no other counsel." *Basile,* 777 A.2d at 102 (citations omitted). In Pennsylvania, a claim for breach of fiduciary duty must allege that: "(1) the defendant acted negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) the plaintiff suffered injury; and (3) the agent's failure to act solely for the plaintiff's benefit was a real factor in bringing about plaintiff's injuries." *Schmidt, Long & Assoc. v. Aetna U.S. Healthcare, Inc.,* Civ. A. No. 00–3683, 2001 WL 856946, at *9 (E.D.Pa. July 26, 2001) (citation omitted).

Here, the Amended Complaint states that:

Defendants owed a duty, imposed by common law, to [Plaintiffs] to represent them and their interests in a fair and honest manner, and to invest their finances in conservative, low-risk investments that would be tax-free and safe, and that would maximize the tax and estate savings and benefits to the [P]laintiffs ... Defendants breached the fiduciary duties which they owed to [P]laintiffs.

(Am.Compl.¶¶ 199, 200.) The Amended Complaint further alleges that Strope, acting on behalf of AILIC and Oxford, held himself out as an expert on tax and estate planning. (*Id.* ¶¶ 117) As a result of Strope's representations, Plaintiffs posed justifi-

able trust in him and in AILIC and Oxford. (*Id.* ¶ 103); see *Basile,* 777 A.2d at 101–02. The Amended Complaint asserts that AILIC and Oxford breached their fiduciary duty when they, through their agent Strope, knowingly or recklessly misrepresented the benefits and drawbacks of living trusts annuities. (Am.Compl.¶ 118, 119.) The Amended Complaint alleges that Defendants made these false representations:

*11 to induce [P]laintiffs to trust [D]efendants and to turn over their assets and estate to [D]efendants, in order that [D]efendants could reap susbstantial fees from the sales and liquidation of [P]laintiffs' assets, and the purchase of the 'tax free' or 'tax deductible' or 'tax deferred' annuities ... and the creation of the living trusts.

(*Id.* ¶ 119.) The Amended Complaint further asserts that Defendants' actions resulted in an estate plan and investments for Plaintiffs which were not in Plaintiffs' best interest, and that the direct and proximate cause of Defendants' actions was a loss to Plaintiffs in the amount of $2.8 million, as well as professional fees and costs. (*Id.* ¶¶ 118, 122.) These allegations are sufficient to establish a claim for breach of fiduciary duty against AILIC and Oxford in connection with tax and estate planning activities. Accordingly, AILIC and Oxford's Motions to Dismiss Count IX of the Amended Complaint are denied.

**H.** *Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law: Count X*

AILIC, Oxford and Bohmueller further seek the dismissal of Count X of the Amended Complaint which alleges a cause of action for violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (the "UTPCPL"), 73 Pa. Stat. Ann. § 201–1, *et. seq,* based on fraudulent misrepresentations as well as aiding and abetting in the unauthorized practice of law.[FN6] AILIC, Oxford and Bohmueller argue that the Amended Complaint fails to plead the instances of alleged fraud under the UTPCPL with the particularity required by Federal Rule of Civil Procedure 9(b). They fur-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825
**(Cite as: 2005 WL 241181 (E.D.Pa.))**

ther argue that the Amended Complaint fails to demonstrate a sufficient factual basis from which to infer that they were obligated to provide estate planning services to Plaintiffs. In addition, AILIC, Oxford and Bohmueller submit that Plaintiffs' UTP-CPL claims for aiding and abetting the unauthorized practice of law must fail because Pennsylvania has not yet adopted a cause of action for aiding and abetting in the unauthorized practice of law.

> FN6. Under Section 9.2 of the UTPCPL, "[a]ny person who purchases ... goods or services primarily for personal ... purposes and thereby suffers any ascertainable loss of money.. as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages." 73 Pa. Stat. Ann. § 201–9.2. Section 3 of the UTPCPL declares as unlawful unfair methods of competition, including acts or practices "causing likelihood of confusion or misunderstanding as to affiliation, connection, or association with ... another" and "any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73. Pa. Stat. Ann. §§ 201–2(iii) and (xxi), 201–3.

The Pennsylvania Supreme Court has held that the purpose of the UTPCPL is to "place on more equal terms seller and consumer" and "to ensure the fairness of market transactions." *Commonwealth by Creamer v. Monumental Properties, Inc.,* 459 Pa. 450, 329 A.2d 812, 816 (Pa.1974). The UTPCPL is to be interpreted liberally so as to effectuate its purpose. *Keller v. Volkswagen of America, Inc.,* 733 A.2d 642, 646 (Pa.Super.Ct.1999). To establish a valid cause of action under the UTPCPL for unfair or deceptive acts or practices, a plaintiff must plead those acts or practices with the same specificity as common law fraud. *Grant v. Kingswood Apts.,* No. Civ. A. 01–1523, 2001 WL 1876343, at *3 (E.D.Pa. Oct 15, 2001). Accordingly, in order to assert a

cause of action pursuant to the UTPCPL, a plaintiff must allege the following essential elements of fraud: "(1) material misrepresentation of a material fact; (2) scienter; (3) intention by the declarant to induce action; (4) justifiable reliance by the party defrauded upon the misrepresentation; and (5) damages to the party defrauded as a proximate result." *Heller v. Shaw Indus.,* Civ. A. No. 95–7657, 1997 WL 535163, at *20 (E.D.Pa. Aug.18, 1997) (citing *Prime Meats, Inc. v. Yochim,* 422 Pa.Super. 460, 619 A.2d 769, 773 (Pa.Super.Ct.1993)).

**\*12** The Amended Complaint asserts a cause of action pursuant to the UTPCPL against Moving Defendants with respect to the estate, asset and tax planning services provided to Plaintiffs, the sale of annuities by Oxford and AILIC, and the sale of living trusts by Bohmueller. (Am.Compl.¶¶ 203, 204.) Plaintiffs obtained these services for the primarily personal use of increasing their retirement income. (*Id.* ¶¶ 74, 75.) The Amended Complaint asserts that Moving Defendants fraudulently gained access to Plaintiffs' assets and violated the UTPCPL by (1) misrepresenting their expertise in estate and tax planning and investments, as well as their relationships with each other; (2) using false and misleading information to persuade Plaintiffs to use Bohmueller as their attorney and to utilize the services of the other Defendants; (3) "causing a likelihood of confusion or misunderstanding as to affiliation, connection, or association with each other;" and (4) engaging in "fraudulent conduct which created the likelihood of confusion or misunderstanding." (*Id.* ¶¶ 205–208.) The Amended Complaint also alleges that the representations made by Defendants "were known by [D]efendants to be false, or were made recklessly in disregard of their truth or falsity, and were made by [D]efendants to induce [P]laintiffs to trust them and turn their entire estate over to them." (*Id.* ¶ 110, 619 A.2d 769.) The Amended Complaint alleges that these actions induced Plaintiffs to justifiably rely on Defendants' misrepresentations, and that Plaintiffs sustained damages in the amount of $2.8 million. (*Id.* ¶¶ 211–213.) These allegations are sufficient to state

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825
**(Cite as: 2005 WL 241181 (E.D.Pa.))**

valid claims under the UTPCPL with respect to the estate, asset and tax planning services, the sale of annuities by AILIC and Oxford, and the sale of living trusts by Bohmueller. *See Heller v. Shaw Indus.,* 1997 WL 535163 at *20.

The Amended Complaint also alleges a cause of action against AILIC, Oxford and Bohmueller for aiding and abetting Strope in the unauthorized practice of law in violation of the UTPCPL and 42 Pa. Stat. Ann. § 2524.[FN7] *(Id. ¶¶ 209–210.)* Plaintiffs do not dispute that Pennsylvania has not yet adopted a cause of action for aiding and abetting liability, and that the Pennsylvania Supreme Court has not yet spoken on the issue. *See Clayton v. McCullough,* 448 Pa.Super. 126, 670 A.2d 710, 713 (Pa.Super.Ct.1996). "When presented with a novel issue of law, or where applicable state precedent is ambiguous, absent or incomplete, [the federal court] must determine or predict how the highest state court would rule." *Rolick v. Colins Pine Co.,* 925 F.2d 661, 664 (3d Cir.1991) *cert. denied,* 507 U.S. 973, 113 S.Ct. 1417, 122 L.Ed.2d 787 (1993). The parties have submitted no authority to support the proposition that the Pennsylvania Supreme Court would recognize a claim for aiding and abetting the unauthorized practice of law. Accordingly, the Court cannot conclude that the Pennsylvania Supreme Court would recognize such a claim. AILIC's, Oxford's and Bohmueller's Motion to Dismiss Count X of the Amended Complaint are, therefore, granted as to the claim for aiding and abetting the unauthorized practice of law, and denied in all other respects.

FN7. Under 42 Pa. Stat. Ann. § 2524 it is unlawful for any person to "hold[ ] himself out to the public as being entitled to practice law ... without being an attorney at Law." 42 Pa. Stat. Ann. § 2524.

I. *Tortious Interference with Contractual Relations: Count XI*
*13 All Moving Defendants have moved to dismiss Count XI of the Amended Complaint which alleges a cause of action for tortious interference

with contractual relations. Moving Defendants argue that the Amended Complaint does not allege that they wrongfully prevented a third party from performing a contract with Plaintiffs, and thus fails to state essential elements of a claim for tortious interference with contractual relations. Pennsylvania has adopted the cause of action for intentional interference with contractual relations as defined in the Restatement (Second) of Torts § 766:

One who intentionally and improperly interferes with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766 (1979); *see also Adler, Barish, Daniels, Levin and Creskoff v. Epstein,* 482 Pa. 416, 393 A.2d 1175, 1183 (Pa.1978); *Daniel Adams Assoc., Inc. v. Rimbach Publ'g, Inc.,* 360 Pa.Super. 72, 519 A.2d 997, 1000 (Pa.Super.Ct.1987). Accordingly, the elements of a cause of action for interference with contractual relations are:
(1) the existence of a contractual ... relation between the complainant and the third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation ...; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Strickland v. Univ. of Scranton,* 700 A.2d 979, 985 (Pa.Super.Ct.1997) (citations omitted).

The Amended Complaint states that "Defendants tortiously interfered with [P]laintiffs' contractual relations with third parties, including without limitation, with the contractual relations existing by virtue of [P]laintiffs' purchase of securities comprising their existing investment portfolios." (Am.Compl.¶ 217). The Amended Complaint, however, alleges no facts which would support an

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825
**(Cite as: 2005 WL 241181 (E.D.Pa.))**

inference that any specific third party was prevented from performing its contractual obligations owed to Plaintiffs as a result of Defendants' conduct. Accordingly, Moving Defendants' Motions to Dismiss Court XI of the Amended Complaint are granted.

*J. Tortious Interference with Prospective Economic Advantage: Count XII*

Moving Defendants also seek the dismissal of Count XII of the Amended Complaint which alleges a cause of action for tortious interference with prospective economic advantage. They argue that the Amended Complaint does not identify any prospective contracts or business relationships that Plaintiffs were prevented from entering into, and thus fails to state essential elements for a valid claim for tortious interference with prospective contractual relations. Under Pennsylvania law, to state a claim for tortious interference with prospective economic advantage a plaintiff must allege:

**\*14** (1) the existence of a potential contractual relation between itself and a third party; (2) purposeful action on the part of the defendant, specifically intended to prevent the prospective relation from occurring; (3) the absence of a privilege or justification on the part of the defendant; (4) the occasioning of actual legal damage as a result of the defendant's conduct; and (5) a reasonable likelihood that the relationship would have occurred but for the interference of the defendant.

*SmithKline Beecham Corp. v. Apotex Corp.,* Civ. A. No. 99–4304, 2004 WL 2222388, at *14 (E.D.Pa. Sept.29, 2004) (citing *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 530 (3d Cir.1998). A prospective contract is "something less than a contractual right, something more than a mere hope; it exists if there is a reasonable probability that a contract will arise from the parties' current dealings." *Alvord–Polk,* 37 F.3d 996, 1015 (3d Cir.1994). Conclusory speculation that plaintiffs might have entered into a business or contractual relationship with unspecified third

parties is insufficient to state a claim for tortious interference. *Alvord–Polk,* 37 F.3d at 1015.

The Amended Complaint states that "Defendants tortiously interfered with [P]laintiffs' prospective economic advantage, including without limitation, with the prospective economic advantage by reason of [P]laintiffs' purchase of securities comprising their pre-existing investment portfolios, and the earnings therefrom, and [Plaintiff's] ability to use their assets as they saw fit." (Am.Compl.¶ 223). The Amended Complaint, however, contains no facts which would support an inference that specific prospective contracts existed into which either third parties or Plaintiffs were prevented from entering. Moreover, the Amended Complaint does not allege that Moving Defendants acted purposefully to harm Plaintiffs and prevent a prospective relation from occurring, or that Moving Defendants were not privileged or justified in their actions. *See Gordon,* 489 A.2d at 1370. The Amended Complaint's bald assertion that Defendants interfered with Plaintiffs' prospective economic advantage is insufficient to state a claim under Pennsylvania law. *See Alvord–Polk,* 37 F.3d at 1015. Accordingly, Moving Defendants' Motions to Dismiss Count XII of the Amended Complaint are granted.

*K. Unjust Enrichment/ Quantum Meruit and Accounting: Counts XIII, XIV*

AILIC and Oxford have also moved to dismiss Counts XII and XIV of the Amended Complaint which allege causes of action for unjust enrichment/ *quantum meruit* and for an accounting. They argue that the Amended Complaint fails to plead how the Defendants were unjustly enriched. AILIC further argues that, because the annuities are an express contract, the purchase of these annuities cannot form the basis of a *quantum meruit* recovery.

In order to plead a claim for unjust enrichment/ *quantum meruit* under Pennsylvania law a complaint must allege the following:

**\*15** benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825
**(Cite as: 2005 WL 241181 (E.D.Pa.))**

acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.... Where unjust enrichment is found, the law implies a contract ... which requires that the defendant pay to plaintiff the value of the benefit conferred. In short, the defendant makes restitution to the plaintiff in *quantum meruit.*

*Schenck v. K.E. David, Ltd.,* 446 Pa.Super. 94, 666 A.2d 327, 328–29 (Pa.Super.Ct.1995). However, "where an express contract governs the relationship of the parties, a party's recovery is limited to the measure provided by the express contract; and where the contract fixes the value of the services involved, there can be no recovery under a *quantum meruit* theory." *Constar, Inc. v. Nat'l Distribution Centers, Inc.,* 101 F.Supp.2d 319, 324 (E.D.Pa.2000) (citing *Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989, 999 (3d Cir.1987)) (internal quotations omitted).

Here, the Amended Complaint alleges that "Defendants were unjustly enriched by [P]laintiffs in the amount of $2.8 million.... Also, or in the alternative, [P]laintiffs are entitled to a *quantum meruit* recovery against [D]efendants in the amount of $2 .8 million." (Am.Compl.¶¶ 229, 230.) The Amended Complaint further alleges that Plaintiffs transferred $2.8 million to Defendants as a result of the fraudulent misrepresentations made by Strope on behalf of himself and all other Defendants. (*Id.* ¶¶ 81, 92.) The Amended Complaint, further states that Plaintiffs were damaged in the amount of $2.8 million in addition to professional fees and costs incurred by Plaintiffs in pursuing this action to recover their assets (*Id.* ¶¶ 112, 114.) The Amended Complaint does not allege the existence of a written agreement or express contract which governs the relationship between Plaintiffs and Moving Defendants or fixes the value of the services involved. However, the Amended Complaint relies on the purchase of annuities from AILIC and Oxford. AILIC has submitted a copy of the two annuity

policies issued to the Gilmours together with its Motion to Dismiss. While a court must accept the well-pleaded allegations of the complaint as true and may not rely on matters outside the complaint in deciding a motion to dismiss, the court may consider documents explicitly relied on in the complaint in its analysis. *See GSC Partners CDO Fund v. Washington,* 368 F.3d 228, 236 (3d Cir.2004). Accordingly, the Court can take into account the annuity policy Plaintiffs and AILIC entered into in ruling on AILIC's Motion to Dismiss. This policy is an express contract which governs the relationship between the parties, and thus prevents Plaintiffs from being able to recover against AILIC on a *quantum meruit* theory. Oxford, on the other hand, did not provide the Court with documentation of an annuity policy which governs the relationship between Plaintiffs and Oxford. In the absence of such policy, the Court can not conclude that such policy in fact existed, much less that it governed the relationship between the parties or fixed the value of the services involved. Under these circumstances and the facts as pled in the Amended Complaint, it would be inequitable to allow Defendants to retain the money given to them by Plaintiffs. *See Schenck,* 666 A.2d at 328. Accordingly, AILIC's Motion to Dismiss Count XIII is granted, while Oxford's Motions to Dismiss Count XIII is denied.

**\*16** AILIC and Oxford further seek the dismissal of Count XIV of the Amended Complaint which alleges a cause of action for an accounting. They argue that the Amended Complaint does not state sufficient facts to support a claim that they were obligated to provide legal, tax or estate planning services to Plaintiffs, and that an accounting would, therefore, be inappropriate. Plaintiffs seek an accounting from Defendants:

(a) Itemizing and describing in detail each and every security and other asset turned over by [P]laintiffs to [D]efendants; and

(b) Itemizing and detailing the liquidation of each such assets, including date sold or disposed, manner of disposition, transferee, amount received

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825
**(Cite as: 2005 WL 241181 (E.D.Pa.))**

(both gross and net of any commissions paid or earned);

(c) Itemizing and detailing each and every payment earned or received by each [D]efendant ... in connection with (i) the liquidation of $2.8 million of [P]laintiffs' existing investment portfolios, and (ii) the purchase of [Defendants'] "tax free" annuities; and (iii) the establishment of the living trust.

(Am.Compl.¶ 232.) Pennsylvania Rule of Civil Procedure 1021 permits parties to seek relief "of several different types, including an accounting." Pa.R.Civ.P. 1021(a). Accordingly, AILIC and Oxford's Motions to Dismiss Count XIV are denied.

### L. *Professional Negligence: Count XV*

AILIC and Oxford further seek the dismissal of Count XV of the Amended Complaint which alleges a cause of action for professional negligence against all Defendants. They argue that the Amended Complaint contains no factual basis from which to infer that they had contracted to provide Plaintiffs with professional services. Under Pennsylvania law, clients may bring tort actions against professionals for their failure to provide the client with professional services consistent with those expected by the profession. *Gorski v. Smith*, 812 A.2d 683, 693–94 (Pa.Super.Ct.2002). Professional negligence actions, however, can be maintained only against persons licensed in Pennsylvania or another state as: (1) health care providers as defined in 40 P.S. § 1303.503; (2) accountants; (3) architects; (4) chiropractors; (5) dentists; (6) engineers or land surveyors; (7) nurses; (8) optometrists; (9) pharmacists; (10) physical therapists; (11) psychologists; (12) veterinarians; or (13) attorneys. Pa.R.Civ.P. 1042.1.

Here, the Amended Complaint alleges that moving Defendants are not registered to do business in Pennsylvania, and use sales representatives such as Strope to market and sell annuities. (Am.Compl.¶¶ 8, 12, 37.) The Amended Complaint further alleges that Moving Defendants:

undertook to provide estate and asset and tax planning advice to [P]laintiffs ... As professionals providing estate and asset and tax planning advice for [P]laintiffs, the [D]efendants owed a common law duty to [P]laintiffs to provide such professional advice to [P]laintiffs with the necessary skill, confidence, prudence and diligence, as other similarly situation estate and asset planning professionals in the community.

**\*17** (Am.Compl.¶¶ 234, 235.)

The Amended Complaint does not allege that any of the Defendants except for Bohmueller are licensed professionals. Under Pennsylvania law, however, professional negligence actions can be maintained only against defendants who are licensed professionals as defined in Pennsylvania Rule 1042.1. *See* Pa. R. Civ. P. 1042.1. Accordingly, AILIC and Oxford's Motions to Dismiss Count XV are granted.

### M. *Motion for a More Definite Statement*

AILIC and Oxford have asked the Court to dismiss the Amended Complaint for its failure to plead short, concise statements in accordance with Federal Rule of Civil Procedure 8(a)(2) or, in the alternative, that Plaintiffs be required to file a second amended complaint pursuant to Federal Rule of Civil Procedure 12(e). Plaintiffs argue that Defendants are attempting to impose inconsistent pleading standards on them, by seeking dismissal of the Amended Complaint for too much detail on the one hand, and lack of specificity on the other. However, it is well-established that it is not necessary to violate Rule 8 in order to comply with Rule 9(b). See *In re Wesinghouse Securities Litig.,* 90 F.3d 696, 703 (3d Cir.1996) ("[i]t is well settled that the particularity demands of pleading fraud under Rule 9(b) in no way negate the commands of Rule 8.") (citations omitted). Accordingly, the requirements of Rule 8 apply even where Rule 9(b) commands that circumstances be pled with particularity. *Id.* (citing to James W. Moore, *et. al, Moore's Federal Practice* ¶ 8.13, at 8–58 (2d ed.1995)).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825
**(Cite as: 2005 WL 241181 (E.D.Pa.))**

Courts should dismiss pleadings for failure to comply with Rule 8 only if the pleading is "so confused, ambiguous, vague or otherwise unintelligible that its true substance, if any, is well disguised." *Martin v. Warrington,* Civ. A. No. 01–1178, 2002 WL 341000, at *3 (E.D.Pa. Mar.4, 2002) (citing *Simmons v. Abruzzo,* 49 F.3d 83, 89 (2d Cir.1995)). While courts can strike pleadings that are "laden with unnecessary factual narrative," courts frequently decline to dismiss complaints despite plain violations of Rule 8(a)(2). *Martin,* 2002 WL 341000, at *3. Accordingly, the Court denies AILIC's and Oxford's Motions to Dismiss the Amended Complaint for violations of Rule 8(a)(2). However, should Plaintiffs decide to file a Second Amended Complaint, they must comply with Rule 8(a)(2).

Under Rule 12(e), a party may move for a more definite statement if the pleading is so "vague or ambiguous that the opposing party cannot respond, even with a simple denial, in good faith without prejudice to itself." *Sun Co.,* 939 F.Supp. at 368 (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1376 (1990)). "The class of pleadings that are appropriate subjects for a motion under Rule 12(e) is quite small ..." *Id.* The Court finds that the Amended Complaint as a whole is not so vague, ambiguous, or unintelligible that Defendants cannot discern the essence of the claims made. Accordingly, AILIC's and Oxford's Motions for a More Definite Statement pursuant to Rule 12(e) are denied.

### III. CONCLUSION

*18 For the foregoing reasons, the Moving Defendants' Motions to Dismiss are granted in part and denied in part. AILIC and Oxford's Motions to Dismiss for failure to comply with Federal Rule of Civil Procedure 8(a)(2) are denied. AILIC and Oxford's Motions to Dismiss are granted as to Count I with respect to any claim for fraud based on their notification by a consumer agency that a larger living-trust scheme existed, and denied in all other respects. In addition, AILIC Motion to Dismiss is denied with respect to Counts II, IV, IX, X (except

with respect to the claims that they aided and abetted in the unauthorized practice of the law) and XIII, and granted with respect Counts III, VIII, XI, XII, XIV and XV. Oxford's Motion to Dismiss is denied with respect to Counts II, IV, IX, X (except with respect to the claims that they aided and abetted in the unauthorized practice of the law), XIII and XIV, and granted with respect Counts III, VIII, XI, XII and XV.

Bohmueller's Motion to Dismiss is granted with respect to Counts III, XI and XII, as well as with respect to the claim made in Count X that he aided and abetted the unauthorized practice of law. Bohmueller's Motion to Dismiss is denied in all other respects. Strope and Patriot's Motions to Dismiss Counts III, VIII, XI and XII are granted. By agreement of the parties and by Order of the Court, Counts V and VI of the Amended Complaint are dismissed.[FN8]

> FN8. In sum, the following claims survive the Motions to Dismiss:
>
> 1. The fraudulent and negligent misrepresentation claims in Counts I and II against Strope as well as New Life, AILIC, Oxford, Bohmueller, and Patriot for false statements made by Strope acting as agent on their behalf.
>
> 2. The civil conspiracy claim against New Life, AILIC, Oxford, Bohmueller, Strope and Patriot.
>
> 3. The professional negligence claim in Count VII against Bohmueller.
>
> 4. The breach of fiduciary duty claim in Count IX against New Life, AILIC, Oxford, Bohmueller, Strope and Patriot.
>
> 5. The UTPCPL claim for fraudulent misrepresentations in Count X against New Life, AILIC, Oxford, Strope, Bohmueller and Patriot.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825
**(Cite as: 2005 WL 241181 (E.D.Pa.))**

6. The unjust enrichment/*quantum meruit* claim in Count XIII against New Life, Oxford, Bohmueller, Strope and Patriot.

7. The claim for an accounting in Count XIV against New Life AILIC, Oxford, Bohmueller, Strope and Patriot.

8. The claim for professional negligence in Count XV against Bohmueller.

An appropriate Order follows.

### ORDER

AND NOW, this 27th day of January, 2005, upon consideration of the Motions to Dismiss the Amended Complaint filed by Defendants Barry O. Bohmueller, Stephen A. Strope, The Patriot Group, Inc., American Investors Life Insurance Company, and Oxford Life Insurance Company (Doc. Nos. 25, 26, 29, 31, 33 and 37), all briefing in response thereto, and the Hearing held on October 28, 2004, IT IS HEREBY ORDERED that:

1. American Investors Life Insurance Company's and Oxford Life Insurance Company's Motions to Dismiss are DENIED as to Counts I and II of the Amended Complaint;

2. American Investors Life Insurance Company's, Oxford Life Insurance Company's, Barry O. Bohmueller's, Stephen A. Strope's, and The Patriot Group, Inc.'s Motions to Dismiss are GRANTED as to Count III of the Amended Complaint; Count III is hereby DISMISSED without prejudice and with leave to file a Second Amended Complaint which includes all factual allegations required by a RICO Case Statement (see attached) within thirty days of the date of this Order;

3. American Investors Life Insurance Company's and Oxford Life Insurance Company's Motions to Dismiss are DENIED as to Count IV of the Amended Complaint;

4. American Investors Life Insurance Company's,

Oxford Life Insurance Company's, Barry O. Bohmueller's, Stephen A. Strope's, and The Patriot Group, Inc.'s Motions to Dismiss are GRANTED as to Counts V and VI of the Amended Complaint by agreement of the parties; those Counts are hereby DISMISSED with prejudice;

**\*19** 5. American Investors Life Insurance Company's, Oxford Life Insurance Company's, Stephen A. Strope's and The Patriot Group, Inc.'s Motions to Dismiss are GRANTED as to Count VIII of the Amended Complaint; Count VIII is hereby DISMISSED without prejudice and with leave to file a Second Amended within thirty days of the date of this Order;

6. American Investors Life Insurance Company's and Oxford Life Insurance Company's Motions to Dismiss are DENIED as to Count IX of the Amended Complaint;

7. American Investors Life Insurance Company's, Oxford Life Insurance Company's, and Barry O. Bohmueller's Motions to Dismiss is GRANTED as to the claim made in Count X of the Amended Complaint for claim for aiding and abetting the unauthorized practice of law; this claim is hereby DISMISSED with prejudice; American Investors Life Insurance Company's, Oxford Life Insurance Company's, and Barry O. Bohmueller' Motions to Dismiss are DENIED as to Count X of the Amended Complaint in all other respects;

8. American Investors Life Insurance Company's, Oxford Life Insurance Company's, Barry O. Bohmueller's, Stephen A. Strope's, and The Patriot Group, Inc.'s Motions to Dismiss are GRANTED as to Count XI of the Amended Complaint; Count XI is hereby DISMISSED with prejudice;

9. American Investors Life Insurance Company's, Oxford Life Insurance Company's, Barry O. Bohmueller's, Stephen A. Strope's, and The Patriot Group, Inc.'s Motions to Dismiss are GRANTED as to Count XII of the Amended Complaint; Count XII is hereby DISMISSED with prejudice;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825
**(Cite as: 2005 WL 241181 (E.D.Pa.))**

10. Oxford Life Insurance Company's Motion to Dismiss is DENIED as to Count XIII of the Amended Complaint;

11. American Investors Life Insurance Company's Motion to Dismiss is GRANTED as to Count XIII of the Amended Complaint; Count XIII of the Amended Complaint against American Investors Life Insurance Company is hereby DISMISSED with prejudice;

12. American Investors Life Insurance Company's and Oxford Life Insurance Company's Motions to Dismiss are DENIED as to Count XIV of the Amended Complaint;

13. American Investors Life Insurance Company's and Oxford Life Insurance Company' Motions to Dismiss are GRANTED as to Count XV of the Amended Complaint; Count XV is hereby DISMISSED with prejudice against all Defendants except for Barry O. Bohmueller; and

14. American Investors Life Insurance Company's and Oxford Life Insurance Company's Motions to Dismiss the Amended Complaint for violating Federal Rule of Civil Procedure 8(a)(2) are DENIED;

15. American Investors Life Insurance Company's, Oxford Life Insurance Company's, Barry O. Bohmueller's, Stephen A. Strope's, and The Patriot Group, Inc.'s Motions for a More Definite Statement pursuant Federal Rule of Civil Procedure 12(e) are DENIED; and

16. IT IS FURTHER ORDERED that any Second Amended Complaint filed by Plaintiffs shall comply with Federal Rule of Civil Procedure 8(a)(2), which requires a short and plain statement of the claims showing that the pleader is entitled to relief.

RICO CASE STATEMENT
*20 1. State whether the alleged unlawful conduct is in violation of 18 U.S.C. §§ 1962(a), (b)(c), and/or (d);

2. List each defendant and state the alleged misconduct and basis of liability of each defendant;

3. List the alleged victims and state how each victim was allegedly injured:

4. Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim. A description of the pattern of racketeering activity shall include the following information:

a. List the alleged predicate acts and the specific statutes that were allegedly violated;

b. If the RICO claim is based on the predicate offenses of wire fraud, mail fraud or fraud in the sale of securities, the "circumstances constituting fraud or mistake shall be stated with particularity". Fed.R.Civ.P. 9(b).

c. Describe how the predicate acts form a "pattern of racketeering activity"; and

d. State whether the alleged predicate acts relate to each other as part of a common plan. If so, describe.

5. Describe in detail the alleged enterprise for each RICO claim. A description of the enterprise shall include the following information:

a. State the names of the individuals, partnerships, corporation, associations or other legal entities that allegedly constitute the enterprise;

b. Describe the structure, purpose, function and course of conduct of the enterprise;

c. State whether any defendants are employees, officers or directors of the alleged enterprise;

d. State whether any defendants are associated with the enterprise; and

e. State whether you are alleging that the defendants are individuals or entities separate from the alleged enterprise or that the defendants are the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825
**(Cite as: 2005 WL 241181 (E.D.Pa.))**

enterprise itself, or members of the enterprise.

6. Describe the alleged relationship between the activities of the enterprise and the alleged pattern of racketeering activity. Discuss how the racketeering activity differs from the usual and daily activities of the enterprise, if at all;

7. Describe the effect of the enterprise on interstate or foreign commerce;

8. If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:

a. State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt;

b. Describe the use of investment of such income;

9. If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe the acquisition or maintenance of any interest in control of the alleged enterprise;

10. If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:

a. State who is employed by or associated with the enterprise; and

b. State whether the same entity is both the liable "person" and the "enterprise" under § 1962(c);

11. If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe the alleged conspiracy;

12. Describe the alleged injury to business or property;

**\*21** 13. Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.

14. Provide additional information that you feel would be helpful in processing your RICO claim.

E.D.Pa.,2005.
Gilmour v. Bohmueller
Not Reported in F.Supp.2d, 2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2001 WL 1876343 (E.D.Pa.)
**(Cite as: 2001 WL 1876343 (E.D.Pa.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Kahil GRANT, Plaintiff,
v.
KINGSWOOD APARTMENTS, Morgan Properties, Doreen Antonucci, Defendants.

No. CIV.A. 01–1523.
Oct. 15, 2001.

MEMORANDUM

GILES, C.J.

*1 Kahlil Grant ("Grant") filed a complaint with this court seeking compensatory and punitive damages against Kingswood Apartments, Morgan Properties, and Doreen Antonucci, (collectively "defendants"), for violation of the Fair Housing Act, 42 U.S.C. § 3604(b) (Count 1), and for state law breach of warranty of habitability (Count 2), fraud (Count 3), negligence/breach of contract (Count 4), and violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (Count 5), 73 PA. CONS.STAT. § 201. Defendants have moved to dismiss the fraud and UTPCPL claims, Counts 3 and 5 respectively, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, the claim for punitive damages under breach of warranty of habitability and the claimed violation of the covenant of quiet enjoyment of premises, Count 2, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, defendants' motion is granted.

I. Facts

The complaint alleges the following facts which the court considers true for the purposes of defendants' motion. In November 1998, Grant, an African–American male, rented an apartment in the Kingswood Apartments. (Compl.¶ 10.) Defendants had advertised the apartment complex as a means to "Experience Quality Living" and as "Comfortable Apartment Homes." (Id.¶ 12.) The lessee is re-

quired to sign an acceptance of the rules of the apartment complex. (Id.¶ 14.) One of the rules states that "residents are not permitted to act in any manner that will interfere with the rights, comforts and convenience of other residents." (Id.¶ 13.)

Over the last two years, Grant complained to the apartment management through multiple letters and phone calls about excessive noise of tenants who live upstairs from him. (Id.¶ 18.) Defendants failed to enforce the rules to control that noise. (Id.) The majority of the tenants in the apartment complex are white. The tenants who live above Grant are white. (Id.¶¶ 16, 17, 24.) Finally, to avoid noise, Grant left the apartment. (Id.¶ 21.)

II. Discussion

A. Fraud

Defendants argue that Grant has failed to comply with Rule 9(b) of the Federal Rules of Civil Procedure since he has not pled a claim of fraud with the requisite specificity. They aver that plaintiff has failed to allege (1) a specific misrepresentation of material fact; (2) the person or persons who allegedly made the misrepresentations; and (3) that the person who allegedly made misrepresentations did so with fraudulent intent. (Mem. of Law in Supp. of Mot. to Dismiss at 3.) Rule 9(b) of the Federal Rules of Civil Procedure requires that an allegation of fraud be pled with specificity. "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b).

Grant alleges that, although defendants represented that they would uniformly enforce the apartment rule requiring all tenants to respect the comfort and peace of other tenants, they refused to enforce this rule for his benefit because he is African–American and the tenants against whom he was complaining are white. (Compl.¶¶ 23, 37.) He alleges further that defendants never intended to enforce this rule even though they promised at the signing of the lease that they would. (Id.) To state a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1876343 (E.D.Pa.)
**(Cite as: 2001 WL 1876343 (E.D.Pa.))**

claim for fraud, a plaintiff must plead: (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his or her damage. *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 284 (3d Cir.1992). "There is a special kind of proximate cause requirement for fraud and misrepresentation, and plaintiff must demonstrate that a specific statement caused a specific harm." *Sun Co., Inc., v. Badger Design & Constructors, Inc.,* 939 F.Supp. 365, 369 (E.D.Pa.1996) (quoting *Hurt v. Philadelphia Hous. Auth.,* 806 F.Supp. 515, 530 n. 25 (E.D.Pa.1992)). Plaintiff must inject precision and some measure of substantiation into the allegations of fraud specifying who, what, when, where, and how. *See Sun Co.,* 939 F.Supp. at 369.

*\*2* Plaintiff has provided no substantiation of his allegations of fraud; namely, that Kingswood management knew, when they permitted plaintiff to sign the lease, that they would not enforce the apartment rule to prevent one tenant from interfering with the rights of another. (Compl. Ex. 2, Kingswood Rules & Regulations.) The complaint alleges that when plaintiff signed the lease, "he was led to believe that the apartment complex would enforce all of the rules in a fair, effective, and evenhanded manner," and instead "the management had no intention of uniformly enforcing its own rules," or "enforcing the rules against all tenants." (Compl.¶¶ 33–37.) These are conclusory allegations with no substantiation, and thus they do not meet Rule 9(b)'s specificity requirement.

Grant attempts to rely on defendants' alleged failure to enforce the apartment rules as proof of fraud. (Pl.'s Answer at 3.) However, as pled, this fraud count really only states a claim for alleged breach of warranty of habitability and a violation of covenant of quiet enjoyment of the premises. In the count for breach of warranty of habitability and violation of covenant of quiet enjoyment of the premises, plaintiff alleges that "[t]he failure of the

defendants to enforce the rules and curb the noisy habits of the noisy tenants Breached [sic] the Warranty [sic] of habitability and violated the covenant of quiet enjoyment of the premises." (Compl.¶ 30.) Plaintiff's fraud count rewords this warranty of habitability claim and alleges that defendants had no intention of enforcing the apartment complex rules that forbade the problematic noise, when they implied that they would. (Compl.¶ 37.) In rewording Count 2, plaintiff fails to inject any factual precision or substantiation for a fraud claim as required by Rule 9(b).

In addition, even assuming that defendants did breach a warranty of habitability and a covenant of quiet enjoyment of the premises, "the mere nonperformance of an agreement is not evidence of fraud." *See Sun Co.,* 939 F.Supp. at 369 (quoting *Oxford Indus., Inc. v. Luminco, Inc.,* C.I.V.A.86–6417, 1991 WL 87928, *\*4* (E.D.Pa. May 22, 1991)). An unperformed promise does not give rise to a presumption that the promisor intended not to perform when the promise was made, and a fraudulent intention will not be inferred from mere nonperformance. *Oxford Indus.,* 1991 WL 87928, at *\*4* (noting that it is well-settled under Pennsylvania law that an oral promise to do something in the future is not a proper basis for a cause of action for fraud). Pleading nonperformance is not sufficient to allege a fraud claim.

*B. Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law*

*\*3* In Count 5, entitled "Violation of Pa Unfair Trade Practices Act," Grant states that "most or all of the acts alleged above, particularly breach of Warranty [sic] of habitability and false advertising constitute violation of Pa Unfair Trade Practices Act." [FN1] (Compl.¶ 48.) Defendants argue that the claims under the UTPCPL should be dismissed because the UTPCPL is aimed at fraud prevention and as such, a violation of the UTPCPL must be averred with the same particularity as a fraud claim. (Defs.' Mem. of Law in Resp. at 3.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1876343 (E.D.Pa.)
**(Cite as: 2001 WL 1876343 (E.D.Pa.))**

FN1. The UTPCPL statute lists a series of practices that constitute "unfair methods of competition" and "unfair or deceptive acts or practices." 73 PA. CONS.STAT. § 201–2(4). For purposes of this motion, the court will assume that plaintiff is attempting to allege violations of the UTPCPL based on breach of warranty of habitability and false advertising. It is not clear whether plaintiff is also stating a claim under the "catch-all fraud clause" of the UTPCPL which states "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." Id. § 201–2(4)(xxi). Count 3 of the complaint is a claim of common-law fraud which appears to be incorporated by plaintiff incorporating all of the above allegations into the count for a violation of UTPCPL. (Id.¶ 47.)

There is no clearly settled Pennsylvania law on the question of whether all claims of a violation of the UTPCPL must be pled with the same specificity as a common-law fraud claim. *Compare Lindstrom v. Pennswood Village,* 417 Pa.Super. 495, 612 A.2d 1048, 1052 (Pa.Super.Ct.1992) (finding that all claims of violations of the UTPCPL must be pled with the same specificity as required of common-law fraud) *with Dilucido v. Terminex Intern., Inc.,* 450 Pa.Super. 393, 676 A.2d 1237, 1241 (Pa.Super.Ct.1996) (finding that plaintiffs are not required to prove elements of common-law fraud for all claims of "unfair methods of competition" and "unfair or deceptive acts or practices" under the UTPCPL). Therefore, this court must predict how the Pennsylvania Supreme Court would decide this issue, based on existing state precedent. *See Comm'r of Internal Revenue v. Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).

This court predicts that, if faced with this precise issue, the Pennsylvania Supreme Court would conclude that all claims of "unfair methods of competition" or "unfair or deceptive acts or practices"

under the UTPCPL must be pled with the same specificity as a common-law fraud claim. In so concluding, this court joins the opinion of another Eastern District of Pennsylvania court that has addressed this issue. *See Heller v. Shaw Industries, Inc.,* No. CIV.A.95–7657, 1997 WL 535163, at *20 (E.D.Pa. Aug. 18, 1997) (holding that to maintain a cause of action under the UTPCPL, plaintiffs must show the essential elements of fraud: (1) material misrepresentation of a material fact; (2) scienter; (3) intention by the declarant to induce action; (4) justifiable reliance by the party defrauded by the misrepresentation; and (5) damages to the party defrauded as a proximate result).

The Pennsylvania Superior Court's panels have not been in agreement as to a precise rule concerning the specificity of pleading required for a claim of a violation of the UTPCPL. One Superior Court panel held that because the UTPCPL is aimed at fraud prevention, all such claims must be pled with the same specificity as required for common-law fraud claims. *See Lindstrom,* 612 A.2d at 1052. Other Pennsylvania Superior Court panels have differentiated between claims of a violation of the UTPCPL based on its "catch-all fraud provision," 73 P.S. § 201–2(4)(xxi) (2001)," as contrasted to a violation of a provision, such as false advertising. Those panels have held that a UTPCPL claim based on the catch-all fraud provision requires a claim to be pled with specificity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure or Rule 1019(b) of the Pennsylvania Rules of Civil Procedure. *See Prime Meats, Inc. v. Yochim,* 422 Pa.Super. 460, 619 A.2d 769, 774–75 (Pa.Super.Ct.1993) (stating that the catch-all fraud provision of the UTPCPL requires proof and pleading of common-law fraud); *Rizzo v. Michener,* 401 Pa.Super. 47, 584 A.2d 973, 980 (Pa.Super.Ct.1990) (holding that to recover under the catch-all fraud provision of the UTPCPL, the elements of common-law fraud must be proven); *cf. Gabriel v. O'Hara,* 368 Pa.Super. 383, 534 A.2d 488, 495 (Pa.Super.Ct.1987) (holding that violations of the UTPCPL could be analogized as multiple types of claims such as "passing off, mis-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1876343 (E.D.Pa.)
**(Cite as: 2001 WL 1876343 (E.D.Pa.))**

appropriation, trademark infringement, disparagement, false advertising, fraud, breach of contract, and breach of warranty"); *DiLucido,* 676 A.2d at 1241 (finding that plaintiffs are not required to prove elements of common law fraud for all claims of "unfair methods of competition" and "unfair or deceptive acts or practices" under the UTPCPL).

**\*4** *Weinberg v. Sun Co., Inc.,* 565 Pa. 612, 777 A.2d 442, 2001 WL 844463, \*1 (Pa. July 26, 2001) [*Weinberg II* ], is the best indicator of the Pennsylvania Supreme Court's position on whether all claims of violations of the UTPCPL have to be pled with particularity. *Weinberg II* raised the issue of whether the Superior Court was correct in finding error with the trial court for not differentiating between claims of fraud and false advertising under the UTPCPL. *Id.* at \*1, 777 A.2d 442. The Superior Court had concluded that plaintiffs who alleged false advertising under the UTPCPL, as opposed to fraud, did not have to show individual reliance and causation. *Weinberg II,* at \*1. That panel based its holding on Superior Court precedent that differentiated between claims of false advertising and fraud-based claims under the UTPCPL and found that the elements of proof differed for the two causes of action. *Id.* (citing *DiLucido,* 676 A.2d at 1237).

The Pennsylvania Supreme Court overruled the Superior Court decision, *Weinberg v. Sun Co., Inc.,* 740 A.2d 1152 (Pa.Super.Ct.1999) [*Weinberg I* ], and held that a private plaintiff must prove reliance and causation in false advertising claims under the UTPCPL. *Id.* at \*3, 777 A.2d 442. Specifically, the court found that in a private action under the UTP-CPL, the underlying foundation is fraud prevention and "nothing in the legislative history suggests that the legislature ever intended statutory language directed against consumer fraud to do away with the traditional common law elements of reliance and causation." *Id.* at \*3, 777 A.2d 442.

**\*5** Accordingly, this court finds that a plaintiff must plead a claim of a violation of the UTPCPL with the same specificity as a claim for common-law fraud. As discussed *supra,* plaintiff has failed

to state a cause of action for common-law fraud. Therefore, plaintiff has failed to plead a violation of the UTPCPL sufficiently.

*C. Punitive Damages as a Remedy for a Breach of Warranty of Habitability*

In considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court accepts as true all well-pled factual allegations contained in the complaint and draws all reasonable inferences in favor of the non-movant. Only if a court concludes that a plaintiff would not be entitled to relief under any set of facts consistent with their allegations, can a court grant a defendant's motion to dismiss pursuant to Rule 12(b)(6). *Jordan v. Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994).

The Pennsylvania Supreme Court has found that "[p]unitive damages may be awarded for conduct that is outrageous, because of defendant's evil motive or his reckless indifference to the rights of others ... Punitive damages must be based on conduct which is malicious, wanton, reckless, willful, or oppressive." *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742, 747–48 (Pa.1984). Plaintiff alleges that defendants, because he is black, ignored his complaints and did not stop white tenants from making noise at a level that violated the rules of the apartment complex. (Compl.¶¶ 20, 23.) However, plaintiff has not pled that defendants acted intentionally, recklessly, or maliciously. Such is necessary to state a claim for punitive damages. Thus, plaintiff's claim for punitive damages under Count 2, breach of warranty of habitability and violation of covenant of quiet enjoyment of premises, has a pleading deficiency.

**IV. Conclusion**

For the above reasons, defendants' motion to dismiss is granted. Plaintiff's claims for fraud under *Count 3* and for violation of the UTPCPL under *Count 5* are dismissed *without prejudice.* Plaintiff may be granted leave to amend these Counts at the close of discovery only if evidence has been adduced to support the essential pleading require-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1876343 (E.D.Pa.)
**(Cite as: 2001 WL 1876343 (E.D.Pa.))**

ments. If a motion to amend is filed, plaintiff must specify under which subdivision of the UTPCPL, 73 PA. CONS.STAT. § 201–2(4), he is seeking relief. The claim for punitive damages for breach of warranty of habitability and violation of the covenant of quiet enjoyment, *Count 2,* is *dismissed with prejudice.*

An appropriate Order follows.

*ORDER*

**\*6** AND NOW, this ___ day of October, 2001, upon consideration of Defendant's Motion to Dismiss, Docket # 2, and the responses thereto, it hereby is ORDERED that Plaintiff's claims under Count 3 and under Count 5, are DISMISSED WITHOUT PREJUDICE. The claim for punitive damages under Count 2 is DISMISSED WITH PREJUDICE.

E.D.Pa.,2001.
Grant v. Kingswood Apartments
Not Reported in F.Supp.2d, 2001 WL 1876343 (E.D.Pa.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

**H**
United States District Court, E.D. Pennsylvania.
Carol HELLER and Thomas Heller, individually
and as the parents and natural guardians of Emily
and Katherine Heller, Plaintiffs
v.
SHAW INDUSTRIES, INC., Defendant

No. Civ.A. 95-7657.
Aug. 18, 1997.

**MEMORANDUM**

YOHN, Judge.
*1 August 15, 1997

In September, 1993, plaintiffs Carol and Thomas Heller purchased and moved into a new home with their daughters Katherine and Emily. Sometime after, Carol and Thomas Heller began to experience respiratory problems, including asthma, difficulty breathing, wheezing, coughing, and dizziness. Plaintiffs claim that their illnesses were caused by exposure to a combination of chemicals emitted by newly installed carpets manufactured by defendant Shaw Industries, Inc. Although defendant subsequently removed the carpets, plaintiffs continued to experience respiratory problems and, as a result, plaintiffs eventually moved out of and sold their home.

Subsequently, plaintiffs filed suit against defendant, alleging claims of breach of warranty, strict liability, negligent and intentional misrepresentation, and violation of Pennsylvania consumer protection laws. Plaintiffs seek to recover for personal injuries, future medical monitoring costs, and punitive damages.

Presently, defendant has moved *in limine* to exclude the testimony of plaintiffs' expert witnesses. Defendant argues that the opinions of plaintiffs' experts pertaining to causation are not grounded on a scientific methodology and are not reliable. Additionally, defendant has moved for summary judg-

ment on all claims. Defendant contends that plaintiffs have failed to proffer any evidence to establish that defendant's carpets were defective, that the family members' symptoms were caused by defendant's carpets, that plaintiffs suffer a significant increased risk of contacting a serious latent disease, or that medical monitoring and testing procedures exist which make the early detection and treatment of future disease possible and beneficial.

For the reasons that follow, defendant's motions will be granted.

**I. BACKGROUND**
On September 30, 1993, plaintiffs purchased and moved into a nine year old house and property located at 1205 Fox Glove Lane, West Chester, Pennsylvania (the "Fox Glove residence"). Shortly after, Thomas Heller began to experience allergy symptoms such as nasal congestion, a sore throat, and a thick nasal discharge.

On November 15, 1993, Thomas Heller sought treatment from Dr. Bennett of Bennett, Mark & Schuster for his symptoms and on December 9, 1993, Thomas consulted Dr. Joseph E. Pappano, an allergist. (Defend. Exhib. F.) Heller informed Pappano that he previously had experienced allergic reactions to cats, and that the prior owner of the Fox Glove residence had owned cats. Pappano concluded that Thomas' symptoms were likely caused by an allergic reaction to residual cat hair and, in the way of remedy, Pappano advised Thomas to remove the old carpets from the house.

On December 13–14, 1993, plaintiffs replaced the existing carpet and carpet pad in the second floor hall, loft, guest room, stairs and first floor master bedroom suit with new carpet pad and V & K Interiors Sutton Newance carpet (Newance carpet)—an off-white, barber type, synthetic carpet manufactured by defendant. (Plain. Exhib. 1 at 98.) The Newance carpet installed in the Heller home was made from polypropylene and nylon fiber

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

woven to a polypropylene primary and secondary backing, which was then bonded with a two layer styrene-butadiene rubber (SBR), or latex, backing. (Plain. Exhib. S–1 at 38.)

**\*2** Plaintiffs also replaced the old carpet and pad in the two upstairs bedrooms (Katherine and Emily's rooms) with carpet remnants. Those remnants were not the same brand and color as the Newance carpet. (Plain. Exhib. 2 at 92–93.) Because there was not enough of Emily's style carpet to cover all her closet, plaintiffs used some of the Newance style carpet in Emily's closet. (Plain. Exhib. 2 at 135.) Later, in March, 1994, plaintiffs replaced the carpet and pad in the family room with hardwood floor. (Plain. Exhib. 1 at 184–85.) In the living room and dining room, plaintiffs kept the existing carpeting. (Plain. Exhib. 1 at 97.)

In the last week of December, 1993, Carol Heller began to experience severe respiratory illness, which became progressively worse throughout the Winter and Spring of 1994. Carol and Thomas Heller's symptoms included asthma, difficulty breathing, wheezing, coughing and dizziness; Katherine Heller complained of shortness of breath, and appeared off-color. (Plain. Exhib. 1 at 111–125; Exhib. 2 at 100–103; Exhib. 1 at 102–111.)

Thomas and Carol Heller initially sought treatment from Dr. Julio Amadio, who is Carol's father. Amadio referred them to Dr. Pappano and Dr. Edward A. Theurkauf, a pulmonologist. (Plain. Exhib. 6 at 6–9.) On February 15, 1994, Carol Heller visited Pappano, and informed him that she began experiencing mild wheezing during the night starting in early January when she moved her sleeping quarters from the upstairs guest bedroom to the master bedroom on the first floor. Carol further reported that three days previously, she had experienced nausea, vomiting, and a viral type infection, followed by bouts of wheezing and shortness of breath, and that her symptoms improved significantly when she went out of doors. Pappano conducted allergy skin tests on Carol and found that she tested positive to house dust, house dust mites,

feathers and dogs, but not to cats, grass or ragweed. Pappano noted that there was no family history of allergic respiratory disease, with the exception of some mild symptoms that Carol had once experienced when visiting a seashore house in Ocean City, New Jersey. Carol also informed Pappano that her home contained newly installed synthetic rugs, and Carol produced a carpet sample for Pappano to examine. Pappano noted that the carpet definitely had a strong chemical odor, and recommended that Heller employ Todd Environmental Consultants (Todd Environmental) to analyze the rug samples and air quality in her home. (Defend. Exhib. H.)

Following Carol's consultation with Pappano, the Heller family took the following measures to isolate the cause of their reaction: (1) encapsulated all their bedding in plastic; (2) hired a house cleaner; (3) removed the family dog from the home; (4) replaced an electronic air-cleaner; (5) replaced all drapes; (6) changed dry cleaners; and (7) purchased a new vacuum cleaner. However, these measures had no effect on their symptoms. (Plain. Exhib. 1 at 180–182; Exhib. 5 at 34–35.)

**\*3** On February 23, 1994, the Heller family hired Todd Environmental to perform a surface dust analysis and evaluation to determine whether dust in the house contained allergens. The results of these tests, however, proved unremarkable. (Plain. Exhib. 9.)

Carol Heller returned to Dr. Pappano on March 19, 1994. Carol told Pappano that she was continuing to experience wheezing, especially in the mornings.

on March 21, 1994, Carol Heller called defendant to inquire about the carpeting. Her call was referred to Todd Bethel, a chemist then employed by defendant. Carol described to Bethel her family's symptoms and inquired whether he had heard of other customers having severe respiratory problems. Bethel told Carol that he had never heard of anything like that happening, and explained that defendant's carpets carry a "green tag," which indic-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

Page 3

ates that the rugs are safe. (Plain. Exhib. 1 at 168–74.) The next day, Bethel forwarded to Heller a copy of a list of ingredients in plaintiffs' carpeting, and a brochure from the Carpet and Rug Institute (CRI) entitled "Carpet and Indoor Environment." (Plain. Exhib. 1 at 168–201; Exhib. 10 at 3.)

Because of their continuing illnesses, on April 7, 1994, the Heller family moved out of their home.

The next day, Carol Heller visited Dr. Edward A. Theurkauf, a pulmonologist, for treatment of her respiratory illness. Theurkauf conducted pulmonary function tests on Carol—the results of which were normal—and diagnosed her as suffering from bronchospasms precipitated by environmental factors. (Defend. Exhib. K.) Two weeks later, Carol informed Theurkauf that her symptoms had improved since she had been away from the Fox Glove residence.

On April 14, 1994, Todd Environmental conducted an air monitoring test at the Hellers' home. Todd collected a sample of air over an eight hour period in the walk-in closet of the upstairs bedrooms—Emily's room—and the sample was sent to MDS Laboratories (MDS) for analysis. MDS analyzed the sample with a standard gas chromatography/mass spectroscopy (GCMS) procedure that is capable of detecting and quantifying volatile organic compounds (VOCs) down to less than one part per billion (ppb). The GCMS procedure detected the following levels of VOCs: total VOC6 20.48 ppb; benzene 2.2 ppb; ethyl benzene 0.69 ppb; cumene 0.11 ppb; 1, 1, 1–Trichloroethane 0.09 ppb; toluene 2.41 ppb; xylene 2.57 ppb; carbon tetrachloride 0.13 ppb; tetrachloroethylene 0.24 ppb; 2 butoxy ethanol 5.6 ppb; propyl benzene 1.62 ppb; 1 ethyl 3 methyl benzene 1.06 ppb; 1 methyl 3 propyl benzene 1.37 ppb; 1 methyl ethyl benzene 1.25 ppb; and 1 ethyl 4 methyl benzene 1.12 ppb. (Plain. Exhib. 12.) In total, MDS detected 14 different VOCs.

On May 5, 1994, at plaintiffs' request, defendant removed the Newance carpeting from the Fox Glove residence and refunded plaintiffs the amount they had paid for the carpets. (Plain. Exhib. 1 at 174.) After the carpet was removed, the windows were opened and the house was aired. Six days later, Todd Environmental repeated the previously performed air sample test. The results of the second test revealed the following levels of VOCs: benzene 0.55 ppb; toluene 2.62 ppb; ethyl benzene 0.54 ppb; xylene 2.9 ppb; and tetrachloroethylene 0.24 ppb. The test revealed a decrease in the presence of benzene, 2 butoxy ethanol, and various compounds that contain a benzene ring, termed benzene homologues. Further, the total number of types of VOCs decreased from 14 to 5 and the concentration of total VOCs dropped to one third the previous level. (Plain. Exhib. 13.)

*4 Subsequently, plaintiffs replaced their carpeting with superhypoallergenic rugs (which cost more than the Newance carpeting) and on May 11, 1994, plaintiffs visited their home. (Plain. Exhib. at 174.) However, although they were in the home for only about one hour, Thomas and Carol Heller's symptoms reappeared.

On May 14, 1994, Carol Heller again visited Dr. Pappano. Carol informed Pappano that her symptoms had improved after moving out of the Fox Glove residence, but that her condition deteriorated when she went back to the Fox Glove home.

After having moved out of the home on April 7, 1994, plaintiffs never returned to the house other than to remove their personal belongings because, according to plaintiffs, their symptoms would reappear whenever they visited the residence. In November, 1994, plaintiffs sold their home for less than they paid for the property in September, 1993. Carol Heller claims that although she currently is not receiving any treatment for asthma, she continues to experience some, albeit subdued, symptoms. (Plain. Exhib. 1 at 178–79, 191–96, 209.)

On December 8, 1995, plaintiffs filed suit against defendant, alleging the following counts: (1) breach of warranty in violation of the Magnuson–Moss Act, 15 U.S.C. § 2310(d); (2) failure

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

to warn; (3) negligent and intentional misrepresent-
ation; (4) defective design and/or manufacture; (5)
violation of Pennsylvania consumer protection
laws; and (6) medical monitoring. The complaint
alleges that the Newance carpets manufactured by
defendant emitted toxic substances, such as ben-
zene, toluene, xylene and vinyl chloride, and that
such substances caused plaintiffs' present symptoms
and significantly enhanced their risk of contracting
future illnesses. Plaintiffs aver that since 1980, de-
fendant has known that carpeting can off-gas toxic
substances, that consumers exposed to such sub-
stances have suffered adverse health effects, and
that defendant concealed its knowledge and failed
to warn consumers of the health risks posed by its
product. Plaintiffs seek damages for losses incurred
in having to sell their Fox Glove home, expenses
incurred in attempting to ascertain and eliminate
the cause of their suffering, pain and suffering, fu-
ture medical monitoring costs, and punitive dam-
ages.

   On March 20, 1997, defendant moved for sum-
mary judgment and on June 24, 1997, defendant
moved *in limine* to exclude the testimony of Alan
Todd and Doctors Amadio, Pappano and Theurkauf
with respect to their opinions regarding causation.

   From July 21 to 29, 1997, the court conducted
an evidentiary hearing on the admissibility of the
testimony of plaintiffs' expert witnesses. At the end
of the hearing, plaintiffs withdrew their claims with
respect to alleged physical injuries sustained by
Thomas, Katherine, and Emily Heller, but continue
to pursue their claim with respect to Carol's alleged
physical injuries.

**II. DISCUSSION**
   Defendant argues that it is entitled to summary
judgment because plaintiffs' expert opinion evid-
ence regarding causation is inadmissible and, there-
fore, there is insufficient evidence to sustain a jury
finding that the Newance carpets were defective
and caused plaintiffs' alleged injuries. Defendant
contends that the methodologies applied by
plaintiffs' experts are not scientific and that the ex-

pert's opinions are hence unreliable.

   **\*5** Plaintiffs proffer proof of causation in the
form of expert opinion testimony by Alan Todd, an
industrial hygienist, and Doctors Julio Amadio,
Joseph Pappano and Edward Theurkauf. Plaintiffs
contend that Carol Heller suffered environmentally
induced asthma caused by a cocktail of seven
VOCs emitted by Newance carpet manufactured by
defendant. Plaintiffs claim that the particular batch
of carpet installed in the Fox Glove residence was
defective in that it emitted dangerously high levels
of benzene, 2 butyl ethanol, and five homologues of
Benzene (propyl benzene, 1 ethyl 4 methyl ben-
zene, 1 methyl ethyl benzene, 1 ethyl 3 methyl ben-
zene, and 1 methyl 3 propyl benzene), all of which
can cause respiratory irritation.

*A. Legal Standard*
   Summary judgment is appropriate if the ad-
missible evidence presents no genuine issue of ma-
terial fact and the moving party is entitled to judg-
ment as a matter of law. *Sempier v. Johnson & Hig-
gins,* 45 F.3d 724, 727 (3d Cir.1995) (citing *Chi-
pollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d
Cir.1987) (en banc)). The moving party need not
produce evidence to disprove the opponent's claim
but does carry the burden of demonstrating the ab-
sence of any genuine issue of material fact. *Celotex
Corp. v. Catrett,* 477 U.S. 317, 323 (1986). In turn,
the non-moving party cannot rely on the allegations
contained in the complaint. Instead, the nonmoving
party must offer specific facts indicating that a
genuine issue for trial exists. *Id.* at 324. If there are
no genuine issues as to material facts, the court
must determine whether the moving party is en-
titled to a judgment as a matter of law. Fed.R.Civ.P.
56(c).

   Plaintiffs' have asserted claims of failure to
warn and defective design and/or manufacture
claims. Under section 402A of the Restatements
(Second) of Torts, which was adopted by the
Pennsylvania Supreme Court in *Webb v. Zern,* 220
A.2d 853, 854 (Pa.1966), a manufacturer is strictly
liable for injuries caused by a product that is

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

"unreasonably dangerous to intended users for its intended use." *Parks v. AlliedSignal, Inc.,* 113 F.3d 1327, 1330 (3d Cir.1997) (quotation omitted). To establish a claim under § 402A, the plaintiffs must prove that the product was defective and that such defect caused the plaintiffs' injuries. *See Berkebile v. Brantly Helicopter Corp.,* 337 A.2d 893, 898 (Pa.1975).[FN1] To establish liability for failure to warn, plaintiffs must prove that the lack of a warning (a) rendered the product ""unreasonably dangerous," and (b) was the proximate cause of plaintiffs' injuries. *Staymates v. ITT Holub Industries,* 527 A.2d 140, 147 (Pa.Super.Ct.1987).

> FN1. As a threshold matter, where plaintiffs allege defective design, the court must conduct a risk-utility analysis to determine as a matter of law whether the product at issue is defective. *Surace v. Caterpillar, Inc.,* 111 F.3d 1039, 1046 (3d Cir.1997). A product design is defective where the product's condition justifies placing the risk of loss on the manufacturer or supplier because the unavoidable dangers posed by the product outweigh its social utility. *Id.* " If the court determines that the product is defective as alleged, then the case is submitted to the jury to determine whether the facts indicate that when the product left the manufacturer's control it 'lack[ed] any element necessary to make it safe for its intended use or possess[ed] any feature that rendered it unsafe for its intended use.' " *Id.* at 1044 (quoting *Azzarello v. Black Bros. Co.,* 391 A.2d 1020, 1027 (Pa.1978)). The court has not conducted a risk-utility analysis to determine whether synthetic carpets made by defendant are defectively designed because that issue was not fully briefed by the parties, and because the court will dispose of the case on causation grounds.

**\*6** For a defective design and/or manufacture claim, the plaintiff bears the burden of demonstrat-

ing proof of causation. *See City of Philadelphia v. Lead Industries Ass'n,* 994 F.2d 112, 123 (3d Cir.1993); *Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 366 (3d Cir.1990). Similarly, the absence of proof of causation is fatal to a failure to warn claim. *Staymates,* 527 A.2d at 147. Plaintiffs must show that the harmful result would not have occurred but for the defendant's conduct, and that the causal connection between the defendant's conduct and the plaintiffs' injuries is not remote. *See Robertson,* 914 F.2d at 367. Although causation is normally an issue of fact for the jury, the question becomes one of law where the relevant facts are not in dispute and the remoteness of the causal connection between the defendant's negligence and plaintiffs' injuries is clearly apparent. *See Conti v. Ford Motor Co.,* 743 F.2d 195, 197–98 (3d Cir.1984).

In toxic tort claims, plaintiffs must prove general and specific causation. *See DeLuca v. Merrell Dow Pharmaceuticals,* 911 F.2d 941, 958 (3d Cir.1990). General causation addresses whether products of the same nature as defendant's product are capable of causing the type of injuries alleged here; specific causation addresses whether defendant's product more likely than not caused injuries in this particular case. *Rutigliano v. Valley Business Forms,* 929 F.Supp. 779, 783 (D.N.J.1996), *aff'd sub nom. Valley Business Forms v. Graphic Fine Colors, Inc.,* —— F.3d —— (3d Cir. June 27, 1997). To prove specific causation, plaintiffs must prove that (1) that the defendant released toxins into the environment, (2) that plaintiffs were exposed to such toxins, (3) that plaintiffs have an injury, (4) and that the toxins released by defendant caused that injury. *See In re TMI,* 67 F.3d 1103, 1118–19 (3d Cir.1995), *cert. denied,* 116 S.Ct. 1034 (1996); *In re Paoli R.R. Yard PCB Litigation,* 916 F.2d 829, 860 (3d Cir.1990). The first element represents a combination of the traditional tort elements of duty and breach, while the remaining elements add an exposure prong to the causation and injury requirement. *In re TMI,* 67 F.3d at 1119. The exposure element requires plaintiffs to show that they

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

were exposed to levels that exceed the normal background level, *Id.,* while the causation element requires proof that the dosage and duration of plaintiffs' exposure were at levels that are hazardous to human beings. *See Mateer v. U.S. Aluminum,* 1989 WL 60442, at *6 (E.D.Pa. June 6, 1989) (holding that plaintiffs "must at a minimum show that their level of exposure created a significant potential health risk."). *Id.*

*7 Where essential elements of plaintiffs' case depend on expert testimony, a determination of defendant's summary judgment motion must be preceded by a determination of the relevance and reliability, and hence admissibility, of the proffered expert testimony. *See Rutigliano,* 929 F.Supp. at 783. In *Daubert v. Merrell Dow Pharmaceuticals,* 113 S.Ct. 2786, 2795 (1993), the Supreme Court held that Federal Rule of Evidence 702 FN2 requires the district court to ensure that any and all scientific testimony and evidence is reliable. Pursuant to Fed.R.Evid. 104(a),FN3 the court must make a preliminary assessment of the reasoning or methodology underlying the proffered expert scientific testimony. *See Id.* at 2796. The district court's gatekeeper role entails the preliminary assessment of the qualifications of the expert, and the reliability and fit of the testimony; the court must ascertain whether the expert is qualified to render an opinion on the subject, whether the methodology or reasoning underlying the testimony is scientifically valid, and whether the opinion can be applied to the facts at issue. *Daubert,* 113 S.Ct. at 2796.FN4

FN2. Rule 702 provides that:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702.

FN3. Rule 104(a) provides:

Preliminary questions concerning the qualification of a person to be a witness, the existence of privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b) [ [ [pertaining to conditional admissions]. In making its determination it is not bound by the rules of evidence except those with respect to privileges.

Fed.R.Evid. 104(a).

FN4. Defendant does not challenge the qualifications of plaintiffs' experts or whether their testimony fits the particular disputed factual issues in the case.

The party proffering the testimony must show by a preponderance of evidence that the techniques or principles underlying an opinion are sufficiently reliable so that the opinion will aid the jury in reaching an accurate decision. *DeLuca,* 911 F.2d 956; *United States v. Downing,* 753 F.2d 1224, 1240 n. 21 (3d Cir.1985) ("When there is a serious question of reliability of evidence, it is appropriate for the court to exercise some degree of evidentiary screening function."). The expert's opinion must be based on scientific knowledge; that is the methods and procedures must be grounded in science, rather than "subjective beliefs or unsupported speculation." *Daubert,* 113 S.Ct. at 2795. To qualify as "scientific knowledge," "an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by the appropriate validation—i.e., 'good grounds' based on what is known." *Id.*

The trial judge should not exclude evidence merely because he or she disagrees with the expert's conclusions or finds that the expert's techniques have flaws sufficient to render the expert's conclusion inaccurate. *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 745 (3d Cir.1994). "The focus ...

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

must be solely on principles and methodology, not on the conclusions that they generate." *Daubert,* 113 S.Ct. at 2797. Indeed, the fact finder may be assisted in reaching an accurate result by a consideration of the expert's testimony together with an assessment of its flaws. *In re Paoli* 35 F.3d at 745. However, where the flaws are large enough that the expert lacks "good grounds" for his or her conclusion, the court should exercise its gatekeeper role and exclude the evidence. *Id.* at 746.

**\*8** In determining the validity of the methodology and principles underlying an expert's opinion, the district court should take into consideration the following factors: (1) the existence and maintenance of standards controlling the technique's operation; (2) whether the methodology has been subject to peer review and publication; (3) what the known or potential rate of error of that technique may be; (4) whether the methodology has been generally accepted in the scientific community; (5) the degree to which the expert is qualified; (6) the novelty of the technique, that is, its relationship to more established modes of scientific analysis; (7) and the non-judicial use to which the scientific technique is put. *Id.*[FN5]

> FN5. After assessing the reliability of the evidence, the court must also weigh the danger that the evidence might confuse or mislead the jury through an unwarranted "aura of reliability." *Downing,* 753 F.2d at 1239. This analysis is performed under the rubric of the probative against prejudice balancing test of Fed.R.Evid. 403. In order to exclude evidence under Rule 403, "there must be something *particularly* confusing about the scientific evidence at issue—something other than general complexity of scientific evidence." *Paoli,* 35 F.3d at 747 (emphasis in original). However, Rule 403 is rarely appropriate as a basis for pre-trial exclusion, unless the *in limine* hearing creates the "virtual surrogate for a trial record." *Id.*

Additionally, the court must make an independent evaluation of proffered expert testimony to ascertain whether it conforms to the requirements of Federal Rule of Evidence 703, which mandates that the facts and data upon which an expert relies in reaching a conclusion must be of a type reasonably relied upon in the particular filed. *In re Paoli,* 35 F.3d at 747.[FN6] "[T] he proper inquiry is not what the court deems reliable but what experts in the relevant discipline deem it to be." *DeLuca,* 911 F.2d at 952 (quotation omitted). However, "it is the judge who makes the determination of reasonable reliance, and [ ] for the judge to make the factual determination under Rule 104(a) that an expert is basing his or her opinion on a type of data *reasonably* relied upon by experts, the judge must conduct an independent evaluation into reasonableness." *Id.* at 748 (emphasis in original). The court must ascertain that the expert had good grounds for finding the data reliable and good grounds to rely on this data to draw the conclusion reached by the expert. *Id.* at 749.[FN7]

> FN6. Fed.R.Evid. 703 provides:
>
> > The facts and data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before trial. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
>
> FN7. In addition, in cases governed by Pennsylvania law, the court must apply the Pennsylvania rule requiring experts to testify that defendant's actions caused plaintiffs' illness with a reasonable degree of medical certainty. *See Paoli,* 35 F.3d at 750–52. The Pennsylvania requirement of reasonable medical certainty is not merely a rule of admissibility but also constitutes part of the plaintiffs' burden of proof under Pennsylvania law. *Id.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

*B. The Testimony of Plaintiffs' Experts*

*i. Alan Todd*

Alan Todd, proffered by plaintiffs as an expert in industrial hygiene and environmental assessment and occupational health and safety, opined in his report and at the *in limine* hearing that Carol Heller's symptoms were caused by exposure to high concentrations of benzene, 2 butoxy ethanol and benzene homologues emanating from the Newance carpeting.

With respect to general causation, defendant argues that the undisputed scientific evidence shows that carpet emissions do not present a risk to human health.[FN8] Defendant's expert Ronald E. Gots, M.D., Ph.D., testifies that there have been five significant risk assessment studies of emissions from carpeting, and that each study found that the levels of VOCs emitted from carpets were well below levels anticipated to produce health effects based on available toxicological data. (Defend. Exhib. J at 22.) [FN9]

FN8. The following risk assessment studies conducted tests for emissions from nylon, SBR-backed carpets: (1) in 1990, Terra Inc. conducted emission testing on eight SBR-backed carpets; (2) in 1992, the United States Consumer Products Safety Commission conducted emission tests on four carpet samples, two of which were SBR-backed; (3) in 1992, the Research Triangle Institute performed a risk analysis on emissions from nineteen different carpet samples, all of which were SBR-backed carpets; (4) in 1994, Environ. Corp. conducted a risk analysis of chemicals found to be emitted from new carpets; and (5) in 1994, Alan Hedge, Ph.D. and Rodney Dietert, Ph.D. of Cornell University prepared a review summarizing the current literature concerning chemical emissions from new carpets and their potential for toxicity. All five studies concluded that

SBR-backed carpeting poses no significant health threat.

FN9. Plaintiffs argue that defendant's own internal memoranda reveal that the five emissions studies are not scientifically valid. Plaintiffs note that none of the studies is published, and that the studies surveyed a relatively small number of VOCs emitted from a statistically insignificant number of carpets. Moreover, plaintiffs contend that the studies were developed by defendant and the carpet industry as part of a public relations effort to portray the industry in a favorable light. Plaintiffs quote Carey Mitchell, defendant's expert witness on the subject of carpet emission research, who characterized the research as "political rather than scientific." (Plain. Exhib. 34.)

**\*9** At the *in limine* hearing, Todd opined that SBR-backed carpeting can cause the type of symptoms experienced by Carol Heller. To support his opinion, Todd cited the following: research conducted in Scandinavia pertaining to " sick building syndrome " [FN10]; various defendant internal memoranda acknowledging that carpets emit VOCs; and records of numerous consumer inquiries and complaints to defendant, CRI, and the government concerning carpet odors and related health risks.

FN10. *See* Lars Molhave, *Volatile Organic Compounds, Indoor Air Quality and Health,* Proceedings of 5th International Conference on Indoor Air Quality and Climate (1990) (Plain. Exhib. 17); Dan Norback and Margareta Torgen, *A Longitudinal Study Relating Carpeting With Sick Building Syndrome,* 15 Envtl. Int'l 129–35 (1989) (Plain. Exhib. 18); B. Seifert, D. Ullrich and R. Nagel, *Volatile Organic Compounds from Carpeting,* Proceedings of the 8th World Clean Air Congress (1989) (Plain. Exhib. 19); Dawn Tharr, *Organic Vapor Emissions from Wall-to-Wall Carpets as a Source of Indoor Air Pollu-*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050

Page 9

**(Cite as: 1997 WL 535163 (E.D.Pa.))**

*tion,* 11(5) Appl.Occup.Envtl.Hyg. 436–39 (1996) (Plain. Exhib. 20).

The court finds that the information cited by Todd does not support his conclusion that SBR-backed carpets can cause the types of symptoms experienced by Carol Heller. The publications relied on by Todd do not support his claim that SBR-backed carpeting can cause respiratory illness. The first article, by Lars Molhave, does not relate to carpeting but solely addresses the health effects of various VOC exposures. (Plain. Exhib. 17.) The second article, by Dan Norback and Margareta Torgen, reports a correlation between wall-to-wall carpeting and the frequency of respiratory symptoms among children in schools in Sweden. The carpets involved, however, had been installed eight to ten years earlier and the authors of the article specifically state that chemical emission from the carpeting was a less probable cause of the childrens' symptoms. (Plain. Exhib. 18.) The third article, by B. Seifert, D. Ullrich and R. Nagel, reports the results of chamber and field tests for VOC emissions from new carpeting. The authors conclude that although the new carpeting emitted 4 phenylcyclohexane, styrene and 2 ethylhexanol, it was the adhesives used to fix the carpet that emitted general aromatic hydrocarbons at sufficiently levels to explain complaints like those associated with " sick building syndrome." (Plain. Exhib. 19.) Here, there is no dispute that the Newance carpet was not installed with adhesives. The fourth article, by Dawn Tharr, reports the results of ambient air quality tests conducted in rooms containing newly installed, wall to wall, glued down, SBR-backed carpets. Tharr discovered that the new carpets emitted a complex mixture of refined petroleum solvents, and that the majority of the solvents were released in the first few days after installation. However, Tharr reports that "[n]one of the measured air concentrations approached the reported sensory thresholds." (Plain. Exhib. 20.)

Similarly, the defendant memoranda cited by Todd are not of the type of evidence upon which an expert would reasonably rely in concluding that carpets can cause asthma. *See Paoli,* 35 F.3d at 749. Although Todd has not elaborated on the significance of the defendant memoranda and customer complaints, plaintiffs submitted copies of that information in their summary judgment exhibits and discussed its import in their summary judgment briefs. The submitted evidence consists of memoranda in which existing and former employees of defendant acknowledge that new carpets emit VOCs, specifically toluene, 2 butoxy ethanol, 4 phenylcyclohexane, toluene, benzene, 1,1,1–trichloroethane, methylene chloride, and chloroform. Although the submitted memoranda reveal that defendant was aware that new carpets emit VOCs, the memoranda do not reveal what level of VOC emissions had been discovered by defendant, or whether the reported emissions were at a levels known to be hazardous to health.[FN11]

> FN11. Plaintiffs also discuss a 1985 letter from E.C. Roberts, Ph.D., the manager of the Measurements Department of West-Point Pepperell Research Center, to Carey Mitchell, defendant's Director of Technical Services. Roberts reported a pattern of complaints and reported symptoms associated with new carpet installations, and described air sample tests conducted by an unnamed school, which detected the presence of 58 chemicals emitted by carpet nearly two months after installation.

*\*10* Again, the large number of complaints cited by plaintiffs regarding new carpet emissions do not establish general causation because plaintiffs offer no evidence to show that such complaints concern incidents substantial similar to the incident here. *See Spino v. John S. Tilley Ladder Co.,* 1997 WL 329133, at *2 (Pa. June 17, 1997) (holding that evidence concerning other accidents involving the instrumentality that causes the present harm is relevant to prove causation where the other accidents were sufficiently similar to plaintiff's accident); *Di-Frischia v. New York Central Railroad Co.,* 307

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

F.2d 473, 476 (3d Cir.1962). Plaintiffs relate details of two specific instances in which consumers have developed breathing difficulties after having new carpets installed. (Plain. Exhib. S–8, S–9.) However, plaintiffs have not established that those instances involved facts and circumstances sufficiently similar to the facts and circumstance here. Similarly, plaintiffs submit no evidence regarding the nature of the other inquiries and complaints received by defendant, CRI, or the government.

Regarding specific causation, Todd posits that Carol Heller's illness was caused by dangerously high levels of benzene, 2 butoxy ethanol and five benzene homologues emitted by the Newance carpet installed at the Fox Glove residence. Todd estimates that the total ambient air concentration of the above seven hydrocarbons in the Heller residence after the initial 24 hour period following the installation of the rugs in mid-December, 1993 was over 52.71552 parts per million (ppm) or 52,715.52 ppb, and that the concentration of benzene alone was 6.84032 ppm or 6,840.32 ppb. Todd believes that such exposure exceeds the Permissible Exposure Limits (PELs) promulgated as workplace standards by the Occupational Safety and Health Administration (OSHA) and the Threshold Limit Values (TLV), which are workplace exposure guidelines derived by the American Conference of Governmental Industrial Hygienists (ACGIH). In addition, Todd cites a Scandinavian study that suggest that exposure to total VOC concentrations of over 7.8 ppm for fifty minutes or more may be expected to cause toxic effects.

In his analysis, Todd applied a two step methodology: the court will refer to the first step as the subtraction method and the second step as the back-extrapolation method. Todd used his subtraction method to calculate what amount of the VOCs detected in the Heller home in April, 1994 can be attributed to the Newance carpets; Todd then applied his back-extrapolation method to the data obtained from the subtraction method to estimate the levels of VOCs emitted by the Newance carpet when it

was installed in the home in December, 1993.

The subtraction method involves the following. On April 14, 1994, Todd Environmental collected an air sample from the closet in Emily's bedroom using an EPA approved collection technique classified as TO1. The TO1 test equipment extracted ambient air from the closet and passed it through a cartridge in which highly volatile VOCs were trapped on a Tenax resin. After eight hours, Todd removed the cartridge from the sampling equipment and forwarded it to MDS, where the Tenax resin sample was analyzed using the GCMS procedure, in which VOCs were purged from the resin sample with an inert gas and placed in a gas chromatography column at low temperature. The column was then heated and the components eluting were identified by mass spectrometry. The results were depicted on a total ion chromatogram, in which the various peaks readings revealed the presence and amounts of various individual VOCs. On May 5, 1994, Todd Environmental repeated the same tests, only this time using collection method T02, which utilizes a carbon molecular sieve absorbent instead of a Tenax resin, and which utilizes a different purging technique. Subsequently, comparing the results of the April and May tests, Todd noted that the concentrations in the closet of benzene, 2 Butoxy ethanol and the five benzene homologues had decreased sharply from April to May, 1994. Todd posits that the cause of the decrease in the concentrations of those compounds was the fact that the Newance carpet had in the meantime been removed from the house. Todd notes that no other changes had occurred to the residence between the two tests, and that the house had been empty of occupants. Thus, Todd opines that the concentration of VOCs that can be attributed to the Newance carpets equals the concentrations detected in the April minus the concentrations detected in May. Based on that formula, Todd declares that in April, 1994, the Newance carpeting was responsible for the following concentrations of VOCs in the Heller home: benzene 1.67 ppb; 2 butoxy ethanol 5.52 ppb; and benzene homologues 5.68 ppb.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

**\*11** For the next part of his analysis, Todd calculated VOC levels emitted by the Newance carpet in December, 1993 by back-extrapolating from the April VOC levels. Todd posits that the VOCs in the headspace over the carpet disperse in a geometric progression, i.e., VOC concentrations decrease by one half at regular intervals or half-lives. Todd's postulate is derived from the results of various small and large chamber carpet emission tests. In those tests, researchers placed carpet samples in sealed chambers, passed a known volume of clean air through the chamber, recollected the air, and measured it for VOC concentrations. Applying known parameters, the researchers then converted the discovered concentrations into rates of emission in milligrams per meter square of carpet per period of time.

Todd asserts that the carpet study tests reveal that emissions of 4 phenylcyclohexane (4–PCH)—the chemical that produces the characteristic new carpet odor—decease by 50% every eight days. Based on that observation, Todd contends that ambient air concentrations of 4 PCH also decrease in a geometric progression, and that emissions and concentrations of other VOCs decrease in a similar fashion, albeit with differing half-lives.[FN12] For the purpose of calculating the previous levels for benzene, 2 butoxy ethanol and the benzene homologues, Todd chooses a ten day half- life because although benzene and the benzene homologues are more volatile than 4 PCH and dissipate quicker, 2 butoxy ethanol has a low vapor pressure and is more soluble and, thus, off-gasses at a much slower rate than 4 PCH. Consequently, Todd theorizes that the seven VOCs that he attributes to the Newance carpeting have an average half-life of ten days, i.e., the concentrations of those compounds decreases by 50% every ten days.

> FN12. Todd also testified at the *in limine* hearing that benzene levels in the blood stream decrease in a geometric progres- sion.

Based on his ten day half life theory, Todd cal-

culates that the concentrations of the VOCs detected in April, 1994, and attributed by Todd to the Newance carpet were 4096 times higher in December, 1993 because in the 120 day period between December and April, the concentrations of the VOCs went through twelve half-lives, i.e., the concentrations decreased by 50% twelve separate times. Therefore, according to Todd, the levels in December, 1993 were 4096 times higher than in April, 1994; the concentration of benzene in the Heller home was 6,840.32 ppb, the combined concentration of 2 butoxy ethanol and the 5 benzene homologues was 45,875.2 ppb, and the total concentration of all seven VOCs was 52,715.52 ppb.

Finally, Todd opines that the concentrations of VOCs calculated by using his back extrapolation method are sufficiently high to have caused Carol Heller's alleged symptoms because those levels greatly exceeded OSHA and TLV safety standards as modified for residential settings.

After careful consideration of the principles and theories applied by Todd, the court concludes that Todd's opinion is unreliable because the reasoning and methodology underlying his testimony is not scientifically valid. First, neither Todd nor any other researcher has tested Todd's subtraction and back-extrapolation methodologies to see whether the given results are reproducible. *See Daubert,* 113 S.Ct. at 2796 ("Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified"). Similarly, Todd's theories have not been published and subjected to peer review. Although publication is not the *sine qua non* of admissibility, "'submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." *Id.* at 2797.

**\*12** With respect to Todd's subtraction method, Todd did not conduct further tests to ascertain whether changes in the levels of VOCs were attributable to the removal of the carpet or whether the changes were attributable to the natural fluctuation

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

in VOC levels within the home. At the *in limine* hearing, Todd conceded that the VOC levels detected were close to background rates; Todd testified that the background rate for benzene was 2.0 to 0.5 ppb and, although he has never seen a study of the normal range of benzene, Todd acknowledged that 2.22 ppb was within the normal range for benzene. With respect to 2 butoxy ethanol and the benzene homologues, Todd testified that there is no published study of the background rates, and he has not conducted any tests to determine the background rates of those VOCs. However, in his report, defendant's expert Alfred Hodgson testified that in tests conducted in 12 office buildings in California, the geometric concentration of 2 butoxy ethanol was 1.6 ppb with a geometric standard deviation of plus or minus 3.7 ppb, and the geometric average concentration of benzene was 1 ppb with a standard deviation of 2.7 ppb. (Defend. *in limine* Hearing Exhib. 23 at 6.) At the *in limine* hearing, Hodgson opined that the typical range for benzene found within the home is 1 to 3 ppb, and the typical level range for 2 butoxy ethanol is 0.4 to 27 ppb. Defendant's other expert, Ronald E. Gots, testified at the hearing that the average ambient concentration in the home of benzene ranges from 1.6 to 11 ppb, and of 2 butoxy ethanol ranges from 0.2 to 8 ppb. Those averages are derived from the Environmental Protection Agency (EPA) Total Exposure Assessment Methodology study (Team study),[FN13] a 1996 benzene exposure study conducted by Lance Wallace,[FN14] and the EPA's 1988 National Ambient Volatile organic Data Base.[FN15] Here, the Heller home had 2.2 ppb of benzene and 5.6 ppb of 2 butoxy ethanol. Consequently, the VOC concentrations detected by Todd Environmental were all within background ranges.[FN16]

FN13. The TEAM study conducted air monitoring tests for VOCs in 600,000 homes throughout the United States between 1980 and 1987.

FN14. *See* Lance Wallace, *Environmental Exposure to Benzene: An update,* 104 Environ. Health Perspectives Supp. 6 at 1129 (1996) (Defend. *in limine* Hearing Exhib. 11).

FN15. That study did not research 2 butoxy ethanol levels.

FN16. Plaintiffs proffered no evidence with respect to either the background levels or sensory threshold levels for the benzene homologues.

Additionally, Todd did not take any steps to insure that other variables did not effect the air sampling tests. Todd did not measure the air flow or ventilation rates in the closet, no inventory was made of the contents of the closet, and Todd did not personally perform the May, 1994 tests. Further, Todd did not perform any closed chamber tests on a sample of the Newance carpet to verify the source of the VOCs. The American Society for Testing and Materials (ASTM) has validated a procedure for small-scale environmental chamber tests of organic emissions from indoor materials and products, designated as ASTM D 5116–90.[FN17] (Defend. *in limine* Hearing Exhib. 1.) The use of that procedure would have enabled Todd to measure the exact level of VOC emissions from the carpet and to verify the accuracy of his subtraction method.

FN17. In the 1991 Carpet Policy Dialogue Compendium report Discussion draft, the Environmental Protection Agency (EPA) adopted ASTM D5116–90 as the appropriate procedure for testing emissions from carpets. (Defend. *in limine* Hearing Exhib. 2 at 2.1.)

Ironically, it is Todd's back extrapolation method that delivers the *coup de grace* to his subtraction method. Todd posits that the difference in the VOC concentrations in the bedroom closet between April and May, 1994 was caused by the removal of the Newance carpets because everything else in the closet was unchanged. However, according to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

Page 13

Todd's back-extrapolation method, in the twenty days between the April and May tests, the amount of VOCs emitted by the carpeting went through two half lives, i.e., the VOC levels were reduced to 25% of previous levels. Thus for benzene, which had a recorded concentration in April of 2.2 ppb., Todd's back-extrapolation method would predict that the recorded concentrations of benzene in May would be 0.55 ppb, even if the carpet was not removed from the home. The exact concentration of benzene detected in May, 1994 was 0.55 ppb. Therefore, Todd cannot claim that the difference in the concentration of benzene between April and May, 1994 is solely attributable to the removal of the Newance carpets when, according to Todd's back-extrapolation theory, the difference is attributable to benzene's ten day half-life decay.

**\*13** Similarly, Todd performed no testing of his back-extrapolation methodology to see if his results are reproducible, Todd has not written up his back-extrapolation method and there is therefore no peer review of his method. Further, Todd testified that to his knowledge no one else has ever tried to use the same method, and that there is no peer review for any four to five month back-extrapolation of carpet emissions.

Moreover, the results from small and large chamber carpet emissions tests undermine the postulates upon which Todd's back-extrapolation method is based. At first blush, it is difficult to determine whether the prior studies corroborate Todd's calculations because Todd's measurements involve VOC concentrations in ppm and ppb, while the carpet emission studies reported their findings as emissions in the metric of milligrams of VOC per meter square of carpet. Even where the carpet studies discussed concentrations, the studies employed the metric of micrograms per cubic meter. Further, there is no published information concerning the half-life of benzene.

Nevertheless, the carpet study results reveal that Todd's half-life theory is not grounded in science in that emissions from carpets do not decrease

in a geometric progression over the first four months following installation; rather, carpet VOC emissions decease rapidly in the first few days, after which the rate of decrease slows until by the fourteenth day after installation, VOC emissions are at background levels. (Plain. Exhib. 20; Exhib. 36; Exhib. 45.) Professor Alfred T. Hodgson, who has performed closed chamber carpet emission studies at the Indoor Environment Program, Environmental Energy Technology Division, of the Lawrence Berkeley National Laboratories, testified for defendant that although emission rates do decline exponentially if an emitting substance is present and air flow rates are steady, the emitting curve is exponential for a very short time. Hodgson states in his report that "the scientific literature does not support the assumption of an exponential decay for even a period as short as one week." [FN18] (Defend *in limine* Hearing Exhib. 23 at 18.) Furthermore, Hodgson testified at the hearing that the same exponential decline phenomena does not apply to VOC concentrations in air. Hodgson explained that emission rates and air concentrations measure different phenomena: emission rates describe the amount of VOCs released from an emitting substance during a stated period of time; air concentrations measure the total number of molecules or the mass of VOCs in a set amount or volume of air. While emission rates initially may be exponential, the same is not necessarily true for air concentrations within a room because air concentrations are largely affected by ventilation rate. Moreover, no chamber emissions studies have ever detected emissions of benzene, 2 butoxy ethanol or benzene homologues in anywhere close to the levels back-extrapolated by Todd.[FN19] Consequently, there is no support for Todd's hypotheses that the concentrations of benzene, 2 butoxy ethanol, and the benzene homologues will continue to decrease by 50% every ten days for up to four months after installation.[FN20]

FN18. Todd conceded at the *in limine* hearing that he had never seen a decay curve for benzene or 2 butoxy ethanol.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

FN19. The 1991 Terra study detected emissions of 2 butoxy ethanol for seven of the eight samples of carpet tested. However, the highest air concentration of 2 butoxy ethanol detected was 4.5 micrograms per cubic meter, or under 1 ppb. (Defend. *in limine* Hearing Exhib. 14 at A–9.)

FN20. In their reply memorandum to defendant's motion *in limine,* plaintiffs submit the affidavit of Kenneth P. Reed, Ph.D, who testified that Todd's calculation of the December, 1993 emission levels is valid and that the methodology employed is generally accepted within the scientific community. Reed explains that he used the same methodology when testifying in a similar case in Louisiana state court. Further, Reed makes his own calculation of the VOC concentration in December, 1993; Reed concludes that the concentration of VOCs at the time of installation was 50 milligrams per cubic meter (mg/m3). (Plain. Motion *In Limine,* Exhib. L at ¶ 6.)

However, the court and not Dr. Reed must decide whether Todd's opinion is reliable, and Reed's conclusory statements add little to an analysis of the validity of Todd's methodology. Moreover, Reed's research and opinions were not relied upon by any of plaintiffs' experts, and plaintiffs did not call Reed to testify at the *in limine* hearing.

*14 A further factor pertinent to reliability is the known or potential rate of error of the method. At the *in limine* hearing, Todd testified that his estimate of VOC levels for December, 1993 could be off by as much as 100%. Such a margin of error casts further doubt on the reliability of Todd's VOC projections.[FN21]

FN21. Todd has changed his estimate of VOC levels for December, 1993 four times; each time he has greatly increased the size of his estimate. In his initial report, Todd stated that the total concentration of VOCs was 20.48 ppb in mid-April, 1994, and that the concentration of VOCs in December, 1993 would have been two fold and more likely 10 fold higher, i.e. approximately 200 ppb or 0.2 ppm. Based on that estimate, Todd concluded that "off-gassing from the Shaw manufactured carpeting installed in the residence in December 1993 was the likely source of the irritation and related responses." (Defend. Exhib. J at 12.) Second, at his first deposition, Todd testified that the December, 1993 levels were 50 to 100 times higher than the levels detected in April, 1994. Third, in Todd's addendum report, Todd stated that the December levels were 1024 times higher than in April. Finally, at the *in limine* hearing, Todd testified that the December concentrations were 4096 times higher than the April concentrations.

With the exception to Todd's qualifications, the remaining factors for consideration in determining reliability all weigh against admitting Todd's opinion. There is some evidence that Todd's subtraction method is not novel and has nonjudicial uses. Todd testified that he has used his subtraction method in EPA air quality compliance test. Similarly, defendant's expert Hodgson, who has previously conducted studies of VOC emissions from carpets in a residential test site, employed a similar subtraction method to distinguishing carpet VOC emissions from VOC background levels. In contrast, however, Todd's back extrapolation method is novel, it has not been put to any non-judicial uses, and there is no evidence of record that Todd's theory is generally accepted by the scientific community.

Even if the court were to admit Todd's testimony regarding post-installation emission rates,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

Page 15

Todd's opinion must nevertheless be discarded because Todd offered no support for his contention that benzene, 2 butoxy ethanol or benzene homologues can in general, or in the specific concentrations calculated by Todd, cause the type of illness allegedly experienced by Carol Heller. Plaintiffs' expert Ronald E. Gots, M.D., Ph.D. testifies that benzene does not produce allergies and is not an asthmogenic, except at extremely high levels of hundreds of ppm. (Defend. Exhib. J at 11.) Similarly, plaintiffs offer no proof that 2 butoxy ethanol can cause asthma or allergies.

Todd concedes that the relevant compounds are not allergenic or asthmogenic, but posits that the compounds are irritants when present at sufficiently high levels of exposure. At the *in limine* hearing, Todd testified that Scandinavian research supports his opinion that the levels of benzene, 2 butoxy ethanol and benzene homologues estimated for December, 1993 are sufficient to have caused Carol's symptoms. In one article, Lars Molhave [FN22] —a professor at the University of Aarhus, Denmark—states that discomfort is expected when total VOC emission levels in a residential setting exceed 3.0 milligrams per cubic meter (mg/m3),[FN23] and that levels in excess of 8 mg/m3 produce perceived odor and acute irritation. Additionally, Molhave states that exposure to levels of 25 mg/m3 seems to cause weak environmental stress symptoms such as headaches and drowsiness, and associated psychological effects like changed performance, confusion, and fatigue. (Plain. Exhib. 17 at 10.) However, Molhave cites total VOCs and not the specific VOCs discussed by Todd. Further, Molhave's article discusses VOC concentrations in milligrams per cubic meter, while Todd's report uses the parts per million/billion scale. In their reply memorandum, plaintiffs have converted Molhave's data into parts per million/billion in order to compare Molhave's limits with Todd's estimates. However, the court is unable to verify the accuracy of plaintiffs' data conversion because plaintiffs have not explained what formula was used.[FN24] Consequently, the threshold limits stated by the

Molhave article are not stated in data that have meaning to the issues here.

> FN22. *See* Lars Molhave, *Volatile Organic Compounds, Indoor Air Quality and Health,* Proceedings of 5th International Conference on Indoor Air Quality and Climate (1990) (Plain. Exhib. 17).

> FN23. Although Molhave notes that investigations found that complaints seem to be present when VOC concentrations exceed 1.7 mg/m3, in the same paragraph Molhave states that concentrations reported from field investigators were improperly investigated and may be biased. (Plain. Exhib. 17 at 9.)

> FN24. The formula for converting concentrations in parts per million/billion into concentrations in milligrams per cubic meter includes variables for molecular weight, temperature and pressure. Ten parts per million of a hydrocarbon with a low molecular weight weigh less—and therefore measure less in milligrams per cubic meter—than ten parts per million of a hydrocarbon with a higher molecular weight. (*See* Defend. *in limine* Hearing Exhib. 23 at 19–20.)

**\*15** Additionally, Todd asserts that his estimated VOC levels for December, 1993 exceed the OSHA and TLV standards as modified for residential locations. Todd testified at the *in limine* hearing that the OSHA permissible exposure level for benzene is 10 ppm, the TLV for benzene is 5 ppm, and the TLV for 2 butoxy ethanol is 25 ppm. (Plain. *in limine* Hearing Exhib. 14, A Safety Assessment of Carpet Emissions by Terra, Inc. at 7). Todd states that these standards were derived for industrial settings, and that to obtain similar standard for residential environments, the PEL and TLV levels must be divided by 100. Todd argues that such an adjustment is accepted practice because individuals spend more time in the home, and because acceptable

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

Page 16

levels of exposure are lower where the individuals exposed may be elderly, children or pregnant women. Todd opines that his 100 fold adjustment is conservative in that the 1991 Terra study on carpet emissions applied a 420 safety factor to ensure that individuals who may be more sensitive than the normal factory worker are protected. Consequently, Todd believes that the residential TLV for benzene is 50 ppb, and for 2 butoxy ethanol is 250 ppb.

However, the OSHA and TLV standards cited by Todd relate to long term exposure risks. The modified residential TLVs cited in the Terra study are defined as the maximum "concentration of chemical which under continuous exposure conditions is expected to be devoid of all acute and chronic toxicities." (Plain. *in limine* Hearing Exhib. 14 at 3.) According to Todd's own back-extrapolation estimate, the levels of benzene and 2 butoxy ethanol were above the residential TLVs for only 80 days.[FN25] Moreover, at the *in limine* hearing, Todd conceded that the OSHA and TLV standards do not relate to asthma or allergy, but to long term health risks for cancer and leukemia.[FN26]

> FN25. Further, Todd's causation theory does not explain why Thomas and Carol still continued to experience symptoms after the concentration of VOCs declined following the initial period of time after the carpet was installed. Further, Todd's theory does not explain why persons who visited plaintiffs' home in February and March, 1994 allegedly experienced an allergic reaction. Plaintiffs state that Thomas Heller's sister, Patricia Heller, experienced coughing, difficulty breathing, irritation and "feeling like [she] had sand in her lungs[ ]" when she spent the weekend with plaintiffs at Easter, 1994. Similarly, plaintiffs claim that Dan Smith, who visited the Heller home in February or March, 1994, experienced a burning sensation in his nose, throat and eyes, difficulty breathing and an ill feeling after his visit.

Alternatively, plaintiffs argue that the latex backing in the carpeting became delaminated, producing off-white sandy particles, and that such particles remained in the home after the carpets were removed, thus precipitating plaintiffs' continued allergic reaction. Plaintiffs, however, have failed to proffer evidence that the delamination process produces chemicals harmful to human health. Plaintiffs contend that, "it is well known that the inhalation of latex particles can cause severe asthmatic attacks, sensory irritation and dermatological irritation." (Plain. Memo. in Opp. to S.J. at 17.) As support for that assertion, plaintiffs cite defendant's expert Dr. S. Michael Phillips, M.D. (Plain. Exhib. 15 at 226–31.) However, Phillips specifically states that the particles produced by carpet delamination cannot cause health problems because the particles produced are too large to be absorbed through inhalation. (*Id.*)

Recently, plaintiffs suggest that Carol experienced symptoms after the carpet had been removed because of the "sink effect" mentioned by Hodgson, who testified at the hearing that surfaces within a room absorb VOCs and re-emit them at a later time. Plaintiffs opine that re-emitted VOCs caused Carol to feel sick when she returned to the home in May, 1994. However, even if some VOCs originally emitted by the carpets were re-emitted by the room surfaces, the May, 1994 air sample tests reveal that after the carpet was removed, VOC concentrations in the home were at background levels, and were too low to have caused any physical effect.

> FN26. In addition, plaintiffs have not presented any evidence that the actual

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

levels of VOCs detected in April and May, 1994 exceeded levels harmful to human health.

Consequently, because there are no good scientific grounds to support crucial elements of Todd's opinion, the court will exclude his testimony regarding causation.

*ii. Joseph Pappano*

Doctor Joseph Pappano opines that VOCs, especially Benzene, produced by the Newance carpets, and detected by Todd Environmental, precipitated Carol's respiratory problems. Pappano deduces that Carol "may have had some mild underlying allergic respiratory problems that were worsened significantly by the presence of the volatile organic compounds coming from the newly installed rugs." (Defend. Exhib. H at 3.) [FN27] Pappano's opinion is based on the temporal relationship of Carol's symptoms to her proximity to the carpeting, and his elimination of other causal factors; Pappano ruled out an infectious cause for Carol's symptoms after reviewing Carol's history and after conducting a physical examination, and Pappano ruled out Carol's allergy to dogs and dust because Carol had not experienced symptoms when previously exposed to those allergens.

> FN27. Pappano testified at the *in limine* hearing that certain persons are predisposed to allergic reactions and that Carol Heller is one of those persons. Pappano agreed that Carol's sensitivity only causes her symptoms when she is exposed to an agent which irritates her, and only for the time of her expose to the agent. Theurkauf testified that Carol would recover within one day after leaving the house. Hence, even if plaintiffs prove liability, damages would be limited because plaintiffs' injuries ended when the carpet was removed.

Pappano's opinion as to causation, however, suffers from the same defect as Todd's opinion; namely, Pappano cites no research to support his contention that the levels of VOCs detected by Todd Environmental can and did cause the type of illness allegedly experienced by Carol. At the *in limine* hearing, Pappano acknowledged that he was unaware of the background levels of benzene or any of the other VOCs. In addition, Pappano conceded that he had no authority that states that 2 butoxy ethanol is an irritant and no authority as to the levels of 2 butoxy ethanol required to cause a response.

**\*16** Further Pappano conducted no differential diagnosis to eliminate all other likely causes, the temporal relationship relied upon by Pappano is not supported by the record, and Pappano conducted no tests to verify that Carol was sensitive to benzene, 2 butoxy ethanol or benzene homologues. In reaching his conclusion, Pappano failed to rule out all alternative possible causes of Carol Heller's illness. The district court may exclude an opinion where (1) the expert engaged in few standard diagnostic techniques normally used to rule out alternative causes and the expert offers no explanation for why his or her opinion remains reliable, or (2) the defendant points to an alternative likely cause for plaintiffs' injuries and the expert offers no reasonable explanation why he or she nevertheless believes that the defendant's action caused the plaintiffs' injuries. *See In re Paoli,* 35 F.2d at 760 (discussing expert medical testimony). Defendant suggests that other items in the Heller home could have caused Carol's illness, such as the old carpets, the carpet remnants, the carpet pad or dander from the prior owner's pets. Pappano offers no explanation for why he believes that Carol Heller's illness was caused by the Newance carpets as opposed to those other products.

Similarly, Pappano's opinion contains the premise that all VOCs detected in the April and May, 1994 air ample tests were produced by the Newance carpeting; however, Pappano does not specifically negate the possibility that the VOCs were emitted by other materials located within the home.[FN28] At the *in limine* hearing, Pappano ad-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

mitted that other sources in the home could emit benzene and 2 butoxy ethanol, and the record reveals that other items were present within the Heller home that can emit the types of VOCs detected by Todd Environmental in the April and May tests. In correspondence forwarded by Todd to Carol Heller on May 23, 1994, Todd acknowledges that the detected VOCs may have been emitted by a variety of household products. Todd states that many of the hydrocarbons found in Emily Heller's bedroom closet were common to gasoline, and that the levels of Benzene found suggest that the source of that compound was small equipment or car tanks located in the garage partially below the closet. (Defend. Exhib. M at 2.) Todd also notes that benzene is not used in the manufacture of carpeting, carpet padding, or adhesives used in the installation process. Further, Todd explains that the chlorinated hydrocarbons detected were probably off-gassed from dry cleaning, and that the 2 butoxy ethanol identified in the first sample is a common component of many household cleaners for glass, wood or plastic surfaces. (Id; Defend. Addendum Exhib. E at 110.) Defendant's expert Ronald a common cleaning agent used in such products as Windex and Fantastik. Thus, Pappano does not have good grounds for his opinion that the VOC levels detected in the April and May, 1994 air sample tests came from the Newance rugs.

FN28. Todd conducted his air sample tests in Emily's bedroom closet, which contained two types of carpeting: the white Newance carpets and a second brand that plaintiffs used in the girls' bedrooms. Carol Heller testified at the *in limine* hearing that the remnant covered over 60% or more of the closet floor, while the Newance carpet covered 40% or less. There is no evidence of record to link defendant to the remnant carpets in the girls' bedrooms and, consequently, plaintiffs have failed to eliminate a possible alternative source for the VOCs detected by the air sample tests.

*17 Additionally, there was no significant temporal relationship between Thomas and Carol's symptoms and their exposure to the odors emanating from the Newance Carpeting; plaintiffs proffer no statistical evidence to show the existence of a statistically significant correlation. Moreover, the following incidences disprove the existence of a temporal relationship: (1) although Pappano testified at the *in limine* hearing that individuals with VOC sensitivity would experience symptoms within 24 hours of exposure, the record reveals that the carpets were installed on December 13–14, 1993 and yet Carol did not experience symptoms until the last week in December, 1993; [FN29] (2) Carol and Thomas Heller claim that they continued to experience symptoms after the carpet had been removed from the Heller residence; (3) Thomas Heller received treatment for respiratory illness soon after moving into the Fox Glove home but prior to the installation of the carpets.[FN30]

FN29. Carol Heller testified at the *in limine* hearing that her symptoms began to appear in the last week of December, 1993. However, at her deposition, Carol testified that she started to experience symptoms in early January, 1994 after New Year's day. (Plain. Exhib. 1 at 102.) Similarly, Pappano's report states that Carol informed him that she started to experience symptoms in January, 1994. (Defend. Exhib. H at 2.) For the purpose of this motion, the court will accept Carol's testimony that her symptoms first appeared in the last week of December, 1993, i.e., after December 24, 1993. However, because the Newance carpet was installed on December 13–14, 1993, Carol's symptoms appeared over ten days after the installation.

FN30. At the *in limine* hearing, Pappano stated that he treated Thomas Heller on December 9, 1993, prior to the Newance carpeting being installed. Thomas informed Pappano that he was suffering from

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 19

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

asthmatic conditions brought on by carpet vacuuming, and Pappano concluded that Thomas' symptoms were caused by the cats which the prior owners had in the house.

Finally, Pappano did not conduct any tests to verify his conclusion that Carol's symptoms were precipitated by exposure to benzene, 2 butoxy ethanol or benzene homologues. Although pappano conducted skin tests to ascertain whether Carol was allergic to dust and animal dander, he did not attempt to reproduce Carol's reactions by subjecting her to similar tests for low concentrations of VOCs.

Consequently, Pappano's testimony regarding causation is similarly inadmissible.

*iii. Julio Amadio*
Doctor Amadio testified at his deposition that he diagnosed Carol Heller's breathing difficulties as asthma, and that he determined that the cause of her illness was the new carpet. Amadio claimed that his conclusion was based on his reading of articles that set forth that there could be a direct relationship between carpets and asthma, and his observation that plaintiffs had previously installed new carpets and that Carol's asthma improve when she went out-of-doors. (Plain. Exhib. 6 at 8.)

However, at the *in limine* hearing, Amadio testified that he was unable to render a definite opinion with a reasonable degree of medical certainty that the Newance carpet caused Carol Heller's respiratory illness. Consequently, while Amadio's testimony is admissible with respect to his asthma diagnosis—in that Amadio observed Thomas and Carol's symptoms and he is competent to render that diagnosis—Amadio's opinion as to whether defendant's rugs caused Carol Heller's symptoms is inadmissible.

*iv. Edward Theurkauf*
Finally, although plaintiffs state in a reply brief that Doctor Theurkauf attributed Carol's illness to the carpets, the record reveals that Theurkauf offers no opinion as to whether the Newance carpeting caused Carol's symptoms. Rather, at the *in limine* hearing and at his deposition, Theurkauf merely opined that Carol Heller suffered bronchospasms caused by an environmental irritant, but that he did not know what environmental irritant was causing her bronchospasms. (Defend. Motion *in limine* Exhib. K at 4, 7.) Theurkauf testified that he cannot tell whether or not the Newance carpets caused Carol's illness. (*Id.* at 15.)

**\*18** Consequently, the opinions of plaintiffs' experts regarding causation are inadmissible, and defendant's motion *in limine* to exclude will be granted.

*C. Summary Judgment Motion*

*i. Defective Design and/or Manufacture, Failure to Warn; Whether a Defect in the Newance Carpets Caused Plaintiffs Injury*

Absent the testimony of their experts, plaintiffs provide no admissible evidence that Carol Heller's injuries were caused by defendant's carpeting. Plaintiffs have failed to present evidence sufficient to establish general or specific causation or to show that the Newance carpets manufactured by defendant were defective. Plaintiffs' remaining evidence is the testimony of Thomas and Carol Heller that Carol experienced asthmatic symptoms when in the Fox Glove residence. However, plaintiffs offer no reasonable scientific explanation for how the carpets caused Carol's symptoms and, as stated above, the temporal relationship between Carol's illness and her proximity to defendant's rugs does not withstand scrutiny; defendant's carpeting is not the obvious cause of plaintiffs' illnesses because plaintiffs experienced symptoms before and after the carpeting was removed, and because plaintiffs have not ruled out other possible causes of their health problems. Consequently, absent proof of defect or causation, defendant is entitled to summary judgment on plaintiffs' defective design and/or manufacture claim and failure to warn claim.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

With respect to plaintiffs' additional claims, defendant contends that plaintiffs have failed to proffer evidence in support of each element of their claims.

*ii. Magnuson–Moss Act*

Plaintiffs claim damages for breach of warranty pursuant to the Magnuson–Moss Act, 15 U.S.C. § 2310(d). However, the Magnuson Moss Act does not create a private, independent cause of action for personal injury damages arising out of a breach of warranty, absent allegations that defendant violated a specific standard set forth in the Act. *See Santarelli v. BP America,* 913 F.Supp. 324 (M.D.Pa.1996); 15 U.S.C. 2311(b)(2) ("Nothing in this chapter (other than [substantive federal warranty standards]) shall (A) affect the liability of, or impose liability on, any person for personal injury, or (B) supersede any provision of state law regarding consequential damages for injury to the person or other injury.") Here, plaintiffs merely allege a breach of warranty. Further, a plaintiff may not maintain a Magnuson–Moss Act claim unless plaintiffs have given defendant an opportunity to cure the alleged breach of warranty. 15 U.S.C. § 2310(e). Here, there is no dispute that defendant removed the Newance carpets and refunded plaintiffs for the cost of the carpets and installation. Consequently, defendant is entitled to summary judgment on plaintiffs' Magnuson–Moss Act claim.

*iii. Negligent and Intentional Misrepresentation*

**\*19** Plaintiffs contend that defendant misrepresented facts concerning prior complaints received by defendant regarding carpet emissions, and that plaintiffs' reliance on defendant's representations caused them to remain in the Fox Glove home for an additional three weeks, thus prolonging their suffering. According to plaintiffs, Carol Heller telephoned defendant on March 21, April 5, and April 28, 1994, seeking information to help her determine the cause of her family's illnesses. Carol Heller testifies that her calls were referred to Todd Bethel, who informed Heller that he had never heard of any complaints of persons having health problems or

severe respiratory problems related to new carpets, and that the cause of her family's health problems must be attributable to something else. (Plain. Exhib. 1 at 170–74.) Plaintiffs claim that contrary to his alleged assertion, Bethel was well aware of carpet related health complaints because Bethel was the defendant employee responsible for handling customer complaints of health problems. Further, plaintiffs note that by January, 1994, 100% of Bethel's time was devoted to handling complaints related to carpet emissions. (Plain. Exhib. 48.) In addition, plaintiffs assert that defendant never sent Carol Heller any information about the health effects of the chemicals emitted from carpeting. (Plain. Exhib. 1 at 199–200.)

Under Pennsylvania law, a cause of action for fraud consists of the following elements: (1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention by the maker that the recipient will thereby be induced to act; (4) justifiable reliance by the recipient upon the misrepresentation; (5) damage to the recipient as the proximate result. *Woodward v. Dietrich,* 548 A.2d 301 (Pa.Super.Ct.1988). "A 'negligent' misrepresentation is a misrepresentation which arises from a want of 'reasonable care or competence in obtaining or communicating information,' as opposed to a 'fraudulent' misrepresentation which involves either a 'knowing' or a 'reckless' communication of a misrepresentation." *Id.* at 308 n. 5.

Here, a question of fact exists with respect to whether Bethel informed Carol Heller that he was not aware of other health related complaints.[FN31] Nevertheless, plaintiffs claim fails because there is no evidence of record to support plaintiffs' assertion that they were injured by reliance on Bethel's alleged misrepresentation. The Hellers moved out of the Fox Glove residence on April 7, 1994, and plaintiffs proffer no evidence to prove that they would have moved-out of the Fox Glove residence at an earlier date if they had been aware of the existence of other complaints to defendant. Further, plaintiffs have not substantiated their assertion that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

they suffered injuries as a consequence of having dwelled in the Fox Glove home for a further three weeks.

> FN31. In his deposition, Bethel stated that he would not have made such a statement. (Defend. Exhib. J at 59–60.)

*iv. Pennsylvania Consumer Protection Laws*

**\*20** Plaintiffs claim that defendant violated the Pennsylvania Unfair Trade Practices and Consumer Protection Laws, 73 P.S. §§ 201 *et seq.,* when it represented that its carpets passed a quality control program. Defendant places a "green tag" on all carpets it sells that pass a CRI inspection test. To qualify for a green tag, a sample from a style of carpet is tested once a year to ensure that total VOC emissions do not exceed a concentration of 0.6 mg/m3. Plaintiff claims that the green tag program is confusing to consumers and lacks credibility in that the emission results for one carpet sample are not indicative of the emissions for all the hundreds of carpets that are in the same category.

"The basic policy of the Pennsylvania Consumer Protection law is to prohibit unfair methods of competition and unfair and deceptive practices in the conduct of a trade or commerce." *Rizzo v. Michener,* 584 A.2d 973, 980 (Pa.Super.Ct.1990). To maintain a cause of action under the Pennsylvania Unfair Trade Practices Act, plaintiffs must show the essential elements of fraud: (1) material misrepresentation of a material fact; (2) scienter; (3) intention by the declarant to induce action; (4) justifiable reliance by the party defrauded by the misrepresentation; and (5) damages to the party defrauded as a proximate result. *Prime Meats v. Yochim,* 619 A.2d 769 (Pa.SuperCt.1993). Here, plaintiffs have failed to proffer expert testimony that the Newance carpeting manufactured by defendant was defective, or that the green tag Program was confusing or deceptive. Moreover, plaintiffs did not rely on the CRI green tag representation of safety when purchasing the carpets; Carol Heller testified at her deposition that she never saw any green tags on the carpets. (Plain. Exhib. 1

at 172.) FN32

> FN32. Similarly, to the extent that plaintiffs' complaint alleges a state law breach of warranty claim, that claim fails because plaintiffs offer no admissible evidence that the carpets in their Fox Glove home were defective. *See Altronics of Bethlehem, Inc. v. Repco,* 957 F.2d 1102, 1105 (3d Cir.1992) (breach of warranty claim requires proof that product was defective).

*v. Medical Monitoring*

In their reply brief, plaintiffs indicate that they intend to file a motion to withdraw without prejudice their medical monitoring claim. (Plain. Reply Memo. at 64.) In response, defendant argues that the court should either dismiss that claim with prejudice or grant summary judgment because there is no evidence to support plaintiffs' medical monitoring claim.

Voluntary dismissal at this stage of the proceedings is a matter for the court's discretion. *See Sinclair v. Soniform, Inc.,* 935 F.2d 599, 603 (3d Cir.1991); Fed.R.Civ.P. 41(a)(2) (after defendant has filed answer, "an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper"). In deciding whether to grant a voluntary dismissal, the court may consider the following factors: (1) the excessive and duplicative expense of a second litigation; (2) the effort and expense incurred by defendant in preparing for trial; (3) the extent to which the current suit has progressed; and (4) plaintiffs' diligence in bringing the motion to dismiss. *Maleski v. DP Realty Trust,* 162 F.R.D. 496 (E.D.Pa.), *remanded by Kaiser v. DP Realty Trust,* 72 F.3d 123 (3d Cir.1995). Because of the time and resources already expended by defendant in litigating plaintiffs' medical monitoring claim, and because plaintiffs did not move for a dismissal until after discovery and after defendant moved for summary judgment, the court will deny plaintiffs' request to withdraw their medical monit-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050
**(Cite as: 1997 WL 535163 (E.D.Pa.))**

oring claim without prejudice, and will address the merits of that claim.

**\*21** In Count VI of the amended complaint, plaintiffs allege that they have been exposed to chemicals known to cause an enhanced risk of contracting latent diseases, and that early and frequent medical monitoring and detection is reasonably available and necessary to protect their health.

To obtain damages for medical monitoring, plaintiffs must establish the following four elements:

1. Plaintiff was significantly exposed to a proven hazardous substance through the negligent action of the defendant.

2. As a proximate result of such exposure, plaintiff suffers a significantly increased risk of contacting a serious latent disease.

3. That increased risk makes periodic examination reasonably necessary.

4. Monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial.

*Redland Soccer Club v. Dept. of Army of U.S.,* 55 F.3d 827, 845 (3d Cir.1995), *cert. denied,* 116 S.Ct. 772 (1996). Plaintiffs must prove that they were exposed to chemicals "beyond what would normally be encountered by a person in everyday life, so that the risk of being injured from the exposure is greater, in some way, than the normal risks all of us encounter in our everyday lives." *Id.* at 846. Additionally, plaintiffs must prove that the increased risks of harm caused by their exposure to toxic substances "warrant a change in the medical monitoring that otherwise would be prescribed for [them]." *Id.* at 846 (quotation omitted).

Here, plaintiffs have adduced no evidence that defendant's carpets emitted VOCs at concentrations harmful to health, that the levels of VOCs detected by Todd Environmental are higher than the normal

background presence, that plaintiffs suffer increased risk of contracting a serious latent disease as a result of their exposure to the levels of VOCs detected by Todd Environmental, or that medical monitoring would be beneficial to the treatment and early detection of serious latent disease. Consequently, defendant will be granted summary judgment on plaintiffs' medical monitoring claim.

**III. CONCLUSION**
Defendant's motion *in limine* to exclude expert testimony and motion for summary judgment will be granted.

An appropriate order follows.

**ORDER**
**AND NOW,** this 15th day of August, 1997, upon consideration of defendant's motion *in limine* to exclude expert testimony and motion for summary judgment, and the plaintiffs' responses thereto, **IT IS HEREBY ORDERED** that defendant's motions are **GRANTED,** and judgment is entered in favor of the defendant and against the plaintiffs.

E.D.Pa.,1997.
Heller v. Shaw Industries, Inc.
Not Reported in F.Supp., 1997 WL 535163 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 15,050

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2003 WL 22939377 (E.D.Pa.)
**(Cite as: 2003 WL 22939377 (E.D.Pa.))**

▷

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Mary KANE, Plaintiff,
v.
EQUITY ONE, INC., Sovereign Bank, and Michael
J. Frankenfield d/b/a Tri–State Financial Services,
Defendants.

No. Civ.A. 03–3931.

Nov. 21, 2003.

David A. Scholl, Newtown Square, PA, for Plaintiff.

Michael K. Sullivan, Blank, Rome, Comisky & Mc-Cauley, Philadelphia, PA, Sandra G. Torget, Walter Weir, Jr., Weir & Partners, LLP, Philadelphia, PA, for Defendants.

## MEMORANDUM AND ORDER

SCHILLER, J.

**\*1** Plaintiff Mary Kane brought this action alleging violations of the federal Truth–In–Lending Act ("TILA"), 15 U.S.C. §§ 1601 – 1693, by Equity One, Inc. ("Equity One") and Sovereign Bank, ("Sovereign"), and violation of state laws relating to lender liability by Equity One and Michael J. Frankenfield d/b/a Tri–State Financial Services ("Tri–State"). Presently before this Court are Defendant Equity One's and Defendant Sovereign's motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and 12(b)(1). For the reasons that follow, I deny Defendant Equity One's motion to dismiss and grant in part and deny in part Defendant Sovereign's motion to dismiss.

## I. BACKGROUND

This case concerns residential mortgage loan financing provided to Plaintiff Mary Kane on June 8, 2000. (Am.Compl.¶ 6.) Plaintiff alleges that a broker from Tri–State solicited her to refinance a wrap-around mortgage that included both her own home and the home of her son, Derrick Kane. (*Id.* ¶ 5.) According to Plaintiff, she went to the offices of Equity One to sign the loan documents with the expectation that the transaction would be structured as one loan. (*Id.* ¶¶ 6, 11.) Despite her expectations and without explanation, the transaction was split into two separate loan documents with separate Federal Truth–in–Lending Disclosure Statements and Settlement Statements. (*Id.* ¶ 8.) The larger of the two loans was for $48,805.00 at an annual percentage rate ("APR") of 11.489 percent and a term of 15 years. (*Id.,* Ex. A, B.) The second loan was for $9,710.00 at an APR of 14.257 percent and a term of 10 years. (*Id.,* Ex. C, D.) Additionally, Plaintiff alleges that the smaller loan included a charge of $1415.55 for a gas bill despite the fact that Equity One also assessed this charge in a separate loan that was extended to Mr. Derrick Kane, Plaintiff's son, on the same date. (*Id.* ¶ 10.) Approximately one month after the loans were extended, Equity sold both loans to Sovereign Bank. (Am.Compl.¶ 13.) Thereafter, on March 24, 2003, Plaintiff's counsel contacted both Equity One and Sovereign asserting Plaintiff's right to rescind the loan pursuant to TILA. (*Id.* ¶ 12.) To date, Sovereign has not responded to Plaintiff's request for rescission. (*Id.* ¶ 13.)

## II. STANDARD OF REVIEW

In considering a motion to dismiss for failure to state a claim upon which relief may be granted, courts must accept as true all of the factual allegations pleaded in the complaint and draw all reasonable inferences in favor of the non-moving party. *See Bd. of Trs. of Bricklayers & Allied Craftsmen Local 6 of N.J. Welfare Fund v. Wettlin Assocs., Inc.,* 237 F.3d 270, 272 (3d Cir.2001). A motion to dismiss will only be granted if it is clear that relief cannot be granted to the plaintiff under any set of facts that could be proven consistent with the complaint's allegations. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22939377 (E.D.Pa.)
**(Cite as: 2003 WL 22939377 (E.D.Pa.))**

(1984) (*citing Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

III. DISCUSSION

A. Claims Against Defendant Equity One

1. TILA

**\*2** Plaintiff alleges that Equity One violated TILA by structuring her mortgage refinancing as two separate loan transactions instead of as one closed-end transaction in accordance with her expectations. (Am.Compl.¶¶ 9, 11, 16.) Defendant Equity One responds that TILA permits lenders to structure a transaction as two separate loans with separate disclosures. Equity One's contentions are correct provided that the borrower expected that the transaction would be structured in that manner. However, a lender may violate TILA if a borrower expected to receive a single loan executed in one transaction and nonetheless received two separate loans. *See Hemauer v. ITT Fin. Servs.,* 751 F.Supp. 1241, 1243–44 (W.D.Ky.1990) (finding lender violated TILA by executing two loans for one transaction on same day despite fact that borrowers only made one request for loan).

Although the Third Circuit has not yet encountered a case alleging "loan splitting" under TILA, other courts have found that such practices violate TILA's mandate that the lender provide a single, comprehensible disclosure of the cost of credit. 12 C.F.R. § 226.17(a) (2003) (requiring that lenders group all disclosures for single transaction in one writing); *see Harris v. Ill. Vehicle Premium Fin. Co.,* No. 99–C–5411, 2000 WL 1307513, \*2, 2000 U.S. Dist. LEXIS 13763, at \*6–7 (N.D.Ill. Sept.12, 2000) (denying motion to dismiss because pleadings did not reveal whether plaintiff expected one transaction or two); *Hemauer,* 751 F.Supp. at 1243–44 (W.D.Ky.1990); *In re Buckles,* 189 B.R. 752, 760 (Bankr.D.Minn.1995) (*citing Blair v. Nat'l Constr. Co. of the South,* 611 F.2d 80, 83 (5th Cir.1980)). These courts describe "loan splitting" as "a situation where the debtor wants, requests and

expects to get a single loan consummated in a single transaction, but the lender instead documents and makes disclosures for the loan as if it were two separate transactions." *Harris,* 2000 WL 1307513, at \*2, 2000 U.S. Dist. LEXIS, at \*6.

In considering Defendant's motion to dismiss, this Court must draw all reasonable inferences in favor of Plaintiff. *Bd. of Trs. of Bricklayers & Allied Craftsmen,* 237 F.3d at 272. Plaintiff's Amended Complaint alleges that Equity One structured this transaction as two separate loans in contravention of her expectations. (Am. Compl. ¶¶ 6, 8 ("Plaintiff received no explanation regarding the terms of the loan and was rushed through a closing ... Plaintiff did not realize ... until she appeared at settlement, the transaction was broken into two loans.")) At this stage of the proceedings, this allegation is sufficient to make out a case of loan splitting; an eventual determination of what TILA required for this particular transaction or transactions depends on further factual analysis and can only be resolved after consideration of the circumstances surrounding the transaction and the parties' original agreement as to the nature, number, and purpose of the contemplated transaction. *See Buckles,* 189 B.R. at 760–1. Therefore, this issue cannot be resolved on Defendant's motion to dismiss and I accordingly deny the motion to dismiss Plaintiff's TILA claims against Equity One.

2. Home Ownership and Equal Protection Act

**\*3** In 1994, TILA was augmented by the Home Ownership and Equity Protection Act ("HOEPA"), which requires additional disclosures for certain high-cost loans. Pub.L. No. 103–325, tit. I, § 151, 108 Stat. 2190 (1994) (amending 15 U.S.C. §§ 1601–02, 1604, 1610, 1639–41, 1648). HOEPA applies to consumer credit transactions that are secured by the consumer's principal dwelling, other than a residential mortgage transaction, a reverse mortgage transaction, or a transaction under an open-end credit plan, if:

(A) the annual percentage rate at consummation of the transaction will exceed by more than 10

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22939377 (E.D.Pa.)
**(Cite as: 2003 WL 22939377 (E.D.Pa.))**

percentage points the yield on Treasury securities having comparable periods of maturity on the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor; or

(B) the total points and fees payable by the consumer at or before closing will exceed the greater of-

(i) 8 percent of the total loan amount; or

(ii) $400.

15 U.S.C. § 1602(aa) (2003).

Plaintiff contends that if the two loans had in fact been executed as one loan, with the same percentage of equity and with the gas bill included as a finance charge, then the single hypothetical consolidated loan would violate HOEPA. Therefore, Plaintiff suggests, Equity One violated HOEPA by failing to provide the required disclosures for this high-cost loan transaction. In response, Defendants contend that the gas bill payment is not a finance charge as defined by the TILA regulations because Equity One did not require the use of the third-party gas company and Equity One did not retain any portion of the charge. *See* 12 C.F.R. § 26 .4(a)(1) (2003). Although Plaintiff has not identified, and the Court has not uncovered, any case law applying HOEPA in the context of a loan-splitting allegation in which the two loans, if combined, would be covered by the HOEPA provisions, this Court cannot dismiss Plaintiff's novel claim as a matter of law at this time. Furthermore, the threshold question of whether Equity One charged two borrowers for the gas bill and inappropriately retained the excess amount, potentially rendering this loan subject to HOEPA, is factual in nature and is not appropriately resolved at this stage of the proceedings.

3. State Law Claims
Defendant Equity One also moves pursuant to Federal Rule of Civil Procedure 12(b)(1) to dismiss Plaintiff's state law claims under the Pennsylvania Credit Services Act, 73 PA. CONS.STAT. ANN. § 2181 (West 2003), and the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 PA. CONS.STAT. ANN. § 201–1 (West 2003), for lack of subject matter jurisdiction. Because this Court has allowed Plaintiff's federal claims against Defendant Equity One to proceed, Defendant's motion to dismiss the pendent state law claims is denied. *See* 28 U.S.C. § 1367 (2003). In light of the foregoing discussion, Defendant Equity One's motion to dismiss is denied.

B. Claims Against Assignee Defendant Sovereign
*4 Plaintiff asserts that Sovereign, as the assignee of both loans, is liable for TILA violations in the original credit transaction and for failing to rescind the transaction. As fully discussed below, I find that Plaintiff has not alleged a set of facts that would subject Sovereign as an assignee to liability for TILA violations in the original loan transaction. Sovereign is, however, subject to Plaintiff's claim for rescission.

1. Assignee Liability under TILA's General Provisions [FN1]

FN1. "General provisions" refers to those provisions governing non-HOEPA transactions.

Plaintiff alleges in her Amended Complaint that, by virtue of the fact that there were two separate loans, Sovereign "knew or should have known that this was unusual or irregular and that misrepresentations were likely to have been made in the course of the transaction." (Am.Compl.¶ 18.) Furthermore, Plaintiff states that, through inspection of the loan documents, "Sovereign did or should have noticed the questionable nature of the charges referenced herein and should have been alerted to the fact that it was likely that TILA violations pervaded this transaction." (*Id.*) Specifically, the "questionable charge" Plaintiff refers to is the alleged double payment of the gas bill.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22939377 (E.D.Pa.)
**(Cite as: 2003 WL 22939377 (E.D.Pa.))**

TILA imposes assignee liability in consumer credit transactions secured by real property only if the violation is "apparent on the face of the disclosure statement." [FN2] 15 U.S.C. § 1641(e)(1)(A) (2003). Section 1641(e) further explains that a violation is apparent on the face of the disclosure statement if:

> FN2. Sovereign cites § 1641(a) as the provision governing its liability as assignee. In cases such as this involving loans secured by real property, however, § 1641(e) is the applicable provision. *See Crisomia v. Parkway Mortgage, Inc.,* No. 00–35085DWS, 2002 WL 31202722, at *6, 2002 Bankr.LEXIS 1112, at *23 (Bankr.E.D.Pa. Sept.13, 2002).

> (A) the disclosure can be determined to be incomplete or inaccurate by a comparison among the disclosure statement, any itemization of the amount financed, the note, or any other disclosure of disbursement; or

> (B) the disclosure statement does not use the terms or format required to be used by this subchapter.

15 U.S.C. § 1641(e)(2)(A), (B) (2003).

Plaintiff's allegations fail to state a claim of assignee liability under TILA for two reasons. First, TILA's assignee liability provision expressly limits liability to violations apparent on the face of the assigned documents. Plaintiff fails to allege any violations apparent on the face of the assigned loan documents. Plaintiff's contention that Sovereign should have been alerted to a potential violation due to the inclusion of a gas bill charge that was allegedly duplicative of a charge in Plaintiff's son's loan transaction does not constitute an allegation of a facially apparent violation. The loan documents assigned to Sovereign describing Plaintiff's two loans only included one gas bill charge. (Am.Compl., Ex. A–D.) Thus, any potential violation deriving from the duplication of that charge in

another borrower's loan documents could not have been "apparent on the face" of the loan documents assigned to Sovereign.

Second, the Third Circuit has held that TILA's assignee liability provisions do not impose any duty of additional inquiry on assignees.[FN3] *Ramadan v. Chase Manhattan Corp.,* 229 F.3d 194, 198 (3d Cir.2000) (*citing Taylor v. Quality Hyundai, Inc.,* 150 F.3d 689, 694 (7th Cir.1998) ("Only violations that a reasonable person can spot on the face of the disclosure statement or other assigned documents will make the assignee liable under the TILA.")). In *Ramadan,* the Court noted that an assignee's experience or outside knowledge does not impose any obligation to investigate beyond the face of the assigned documents. *Ramadan,* 229 F.3d at 198. Thus, Plaintiff's allegation that the fact that the transaction was split into two separate loans in and of itself should have put Sovereign on notice of potential TILA violations does not state a claim for assignee liability under TILA. Rather, case law suggests that it is permissible to structure transactions as separate loans if the borrower assents. *See Rendler v. Corus Bank,* 272 F.3d 992, 997–98 (7th Cir.2001) ( "The [TILA] commentary makes it clear that lenders have some flexibility in structuring loan transactions with each consumer, even multiple loan transactions financing a single piece of property."). Thus, the mere fact that two separate loans were assigned does not constitute a violation on the face of the assigned documents.

> FN3. Although the Court in *Ramadan* was interpreting § 1641(a), a provision which governs assignee liability generally, the conclusions are nonetheless applicable to the interpretation of § 1641(e), the provision which creates a slightly different scheme governing assignee liability in transactions secured by real property.

**\*5** In sum, the gravamen of Plaintiff's Amended Complaint-that Equity One violated TILA by structuring the transaction as two separate loans despite Plaintiff's belief that only one loan

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22939377 (E.D.Pa.)
**(Cite as: 2003 WL 22939377 (E.D.Pa.))**

would be extended-is predicated on the borrower's subjective expectation and therefore is not apparent in the documents describing the transaction that was executed. Thus, even taking her allegations as true, Plaintiff has failed to state a claim of assignee liability under TILA.

2. Assignee Liability under HOEPA Provisions

Under TILA, HOEPA loan assignees are subjected to a broader standard of liability than assignees of non-HOEPA loans. *See Cooper v. First Gov't Mortg. and Investors Corp.,* 238 F.Supp.2d 50, 55 (D.D.C.2002). The provision for assignee liability for HOEPA loans provides as follows:

Any person who purchases or is otherwise assigned a [HOEPA] mortgage ... shall be subject to all claims and defenses with respect to that mortgage that the consumer could assert against the creditor of the mortgage, unless the purchaser or assignee demonstrates, by a preponderance of the evidence, that a reasonable person exercising ordinary due diligence, could not determine, based on the documentation required by this subchapter, the itemization of the amount financed, and other disclosure of disbursements that the mortgage was a mortgage [subject to HOEPA].

15 U.S.C. § 1641(d)(1) (2003).

As discussed above, Plaintiff's claim that these loans fall within the HOEPA provisions is premised on her allegation that the double payment of the gas bill constituted a finance charge because it could have been "improperly appropriated" by Equity One. (Am. Compl. ¶ 20; Pl.'s Resp. to Defs.' Mot. to Dismiss at 6.) Although Plaintiff's contention raises factual issues that compel this Court to deny Equity One's motion to dismiss the HOEPA claims asserted against it at this time, Plaintiff's allegations are clearly not sufficient to state a claim of assignee liability against Sovereign. As discussed above, Plaintiff's loan documents only contained one assessment of the gas bill charge. Thus, there is no way that Sovereign could have determined, based

solely on the documentation of the loan, the itemization of the amount financed and other disclosure of disbursements that this loan was a HOEPA loan.

3. Rescission by Assignee

Plaintiff seeks rescission of the loan as well as $2,000.00 in statutory damages and an award of attorney's fees and costs for Sovereign's refusal to respond to Plaintiff's notice of rescission. Under TILA, a borrower who has a right to rescind against the original lender also has the right to rescind against any assignee. 15 U.S.C. § 1641(c) (2003). When a lender takes a security interest in a borrower's principal dwelling in exchange for credit, TILA permits the borrower to rescind the transaction until three business days after the consummation of the transaction or the delivery of the material disclosures required by the statute, whichever is later. 15 U.S.C. § 1635(a) (2003). If the lender does not give the required disclosures, the borrower's right to rescind expires three years after the consummation of the transaction or upon the sale of the property, whichever is first. 15 U.S.C. § 1635(f) (2003). Failure to disclose the proper finance charge, amount financed, APR, total payments, or payment schedule constitutes a material violation which entitles the borrower to rescind the loan. 15 U.S.C. § 1635(a); 12 C.F.R. § 226.23(a)(3) n. 48; *see Brodo v. Bankers Trust Co.,* 847 F.Supp. 353, 356 (E.D.Pa.1994). Within twenty days of receiving notice of the borrower's intent to rescind, the lender, or subsequent assignee, must "return ... any money or property given as earnest money, downpayment, or otherwise, and [must] take any action necessary or appropriate to reflect the termination of any security interest created under the transaction." 15 U.S.C. § 1635(b). Violation of the obligations under this section constitutes a separate TILA violation. 15 U.S.C. § 1635(g).

**\*6** While Plaintiff may assert a valid claim for rescission against Sovereign if she can prove a material violation of TILA's requirements by the original lender, the language of the statute does not permit an award of statutory damages or attorney's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22939377 (E.D.Pa.)
**(Cite as: 2003 WL 22939377 (E.D.Pa.))**

fees against an assignee for failure to respond to a valid rescission notice. *See Brodo,* 847 F.Supp. at 359 ("Congress did not wish to impose liability for damages and attorney's fees on an assignee who was not responsible for and who had not notice of TILA disclosure violations at the time of an assignment.") Although § 1641(c) provides that a material violation by a creditor creates a right to rescind against the creditor's assignee, TILA's civil liability provision only permits "creditor[s]" to be held liable for a monetary penalty or award of attorney's fees for a TILA violation. 15 U.S.C. § 1640(a); *Brodo,* 847 F.Supp. at 359. Neither § 1641(c) nor any other provision of the TILA provides for a statutory penalty or award of attorney's fees against an assignee for failure to respond to a valid rescission notice. *See Brodo,* 847 F.Supp. at 359. In the absence of such authority, this Court must dismiss Plaintiff's claim against Sovereign for statutory damages and attorneys fees. Plaintiff may proceed, however, with her claim for rescission against Sovereign.

Therefore, Plaintiff has failed to state a claim for assignee liability under the general provisions of TILA or under HOEPA. Plaintiff's claim for statutory damages, attorney's fees and costs against Sovereign is dismissed. Plaintiff may proceed against Sovereign only for rescission.

IV. CONCLUSION

For the foregoing reasons, I deny Defendant Equity One's motion to dismiss and grant in part and deny in part Sovereign's motion to dismiss. An appropriate Order follows.

*ORDER*

AND NOW, this 21st day of November, 2003, upon consideration of Defendant Equity One Inc.'s Motion to Dismiss, Defendant Sovereign Bank's Motion to Dismiss, and the response thereto, and for the foregoing reasons, it is hereby ORDERED that:

1. Defendant Equity One's Motion to Dismiss (Document No. 11) is DENIED without prejudice

to Defendant's raising these issues in a motion for summary judgment if appropriate.

2. Defendant Sovereign Bank's Motion to Dismiss (Document No. 11) is GRANTED in part and DENIED in part as follows:

a. Defendant's motion to dismiss Plaintiff's claim for rescission is DENIED.

b. Defendant's motion to dismiss is GRANTED in all other respects.

E.D.Pa.,2003.
Kane v. Equity One, Inc.
Not Reported in F.Supp.2d, 2003 WL 22939377 (E.D.Pa.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2006 WL 1314379 (E.D.Pa.)
**(Cite as: 2006 WL 1314379 (E.D.Pa.))**

Page 1

▷
Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Theresa McMASTER
v.
CIT GROUP/CONSUMER FINANCE, INC., et al.

No. Civil Action 04-339.
May 11, 2006.

Robert P. Cocco, Law Offices Of Robert P. Cocco PC, Philadelphia, PA, for Plaintiff.

Barbara Kiely, Reed Smith, Philadelphia, PA, Dorothy A. Davis, Eckert Seamans Cherin & Mellott, LLC, Pittsburgh, PA, Lisa Hornbeck Prezelski, Mazullo & Murphy PC, Doylestown, PA, for Defendants.

Anita J. Murray, Eckert Seamans Cherin & Mellott, LLC, Philadelphia, PA, for Defendants/Counter Claimants.

Robert P. Cocco, Law Offices Of Robert P. Cocco PC, Philadelphia, PA, for Counter Defendant.

*MEMORANDUM*
THOMAS N. O'NEILL, JR., J.

**\*1** Plaintiff Theresa McMaster filed a complaint on January 26, 2004, alleging that defendants CIT Group, Fairbanks Capital Corporation,[FN1] U.S. Bank National Association, Steven Rosen individually and d/b/a Security Mortgage Brokers, and Kevin Murphy violated federal and state laws in connection with their actions relating to a mortgage on McMaster's residence. Before me now are McMaster's motion for summary judgment against all defendants, CIT Group's response and cross-motion for summary judgment, Steven Rosen and Security Mortgage Broker's response and cross-motion for summary judgment,[FN2] Fairbanks Capital Corp and U.S. Bank's motion for summary judgment, and McMaster's response to Fairbank and U.S. Bank's motion. I have already denied Kevin Murphy's motion for sum-

mary judgment.

> FN1. Fairbanks is now known as Select Portfolio Servicing, Inc.

> FN2. Steven Rosen and Security Mortgage Broker's response and cross-motion for summary judgment is nearly a word-for-word copy of CIT Group's response, with all of the same arguments. The only substantive change concerns violations of the Credit Services Act.

*FACTS*
The factual background of this case can be found in my decision of February 8, 2006, *McMaster v. CIT Group/Consumer Finance, Inc.,* No. 04-339, 2006 U.S. Dist. LEXIS 4760 (E.D.Pa. February 8, 2006). Nevertheless, I will discuss the relevant facts here.

On December 27, 1998, Walter McMaster, plaintiff's husband, died. At that time, he owned a rowhouse located at 415 Snyder Avenue, Philadelphia, Pennsylvania. Following her husband's death, plaintiff moved into the Snyder Avenue home and took steps to become appointed the administrator of her husband's estate. At the time of Walter McMaster's death, plaintiff and her husband had been separated for ten years. However, plaintiff failed to take any action to transfer the deed for the property from Walter McMaster's name to her own.

In February 2001, McMaster's home incurred a severe water leak from a bathroom. At that time, she applied through defendant Security [FN3] for a loan in order to obtain financing for the repairs. McMaster signed an undated broker agreement with Security agreeing to pay them 3% of the amount financed to place the loan (hereinafter "first broker agreement"). Prior to this loan, Theresa McMaster had never purchased a home or entered into a loan transaction. According to Security, the process of obtaining financing for McMaster became difficult due to the fact that she was not on the deed to the property, and Security ended up charging McMaster a higher loan procurement fee than originally

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1314379 (E.D.Pa.)
**(Cite as: 2006 WL 1314379 (E.D.Pa.))**

agreed upon. The increased fee was listed only on the HUD-1 settlement statement. McMaster signed an additional document at closing (hereinafter "second broker agreement"), which indicated that the amount of the broker fee would be listed on the settlement statement. Neither one-page document contained a notice that Mc-Master had a right to cancel or included the name and address of the agent authorized to receive service of process. The second broker agreement also did not include Security's business address. Subsequent to approval, CIT was put on notice that the deed to the property was not in McMaster's name nor had any state inheritance tax return been filed as would be required to effect a transfer.

> FN3. Steven Rosen does business as Security Mortgage Brokers. I will not conduct a separate analysis of his liability and Security's liability, since they are the same.

**\*2** In April 2001, CIT preapproved McMaster for a $32,200 loan payable at a 14.7% rate of interest over thirty years. Although she originally desired only a home equity loan to pay for the repairs, she entered into a refinancing loan. The loan refinanced the $13,000 balance of the 6.3% original mortgage leaving a cash balance of $15,400.[FN4] According to McMaster's deposition. Security required her to endorse a check in that amount over to Ed Rosen, the contractor hired to perform the repairs. McMaster claims that the work done by Rosen was subpar and had a fair market value of only half the price paid.

> FN4. The remaining portion of the loan covered various fees.

The loan closed on April 23, 2001, at which time Kevin J. Murphy, Esq. conducted the closing. The total settlement charges on the Settlement Statement for the CIT Loan included:

| | | |
|---|---|---|
| Underwriting Fee | $ | 495.00 |
| Loan Discount (0.50%) | | 155.99 |
| Appraisal Fee | | 250.00 |
| Appraisal Review Fee | | 42.00 |
| Credit Bureau Fee | | 4.00 |
| Mortgage Broker Fee | | 1380.00 |
| Courier Fee | | 30.00 |
| Closing Fee to Murphy | | 275.00 |
| Title Examination Fee | | 91.00 |
| Title Insurance | | 411.75 |
| Recording Fee | | 135.50 |
| Total | | $ 3270.24 |

CIT calculated the finance charges by adding together the (1) underwriting fee, (2) loan discount, (3) appraisal review fee, (4) credit bureau fee, (5) mortgage broker fee, (6) courier fee, and (7) closing fee to Murphy. These charges added up to $2381.99, 7.9% of the total loan amount.

Prior to closing, Murphy prepared for McMaster, as administratix of her late husband's estate, a Pennsylvania inheritance tax return and documents necessary to transfer the deed to plaintiff's name to enable her to mortgage the subject property. At closing, plaintiff signed documents agreeing to pay Murphy, as a partner of the entity Baltz, Murphy and Mazullo, the sum of $1000. The fee was deducted from the loan proceeds. McMaster asserts that McMurphy did not

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1314379 (E.D.Pa.)
**(Cite as: 2006 WL 1314379 (E.D.Pa.))**

provide her with a copy of the fee agreement prior to closing. She also asserts that although she generally understood Murphy's role at closing to be making the transaction legal, she had no specific understanding of him as her attorney or what specifically he would do in connection with the loan transaction. Murphy also acted as the title agent and attorney for CIT for the loan transaction.

Murphy's title agency, Pinnacle Abstract, LLP, was wholly owned by Murphy's law firm at the time. Pinnacle received 85% of the title premium charge as a commission. Murphy testified at his deposition that the service of title examination was one of several services paid for by the title premium charge. Pinnacle charged McMaster a separate $91.00 title examination charge on the settlement statement. McMaster argues that the $91.00 fee was neither bona fide or reasonable. Murphy did not disclose at settlement that he also received a $275.00 payment for representing CIT.

At closing, McMaster was provided with a Federal Disclosure Statement providing the accurate annual percentage rate, finance charge, amount financed and payment information. She also received a Notice of Right to Cancel. McMaster acknowledged that she understood that by signing the Notice she had three days to cancel the loan. She also executed a HUD-1 Settlement statement. The $1000 legal fee payable to Baltz, Murphy & Mazullo is disclosed on page 3 of the Settlement statement. Plaintiff admits that she read the HUD-1 at closing. US Bank eventually purchased Plaintiff's mortgage from CIT. Fairbanks, at one point, serviced the loan.

**\*3** A foreclosure action against McMaster was filed in March 2003 in the Philadelphia Court of Common Pleas. A default judgment was entered, after which McMaster instituted the present action. Foreclosure is stayed during the pendency of this action.

McMaster asserts a variety of claims against CIT Group, Fairbanks Capital, U.S. Bank, and Security. She asserts Truth in Lending Act ("TILA") and Home Ownership and Equity Protection Act ("HOEPA") claims against CIT, Fairbanks, and U.S. Bank for damages and recission. She also asserts Unfair Trade Practices and

Consumer Protection Law ("UTPCPL") claims against all defendants and seems to assert a Real Estate Settlement Procedures Act ("RESPA") claim against CIT.

On February 8, 2006, I denied Murphy's motion for summary judgment. In that opinion, I held that genuine issues of material facts still existed in this case, including (1) whether the fees paid to Pinnacle were essentially going to Murphy and/or CIT; (2) whether the fee charged for title examination was bona fide and reasonable; and (3) whether Murphy, Pinnacle and Murphy were acting in concert, confusing McMaster as to each of their roles in the loan process. In this memo, I now address McMaster's claims against the remaining defendants.

*STANDARD OF REVIEW*

Rule 56(c) of the Federal Rules of Civil Procedure provides, in relevant part, that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (2005) . Rule 56(e) provides that when a properly supported motion for summary judgment is made, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U .S. 317, 322 (1986). The party moving for summary judgment has the burden of demonstrating that there are no genuine issues of material fact. *Id.* at 322-323. If the moving party sustains the burden, the nonmoving party must set forth facts demonstrating the existence of a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 255. In

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1314379 (E.D.Pa.)
**(Cite as: 2006 WL 1314379 (E.D.Pa.))**

addition, the "existence of disputed issues of material fact should be ascertained by resolving 'all inferences, doubts and issues of credibility against' " the moving party. *Ely v. Hall's Motor Transit Co.,* 590 F.2d 62, 66 (3d Cir.1978), quoting *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 878 (3d Cir.1972).

### DISCUSSION [FN5]

FN5. Due to the fact that there are multiple defendants, each with their own contentions, some repetition is unavoidable.

### I. Fairbanks Capital

**\*4** Fairbanks Capital argues that McMaster's claims against Fairbanks cannot stand because Fairbanks Capital acted only as assignee and servicer of the CIT loan. *See, e.g., Canty v. Equicredit Corp. of America,* 2003 U.S. Dist. LEXIS 8819, \*10 (E.D.Pa.2003) (no derivative liability under UTPCPL); *see also* 15 U.S.C. § 1614(f) (2006) (expressly excluding servicers from the Truth in Lending Act); *Brodo v. Bankers Trust Co.,* 847 F.Supp. 353, 359 (E.D.Pa.1994) (no liability for assignee who was neither responsible for nor had notice of TILA disclosure violations at time of assignment). McMaster stipulates to dismissing Fairbanks Capital from the complaint.

### I. Count I: TILA and HOEPA

### A. Statute of Limitations: Damages

Defendants argue that McMaster's TILA and HOEPA claims for damages are barred by a one year statute of limitations.[FN6] To maintain an action for either actual or statutory damages under TILA or HOEPA, the action must be brought "within one year of the occurrence of the violation." 15 U.S.C. § 1640(e) (2006); *Harris v. EMC Mortgage Corp.,* 2002 U.S. Dist. LEXIS 12251 (E.D. Pa. April 10, 2002) ("HOEPA is an amendment to TILA, and therefore is governed by the same remedial scheme and the same statute of limitations."). A violation occurs when a "consumer becomes contractually obligated on a credit transaction." 12 C.F.R. § 226.2(13) (1999); *see also Oldroyd v. Assoc. Consumer Discount Co/PA,* 863 F.Supp. 237, 240 (E.D.Pa.1994).

McMaster entered into the loan agreement on April 23, 2001. She filed her original complaint on January 26, 2004, over two years later.[FN7] Therefore, her requests for damages under TILA and HOEPA are barred by the statute of limitations.

FN6. Defendants concede that McMaster's action for rescission under TILA is not barred by the statute of limitations.

FN7. In a letter to the court, McMaster argues that the one year period to bring a TILA claim starts when the lender fails to act after receiving notice to rescind. The two cases that she cites, however, list the violation as the creditor's refusal to rescind the transaction, not violations at closing. *See Velasquez v. HomeAmerican Credit, Inc.,* 254 F.Supp.2d 1043, 1048 (N.D.Ill.2003); *Canty v. Equicredit Corp. of America,* 2003 U.S. Dist. LEXIS 8819, \*6 (E.D.Pa.2003). In this case, McMaster alleges that defendants violated TILA by failing to include information when the original loans were signed. Therefore, the statute of limitations regarding TILA damages began running at closing.

### B. Substantive Issues

McMaster asserts that defendants CIT and U.S. Bank committed multiple TILA and HOEPA violations against her. She argues that (1) CIT improperly excluded the $1000 for inheritance tax preparation conducted by Murphy in finance charge calculations; (2) CIT improperly excluded the $91.00 title examination charge in finance charge calculations; and (3) CIT failed to deliver all material disclosures required by TILA, including failing to provide the notice of a high interest loan. McMaster also submits that U.S. Bank is subject to assignee liability for CIT's acts.

### 1. TILA

### A. CIT

Pursuant to the TILA, a lender must disclose, as finance charges, all those charges "payable directly or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1314379 (E.D.Pa.)
**(Cite as: 2006 WL 1314379 (E.D.Pa.))**

indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. 15 U.S.C. § 1605(a) (2006). Fees for title examination are excluded from the finance charge calculation if they are both bona fide and reasonable in amount. *Id.* § 1605(e)(1); 12 C.F.R. § 226.4(c)(7) (2006).

McMaster claims that the title examination fee of $91.00 should have been included in the finance charge calculation because it was unnecessary and unreasonable. According to McMaster, she had already been charged by Murphy for that service. McMaster notes that Murphy described the services charged under the $411.75 Pinnacle fee as "order the title, review it, *examine it,* clear it, then issue a final policy, of course take care of the liens at closing." (Murphy dep. at 49-50) (emphasis added). Murphy later described the basis for the $91.00 title examination fee as "For just what it says, to examine the title." (Murphy dep. at 51). Murphy claims that separating these fees is permissible under Pennsylvania state law, but has not cited specific statutes allowing his conduct. He has also not sufficiently explained why he needed to charge for examining title twice. There remains a genuine issue of material fact as to whether the fees charged by Pinnacle and Murphy were bona fide and reasonable. Therefore, there remains a genuine issue of material fact whether the title examination fee should have been included in the finance charge calculations.

*B. US Bank*

**\*5** US Bank argues that it is not subject to assignee liability under the TILA because it was not on notice of any alleged TILA violations. This is true only in regard to damages. As the TILA provides, "Any consumer who has the right to rescind a transaction under section 125 [ 15 U.S.C. § 1635] may rescind the transaction against any assignee of the obligation." 15 U.S.C. § 1641. Therefore, U.S. Bank's assignee status will not preclude McMaster's rescission remedy.

Regarding damages, the TILA "imposes assignee liability only if a violation is 'apparent on the face of the disclosure statement.' " *Ramadan v. The Chase Manahttan Corp.,* 229 F.3d 194, 197 (3d Cir.2000). The

TILA specifically addresses assignee liability:

[A]ny civil action for a violation of this title ... which may be brought against a creditor may be maintained against any assignee of such creditor only if the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement.... For the purpose of this section, a violation apparent on the face of the disclosure statement includes, but is not limited to (1) a disclosure which can be determined to be incomplete or inaccurate form the face of the disclosure statement or other documents assigned, or (2) a disclosure which does not use the terms required by this title.

15 U.S.C. § 1641(a) (2006). Assignee financial institutions have no duty of inquiry in these cases and are only liable for "violations that a reasonable person can spot on the face of the disclosure statement or other assigned documents." *Ramadan,* 229 F.3d at 198 *quoting Taylor v. Quality Hundai, Inc.,* 150 F.3d 689, 694 (7th Cir.1998). McMaster responds by alleging that U.S. Bank could have been on notice of the TILA violations because the disbursement of $1000 to Murphy was not in accord with any disclosure to plaintiff in the loan file of an attorney-client relationship between McMaster, Murphy or his firm. This allegation is not strong enough to impose TILA assignee liability on U.S. Bank. There are no apparent errors on the face of the loan documents. All the loan documents were complete and signed by McMaster. Even if Murphy's fees were unreasonable, lawyers fees listed as costs of a loan are not per se unreasonable, and U.S. Bank has no obligation to interview Murphy and McMaster to uncover whether Murphy's fees were bona fide. Separate charges for title examination and title insurance are also not per se unreasonable. Therefore, U.S. Bank is not subject to damages for assignee liability under the TILA.

*2. HOEPA*

*A. CIT*

McMaster asserts that the defendants failed to provide notice of a high interest loan as required by HOEPA. HOEPA is an extension of TILA, imposing

Not Reported in F.Supp.2d, 2006 WL 1314379 (E.D.Pa.)
**(Cite as: 2006 WL 1314379 (E.D.Pa.))**

additional disclosure requirements for certain "high cost" mortgage loans. *See* 15 U.S.C. §§ 1639, 1602 (2006). A high cost mortgage is one which "the total points and fees payable by the consumer at or before the closing will exceed" "eight percent of the total loan amount." *Id.* § 1602(aa)(1). TILA specifies which costs are to be included in the HOEPA calculations as "all charges, payable directly or indirectly by the person to whom credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." *Id.* § 1605(a). Certain charges are specifically excluded from the fee calculation, including "fees for preparation of loan related documents" and "fees or premiums for title examination, title insurance, or similar purposes." *Id.* § 1605(e). Section 226.4(e) of Regulation Z additionally requires that the charges be "bona fide, reasonable in amount, and not for purposes of circumvention or evasion of this part." 12 C.F.R. § 226.4(e) (2006).

*6 McMaster's complaint alleges that the loan was a high rate mortgage within the meaning of 15 U.S.C. 1602(aa)(1)(a) because the total points and fees exceeded eight percent of the total loan amount. In my February 8, 2006 opinion in this case, I specifically found that there remains a genuine issue of material fact as to whether the fees charged by Pinnacle and Murphy were reasonable. These fees included the $91.00 title examination fee. If the title examination fee is unreasonable, as McMaster alleges, it will be included in the finance charge. The total points and fees payable by the consumer at or before the closing will then exceed eight percent of the total loan amount, thus making it a high interest loan under HOEPA.

*B. US Bank*

Under TILA, HOEPA loan assignees are subject to a broader standard of liability than non-HOEPA loan assignees. *See Kane v. Equity One, Inc.,* 2003 U.S. Dist. LEXIS 23810 (E.D.Pa.2003). US Bank also asserts that it can only be liable for the greater of (1) the applicable TILA damages or (2) rescission and recovery of all the payments made. HOEPA assignees are fully liable for HOEPA violations unless the "assignee demonstrates, by a preponderance of the evidence, that a reasonable

person exercising ordinary due diligence, could not determine, *based on the documentation required by this subchapter,* the itemization of the amount financed, and other disclosure of disbursements that the mortgage" was a high interest mortgage under HOEPA. 15 U.S.C. § 1641(d) (emphasis added) (2006). As discussed above, McMaster's claims that this is a high interest loan under HOEPA is premised on her allegation that the $91.00 title examination fee was unreasonable and should be included from the finance charge. As with the TILA violation, this allegation is not sufficient to impose HOEPA damages liability on U.S. Bank. As noted above, there is no way that U.S. Bank could have determined, based solely on the loan documentation, that the $91.00 was unreasonable. Therefore, U.S. Bank is not liable for damages under HOEPA.[FN8]

> FN8. US Bank could still be liable for rescission under HOEPA because under TILA, a borrower may rescind against any assignee if she has the right to rescind against the original lender. 15 U.S.C. § 1641(c) (2006).

*III. Count II: UTPCPL Violations* [FN9]

> FN9. McMaster asserted UTPCPL claims against all defendants in this case. I have already denied summary judgment with respect to her claims against Murphy.

*A. Security*

*1. Credit Services Act*

Under the Pennsylvania Credit Services Act ("CSA"), a credit services organization must provide the buyer with a dated contract, including notice of the buyer's right to cancel the contract, the organization's business address and the business address of its agent authorized to receive service of process, within five days of signing. A violation of the CSA shall be deemed to be a violation of UTPCPL. 73 P.S. § 2190(a). McMaster alleges that neither broker agreement contained those terms.

Security does not discuss whether it is a credit services agency subject to the CSA. A credit services or-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1314379 (E.D.Pa.)
**(Cite as: 2006 WL 1314379 (E.D.Pa.))**

Page 7

ganization is defined as follows:

> A person who, with respect to the extension of credit by others, sells, provides or performs or represents that he or she can or will sell, provide or perform any of the following services in return for the payment of money or other valuable consideration:

> **\*7** (i) Improving a buyer's credit record, history or rating.

> Obtaining an extension of credit for a buyer.

> (ii) Providing advice ro assistance to a buyer with regard to either subparagraph (i) or (ii).

73 P.S. § 2182 (2006). The definition also sets forth seven exceptions to the rule, but Security does not allege that any of the exceptions apply. *Id.* Security is a credit services organization because it received compensation from McMaster for helping her obtain the mortgage from CIT.

McMaster argues that neither the first nor the second broker agreement contained the necessary notice requirements. The first broker agreement, attached as Exhibit B-1 to McMaster's motion, is a one page document authorizing Security to obtain mortgage financing for McMaster. It contains Security's name and address, but does not have a date or notice of the buyer's right to cancel the contract. It also does not include the name or address of Security's agent authorized to receive service of process. Security does not offer any explanation of why the first broker agreement is fails to include this information. Security also does not allege that the one page document was incomplete or that McMaster was provided with a copy of the necessary documents within five days of signing. Therefore, the first broker agreement violates the CSA, and thus UTPCPL, and I will grant summary judgment to McMaster against Security on the basis of the faults of the first broker agreement.

Regarding the second broker agreement, Security argues that it has not violated the CSA because McMaster was given a Notice of Right to Cancel at closing. The second broker agreement, also a one page document, is attached to McMaster's motion as Exhibit B-2.

This document is dated and contains the name of the mortgage broker, but not its address. The page does not contain a notice of McMaster's right to cancel, but McMaster did testify that one was included in the documents given to her at closing. It, like the first broker agreement, also does not include the name or address of the agent authorized to receive service of process. Because it lacked this essential information, the second broker agreement also violates the CSA and UTPCPL, and I will also grant summary judgment to McMaster against Security on this claim.

### 2. Other UTPCPL Violations

The Pennsylvania UTPCPL contains twenty specific forms of prohibited conduct and a catchall provision covering other forms of "fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding. 73 Pa. Cons.Stat. § 201-2 (2005). The UTPCPL is to be liberally construed to effectuate the legislature's goal of consumer protection. *Commonwealth v. Monumental Properties Inc.,* 460, 329 A.2d 812, 817 (Pa.1974); *Keller v. Volkswagen of America, Inc.,* 733 A.2d 642, 646 (Pa.Super.Ct.1999). McMaster argues that Security specifically violated (1) 73 Pa. Cons.Stat. § 201-2(4)(xxi) and (v) by "conspiring [with CIT] to deceive plaintiff as to the terms of Security's fee" "; (2) § 201-2(4)(ix) by "bait[ing] plaintiff with the broker agreement 1 terms and switch[ing] them for the broker agreement 2 terms without notice or explanation to plaintiff"; (3) § 201-2(4)(xxi) and (v) by "conspir[ing] to deceive plaintiff as to the existence and disadvantages of her paying a higher interest rate than she otherwise qualified for to cover the yield spread premium fee"; (4) § 201-2(4)(xxi) and (v) by "unfairly broker[ing] a refinancing of her 6.3% first mortgage debt at 14 &⟶% with a first mortgage loan rather than seeking for her or disclosing the advantages and disadvantages of a second mortgage loan"; (5) § 201-2(4)(v) by "deceiv[ing] her as to the unfairness of her paying over loan proceeds to a home improvement contractor who she never met ... and deny[ing] her control over the funds to prevent Rosen from performing poor or overpriced work"; and (6) § 201-2(4)(xxi) and (v) by "deceiv[ing] her ... as to the disadvantages of entering into the Loan, including but not limited to the loan's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1314379 (E.D.Pa.)
**(Cite as: 2006 WL 1314379 (E.D.Pa.))**

higher monthly debt payments and higher annual percentage rate of interest." I will address each argument separately.

**\*8** Regarding the first, that CIT and Security conspired to deceive plaintiff as to the terms of Security's fee, McMaster has not offered any evidence of a conspiracy between CIT and Security. CIT was not a party to either the first or the second broker agreement. McMaster has not alleged any facts which would indicate that Security was acting on behalf of CIT or that Security was CIT's agent. CIT and Security assert that Security's involvement with CIT was limited to submitting to CIT, as a potential lender, the loan application and supporting documents and that Security does not have an agency relationship with the various lenders to whom it submits applications. Further, CIT and Security aver that Security was acting as McMaster's agent, acting to procure a loan on her behalf. Since McMaster offers no contrary evidence, I will grant summary judgment to Security on this claim.

Second, McMaster maintains that Security baited McMaster with favorable terms and later switched them without notice or explanation. Security responds that the second broker agreement was only a notice which directed plaintiff to consult the HUD Settlement Statement. The increase in fees was not for the previously agreed upon services but compensated the broker for his additional time and effort.[FN10] I will grant summary judgment to McMaster on this claim. Security violated the original agreement by charging McMaster more than the original 3% broker commission. Security acted deceptively when it changed the amount of fees by referencing another document, instead of clearly stating that the amount of fees had changed and listing the new amount. Security argues that there was only one broker agreement. If it truly took extra time and effort to secure a loan, Security should have made a separate, additional agreement with McMaster. It should not have changed the cost of the original agreement, then hidden the new cost on a different page of the closing papers.

> FN10. Security seems to argue that the second broker agreement was merely an extension of the first agreement, not a new agreement. Se-

curity avers that the only function of the second broker agreement was to direct McMaster to the HUD settlement statement where she could find the amount of fees. Because I grant summary judgment to McMaster here regardless of whether the second broker agreement was a new agreement or merely a change in terms of the original broker agreement, I do not need to decide whether the second agreement was a new contract supported by additional consideration or indicated an intent to be bound.

Third, McMaster asserts that CIT and Security conspired to charge her a higher fee using the yield spread premium fee. Since, as noted above, McMaster has not offered any evidence of a conspiracy, I will grant summary judgment to CIT and Security on this claim.

Fourth, McMaster argues that Security unfairly brokered a refinancing of her first mortgage debt rather than seeking for her or disclosing the advantages and disadvantages of a second mortgage loan, a violation of § 201-2(4)(xxi) and (v). Neither § 201-2(4)(xxi) or (v) mandates that a mortgage broker obtain the best possible financing for a customer. Further, McMaster alleges that Security's conduct was likely to cause confusion or misunderstanding as to the loan's terms, but McMaster does not allege that she did not realize that she was refinancing all of the outstanding debt on the house. I will grant summary judgment to Security on this claim.

Fifth, McMaster asserts that Security violated UTP-CPL by forcing her to pay her loan proceeds to Ed Rosen, a home improvement contractor who performed the repairs poorly. Security responds by noting that the check was made to McMaster, not to Rosen, and that McMaster was free to use the funds as she wished. Although the check was made out to McMaster, it is possible that she was forced by Security to turn over the funds immediately to Rosen. A genuine issue of material facts exists here.

**\*9** Sixth, McMaster asserts that Security violated UTPCPL by deceiving her regarding the disadvantages of entering into the loan, including but not limited to the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1314379 (E.D.Pa.)
**(Cite as: 2006 WL 1314379 (E.D.Pa.))**

loan's higher monthly debt payments and higher annual percentage rate of interest. Here, McMaster has not offered enough evidence to survive summary judgment. McMaster does not allege that Security gave her misinformation with regards to the monthly payments and interest rate. Therefore, I will grant summary judgment to Security on this claim.

*B. CIT*

*1. Credit Services Act*

In McMaster's complaint, she alleges that CIT violated UTPCPL by violating the CSA. CIT, however, is not subject to the CSA because it specifically excludes licensed lenders. The CSA does not apply to "[a]ny person organized, chartered or holding a license or authorization certificate to make loans or extensions of credit pursuant to the laws of the Commonwealth or the United States." 73 P.S. § 2182. McMaster does not dispute that CIT is a licensed lender. Therefore, I will grant summary judgment to CIT regarding violations of UTPCPL under the CSA.

*1. Other UTPCPL Violations*

McMaster argues that CIT specifically violated (1) 73 Pa. Cons.Stat. § 201-2(4)(xxi) and (v) by "conspiring [with Security] to deceive plaintiff as to the terms of Security's fee" "; (2) § 201-2(4)(xxi) and (v) by "conspir[ing] to deceive plaintiff as to the existence and disadvantages of her paying a higher interest rate than she otherwise qualified for to cover the yield spread premium fee"; (3) § 201-2(4)(xxi) and (v), by "conspir[ing] with Murphy) to deceive plaintiff as to charging her a 'title examination' charge which ... [was] a junk fee to enrich Murphy and benefit CIT by having their agent control all aspects of the loan; (4) § 201-2(4)(iii) and (xxi) by "deceiv[ing] plaintiff and caus[ing] her confusion" regarding the relationship between CIT and Murphy; (5) § 201-2(4)(xxi) and (v) by "deceiv[ing] her ... as to the disadvantages of entering into the Loan, including but not limited to the loan's higher monthly debt payments and higher annual percentage rate of interest." I will address each claim separately.

Regarding the first and second allegations, that CIT and Security conspired to deceive plaintiff as to the terms of Security's fee and to the disadvantages of the higher interest rate used to cover the yield spread premium, McMaster has not offered any evidence of a conspiracy between CIT and Security. CIT was not a party to either the first or the second broker agreement. McMaster has not alleged any facts which would indicate that Security was acting on behalf of CIT or that Security was CIT's agent. CIT and Security assert that Security's involvement with CIT was limited to submitting to CIT, as a potential lender, the loan application and supporting documents and that Security does not have an agency relationship with the various lenders to whom it submits applications. Further, CIT and Security aver that Security was acting as McMaster's agent, acting to procure a loan on her behalf. As McMaster offers no evidence to dispute CIT's statements, I will grant summary judgment to CIT on this allegation.

**\*10** Third, McMaster asserts that CIT and Murphy conspired to deceive plaintiff as to the "title examination charge," which was merely a junk fee to enrich Murphy. As discussed when I denied Murphy's motion for summary judgment, the $91.00 title examination fee was charged by Pinnacle Abstract, the title company. That company was owned by Murphy's law firm and represented by Murphy at closing. Murphy was also representing CIT in the transaction. McMaster notes that Murphy described the services charged under the $411.75 Pinnacle fee as "order the title, review it, *examine it,* clear it, then issue a final policy, of course take care of the liens at closing." (Murphy dep. at 49-50) (emphasis added). Murphy later described the basis for the $91.00 title examination fee as "For just what it says, to examine the title." (Murphy dep. at 51). Murphy claims that separating these fees is permissible under Pennsylvania state law, but has not cited any authority justifying his conduct. He also has not sufficiently explained why he needed to charge for examining title twice. There remains a genuine issue of material fact as to the validity of the $91.00 title examination fee and whether CIT and Murphy conspired to deceive plaintiff about it.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1314379 (E.D.Pa.)
**(Cite as: 2006 WL 1314379 (E.D.Pa.))**

Fourth, McMaster asserts that CIT violated the UT-PCPL by deceiving her regarding the relationship between CIT and Murphy. As discussed above, with the evidence offered so far a reasonable jury could find that Murphy, Pinnacle, and CIT were acting in concert, confusing McMaster as to each of their roles in the loan process.

Fifth, McMaster asserts that CIT violated UTPCPL by deceiving her regarding the disadvantages of entering into the loan, including but not limited to the loan's higher monthly debt payments and higher annual percentage rate of interest. Here, McMaster has not offered enough evidence to survive summary judgment. McMaster does not allege that CIT gave her misinformation with regards to the monthly payments and interest rate. Therefore, I will grant summary judgment to CIT on this claim.

### 3. RESPA

Plaintiff seems to assert a RESPA violation under UTPCPL against CIT for withholding the good faith estimates of all the charges accompanying the loan so that McMaster would have as little time as possible to review and question each charge. Defendants argue that McMaster does not have standing to assert a RESPA claim. Under RESPA, each lender must send, within three days business days after the lender receives the application, "a good faith estimate of the amount or range of charges for specific settlement services the borrower is likely to incur in connection with the settlement." 12 U.S.C. § 2604 (2006). There is no private right of action under this section. *See Brophy v. Chase Manhattan Mortgage Co.,* 947 F.Supp. 879, 882 (1996) ("Since the statute specifically provides for a private right of action under specific sections-but not § 2406-a private right of action should not be implied under § 2604."). Therefore, McMaster's asserted RESPA violation cannot stand.[FN11]

FN11. McMaster seems to argue that a violation of RESPA is also a violation of UTPCPL. She cites no cases to support this principle and also does not specify any facts which would make the RESPA violating conduct also satisfy the UTPCPL requirements. The statutes are different, one is state law, one is federal; they have different requirements; and grant different types of relief. Accordingly, I cannot find that a violation of one is a per se violation of the other. Further, the only case discussing this issue held that UTPCPL does not provide relief for RESPA violations. *Koch v. First Union Corp.,* 2002 Phila. Ct. Com. Pl. LEXIS 82, * 16 (2002).

### C. US Bank

**\*11** UTPCPL provides that a consumer may sue a seller of goods or services who commits an unfair trade practice. *See Williams v. Nat'l School of Health Tech.,* 836 F.Supp. 273, 283 (E.D.Pa.1993). US Bank argues that it cannot be liable for violating UTPCPL because it acted only as assignee and servicer of the CIT loan and did not commit any unfair trade practices. US Bank offers two cases in support of its argument. First, in *Williams v. National School of Health Techology,* 836 F.Supp. 273 (E.D.Pa.1993), Judge Bartle refused to extend UTPCPL liability to a later holder of a consumer loan. *Id.* at 283 He noted that the plaintiff did not offer "any support for the proposition that the UTPCPL applied to non-culpable parties." *Id.* He continued, "The UTPCPL provides that consumers may sue a seller of goods or services who commits an unfair trade practice but does not impose liability on parties who have not themselves committed any wrongdoing." *Id.* (footnote omitted); *see also Canty v. Equicredit Corp. of Am.,* 2003 U.S. Dist. LEXIS 8819, * 10 (E.D.Pa.2003) (finding mortgage holder not liable because plaintiff had not asserted any wrongful conduct by mortgage holder). In this case, McMaster has not attributed any specific acts of wrongdoing, or any unfair trade practices, to U.S. Bank. While it is currently the holder of the mortgage, it cannot be held liable under UTPCPL because McMaster has not offered any evidence to show that U.S. Bank was a culpable party.

An appropriate Order follows.

### ORDER

AND NOW, on this 11th day of May 2006, upon consideration of McMaster's motion for summary judgment against all defendants, CIT Group's response and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1314379 (E.D.Pa.)
**(Cite as: 2006 WL 1314379 (E.D.Pa.))**

cross-motion for summary judgment, Steven Rosen and Security Mortgage Broker's response and cross-motion for summary judgment, Fairbanks Capital Corp and U.S. Bank's motion for summary judgment, and McMaster's response to Fairbank and U.S. Bank's motion, and for the reasons set forth in the accompanying memorandum, it is ORDERED that:

1. Fairbanks Capital Corporation n/k/a Select Portfolio Servicing, Inc.'s Motion for Summary Judgment is GRANTED;

2. McMaster's motion for summary judgment against Security Mortgage Broker and Rosen under the Pennsylvania Credit Services Act is GRANTED;

3. CIT's motion for summary judgment with respect to the Pennsylvania Credit Services Act claims against CIT is DENIED;

4. CIT, Security, and Rosen's motions for summary judgment with respect to conspiring to deceive plaintiff as to the terms of Security's fee (Count II, ¶ 54(a)) are GRANTED;

5. McMaster's motion for summary judgment regarding her claim that Security and Rosen baited her with certain terms and then switched them without notice (Count II, ¶ 54(b)) is GRANTED;

6. CIT, Security, and Rosen's motions for summary judgment with respect to conspiring to charge McMaster a higher fee using the yield spread premium fee (Count II, ¶ 54(c)) is GRANTED;

7. Security and Rosen's motion for summary judgment with respect to the refinancing interest rates (Count II, ¶ 54(e)) is GRANTED;

*12 8. CIT, Security and Rosen's motions for summary judgment with respect to the advantages and disadvantages of entering into the loan (Count II, ¶ 54(I)) is GRANTED.

9. Motions for summary judgment in this case regarding all other claims are DENIED.

E.D.Pa.,2006.
McMaster v. CIT Group/Consumer Finance Inc.
Not Reported in F.Supp.2d, 2006 WL 1314379 (E.D.Pa.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Page 1

Not Reported in F.Supp.2d, 2004 WL 739965 (E.D.Pa.)
**(Cite as: 2004 WL 739965 (E.D.Pa.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Alvin RICCIARDI
v.
AMERIQUEST MORTGAGE COMPANY

No. 03–2995.
March 15, 2004.

David A. Scholl, Newtown Square, PA, for Plaintiff.

Sandhya M. Feltes, Kaplin Stewart, Blue Bell, PA, for Defendant.

*REPORT AND RECOMMENDATION*
RUETER, Magistrate J.

**\*1** Presently before this court is defendant Ameriquest Mortgage Company's ("defendant") motion in limine to preclude plaintiff's claim under the Equal Credit Opportunity Act ("ECOA") (Document No. 13). On February 17, 2004, this court held oral argument on defendant's motion, as well as other motions filed by the parties. At that hearing, the court notified the parties it would consider defendant's motion as a motion for summary judgment with respect to the ECOA claim.[FN1]

> FN1. At the oral argument, the court notified the parties that it considered plaintiff's motion in limine to be a dispositive motion and would review it pursuant to Fed.R.Civ.P. 56. Both parties informed the court that they did not object to the court considering the motion pursuant to Fed.R.Civ.P. 56, acknowledging it was appropriate for the court to decide the issue before trial.

> In his preliminary response to the motion, plaintiff complained that he had not been served properly with the motion and was prejudiced by the lack of time to provide an appropriate response. (Document No. 17.) At

oral argument, plaintiff handed up to the court and filed his formal response to the motion (Document No. 24), and withdrew his claim of prejudice. Moreover, the court allowed plaintiff additional time to supplement his response, which he did by letter dated February 19, 2004 attaching portions of plaintiff's deposition testimony and requesting that it be considered in opposition to the motion. The court accepted this additional evidence and considered it in deciding the motion. *See Bradley v. Pittsburgh Bd. of Educ.,* 913 F.2d 1064, 1069–70 (3d Cir.1990) (approving conversion of dispositive motion in limine to motion for summary judgment so long as sufficient notice given to non-movant).

*I. BACKGROUND*
On August 29, 2002, plaintiff applied for a loan from defendant over the telephone. Plaintiff claims that defendant offered him a loan with an interest rate of 7.25 percent under a special program for unemployed persons. (Pl.'s Mem. Supp. ECOA Claim at 1.) According to a Conversation Log completed by Rhonda Droms, an agent for defendant, at the time of the call, defendant noted an initial interest rate of eight percent and a loan amount of $189,000. [FN2] (Def.'s Mem. Supp. Mot. at 1 and Ex. A.) The Conversation Log identified that the purpose of the loan was to "consolidate." *Id* . Ex. A. On August 30, 2002, defendant provided plaintiff with a preliminary Truth–In–Lending Disclosure Statement, also dated August 30, 2002, reflecting an interest rate of 9.487 percent and a loan amount of $180,578.[FN3] *Id.* at 2 and Ex. B. The interest rate and the amount of the loan were noted to be estimates. *Id.* Ex. B.

> FN2. No evidence in the record corroborates plaintiff's claim that he was offered an interest rate of seven and one-quarter percent. The Conversation Log, completed by defendant at the time of the telephone call between plaintiff and defendant's representative, indicated that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 739965 (E.D.Pa.)
**(Cite as: 2004 WL 739965 (E.D.Pa.))**

Page 2

an initial interest rate of eight percent was discussed. For purposes of this motion, the court assumes plaintiff's recollection of the conversation was correct.

FN3. The August 30, 2002 Truth–In–Lending Disclosure Statement, although containing a line for plaintiff's signature, was not signed by plaintiff.

The loan closing took place on September 11, 2002, less than thirty days after plaintiff applied for the loan from defendant. At the loan closing, defendant provided plaintiff with a document titled: "Borrower's Acknowledgment of Final Loan Terms" (the "Borrower's Acknowledgment Form"). *Id.* Ex. C. The Borrower's Acknowledgment Form contained a two column chart which prominently listed the "original loan terms requested" and the "final loan terms" as follows:

| ORIGINAL LOAN TERMS REQUESTED | FINAL LOAN TERMS |
| --- | --- |
| ... | ... |
| Amount Financed: $180,578.00 | Amount Financed: $171,193.94 |
| Settlement Charges: $10,295.75 | Settlement Charges: $11,489.81 |
| (Includes all Prepaid Finance Charges) | (Includes all Prepaid Finance Charges) |
| Loan Amount: $189,000.00 | Loan Amount: $180,900.00 |
| Annual Percentage Rate: 9.487% | Annual Percentage Rate: 8.824% |
| Term: 360 | Term: 360 |
| Initial Interest Rate: 9.000% | Initial Interest Rate: 8.259% |
| ... | ... |

*Id.* Plaintiff executed the Borrower's Acknowledgment Form and the other loan documents on September 11, 2002.

On May 28, 2003, plaintiff filed the instant action against defendant alleging various claims including a claim that plaintiff violated the ECOA. Plaintiff claims that the first time he knew that the terms of the loan would be different from those discussed on the telephone, was when he arrived at the loan closing on September 11, 2002. In Count Three of his Complaint, plaintiff asserted as follows: "The Defendant significantly changed the terms of the instant credit transaction and substituted different, less favorable terms without so advising the Plaintiff, in violation of U.S.C. section 1691(d) of ECOA." (Complaint ¶ 20.)

II. *SUMMARY JUDGMENT STANDARD*

**\*2** Pursuant to Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court has ruled that Rule 56(c) requires "the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson,* 477 U.S. at 248. A factual dispute is material only if it might affect the outcome of the suit under governing law. *Id.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 739965 (E.D.Pa.)
**(Cite as: 2004 WL 739965 (E.D.Pa.))**

The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party cannot rest on the pleadings, but rather must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "If the evidence [offered by the non-moving party] is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50. On the other hand, "if reasonable minds can differ as to the import of the proffered evidence that speaks to an issue of material fact," summary judgment should not be granted. *Burkert v. Equitable Life Assurance Soc'y of the United States,* No. 99–CV–1, 2001 WL 283156, at *3 (E.D.Pa. Mar. 20, 2001). In considering a motion for summary judgment, the evidence must be considered in the light most favorable to the non-moving party, and all inferences must be drawn in that party's favor. *Celotex,* 477 U.S. at 322.

## III. *REQUIREMENTS OF THE ECOA*

The section of the ECOA at issue is section 1691(d). This section states that "[w]ithin thirty days ... after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application." 15 U.S.C. § 1691(d)(1). The accompanying regulation, known as Regulation B, is found at 12 C.F.R ., Part 202.[FN4] Regulation B provides: "A creditor shall notify an applicant of action taken within: (i) 30 days after receiving a completed application concerning the creditor's approval of, counteroffer to, or adverse action on the application." 12 C.F.R. § 202.9(a)(1)(i). A creditor must provide the applicant written notification if "adverse action" is taken. 15 U.S.C. § 1691(d)(2). Regulation B defines "adverse action" to mean, in pertinent part: "(i) A refusal to grant credit in substantially the amount or on substantially the terms requested in an application unless the creditor makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant uses or expressly accepts the credit offered." 12 C.F.R. § 202.2(c)(i). Clearly, a counteroffer made within the thirty days is not an adverse action

requiring an additional written notice. *See Diaz v. Virginia Housing Dev. Auth.,* 117 F.Supp.2d 500, 504 (E.D.Va.2000) (holding that denial coupled with a counteroffer is excluded from the ECOA's written notice requirement, where the applicant accepts the counteroffer).

> FN4. Regulation B is "issued by the Board of Governors of the Federal Reserve System pursuant to title VII (Equal Credit Opportunity Act) of the Consumer Credit Protection Act, as amended (15 U.S.C. 1601 *et seq.*)." 12 C.F.R. § 202.1(a).

**\*3** Neither the ECOA nor Regulation B mandates the form, content or manner in which a creditor must notify an applicant of a counteroffer. Defendant argues that the ECOA requires notice of the counteroffer within thirty days of receipt of the completed application, but does not specify that the notice of counteroffer must be provided at any particular period of time prior to closing.

The issue in the case *sub judice* is purely a question of law and is as follows: Whether the manner in which defendant notified plaintiff of its counteroffer to plaintiff's loan application, i.e. within thirty days of the date of the completed loan application and on the date of the loan closing in the Borrower's Acknowledgment Form, satisfied the notice requirements of the ECOA. This court finds that it does.

## IV. *DISCUSSION*

The facts are not in dispute. Plaintiff applied for a loan on August 29, 2002. This court will assume that the application was completed on that same date. [FN5] On September 11, 2002, thirteen days after the loan application was completed, defendant provided plaintiff with the Borrower's Acknowledgment Form setting forth the terms of its counteroffer. Plaintiff signed the Borrower's Acknowledgment Form. As detailed above, the Borrower's Acknowledgment Form clearly identified the "original loan terms requested" and the "final loan terms." (Def.'s Mem. Supp. Mot. Ex. C) On that same date, plaintiff also signed the loan documents to finalize the transaction.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 739965 (E.D.Pa.)
**(Cite as: 2004 WL 739965 (E.D.Pa.))**

FN5. Defendant asserts that the loan application was not completed until September 11, 2002 when, apparently, plaintiff signed the final loan application forms. (Def.'s Mem. Supp. Mot. at 5 and Exs. F and G.) However, this date is not crucial to the determination of the issues presented because defendant provided the Borrower's Acknowledgment Form to plaintiff within thirty days of either date.

Plaintiff was deposed on September 29, 2003. He testified that he had the opportunity to review the documents at the closing before signing them. (Pl.'s Dep. at 22–23.) Plaintiff testified that he understood the fees and settlement charges being deducted from his loan proceeds. *Id.* at 35. When plaintiff saw the amount of fees and settlement charges, he did not inform defendant that he did not wish to proceed with the loan. *Id.* Plaintiff understood that he could cancel the loan within one week of the closing date. *Id.* at 36. Plaintiff acknowledged that he signed the note which reflected a fixed interest rate of 8.259 percent. *Id.* at 38. Plaintiff did not inform defendant that he did not wish to proceed with the loan because the interest rate was greater than 7.25 percent. *Id.* at 38–39. Plaintiff understood that his monthly payment of principal and interest would be $1,360.19. *Id.*

The requirements of the ECOA and Regulation B are clear. Notice of a counteroffer must be given within thirty days of receiving a completed application. Neither the ECOA nor Regulation B requires that the notice of counteroffer must be given at a time before the loan closing.

Plaintiff urges that *Newton v. United Companies Fin. Corp.,* 24 F.Supp.2d 444 (E.D.Pa.1998) requires a different result. In that case, four low income homeowners brought an action against a lender with whom they each entered into mortgage loans to finance home improvements. The complaint alleged violations of, *inter alia,* the ECOA. *Id.* at 446. In each of the transactions at issue in *Newton,* the lender, United, was contacted on the plaintiffs' behalf about extending them credit in the amount of their home improvement contracts. United ultimately extended credit in significantly higher amounts and did not provide the plaintiffs with counter-offer notices required by the ECOA. *Id.* at 457. The question at issue in *Newton,* as stated by the court, was "whether plaintiffs made 'completed applications' for credit in the lower amounts and thus triggered United's counteroffer notice duty." *Id.* The court concluded that the applications were completed for the purposes of the ECOA and Regulation B when United received the title reports for the properties. *Id.* at 461.

*4 In addressing the counteroffer requirement of the ECOA, the court stated as follows:

United contends that it is in full compliance with ECOA's notification requirement because each of these loans closed within 30 days of the loan package being sent to Baton Rouge, and therefore all the plaintiffs were notified of approval within 30 days as required by 15 U.S.C. § 1691(d)(1) and 12 C.F.R. § 202.9(a)(1)(i). By that logic, a lender would be relieved of its duty to notify the borrower of a counteroffer being made as long as that counteroffer is approved within the original 30–day period. This result is at odds with the language of the regulation, which is clear in requiring that the lender must notify the borrower of the making of a counteroffer, not just the ultimate approval or denial of that counteroffer.

*Id.* at 461–62. The borrowers in *Newton* received no notice of counteroffer at the closing of their loans, but received the final loan applications and documents which incorporated loan terms different from those they originally requested. The court concluded that the ECOA was "designed to give the borrower fair notice that a counteroffer for a larger loan was in the offing within a reasonable time after the lender knew this, which was before the closing." *Id.* at 462.

*Newton* does not require a different result here. The facts in the instant case are easily distinguishable from those in *Newton.* Here, defendant presented plaintiff with a notice of the counteroffer at the loan closing by way of the Borrower's Acknowledgment Form. As described above, the Borrower's Acknowledgment Form clearly set forth the originally requested terms and the final terms of the loan. Unlike in *Newton,* where the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 739965 (E.D.Pa.)
**(Cite as: 2004 WL 739965 (E.D.Pa.))**

borrowers received no notice of a counteroffer, one was provided to plaintiff in this case. Plaintiff signed the Borrower's Acknowledgment Form. The notice missing in *Newton* was present in this case.

Neither the ECOA nor Regulation B prohibits the notice of counteroffer from being provided at the time of closing. While the court in *Newton* stated that the notice of counteroffer should be provided before the closing, such a requirement is not to be found in the ECOA or Regulation B. The law is clear that regulations are propounded by agencies at the delegation of Congress are entitled to substantial deference. The Supreme Court has made clear that where "there is an express delegation of authority to the agency to elucidate a specific provision of statute by regulation[,][s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (footnote omitted). Here, Congress has explicitly provided that "[t]he Board [or Governors of the Federal Reserve System] shall prescribe regulations to carry out the purposes of this subchapter." 15 U.S.C. § 1691b(a)(1). *See also Nevarez v. O'Connor Chevrolet, Inc.,* 2004 WL 318612, at *9 (N.D.Ill. Feb.5, 2004) ("Because the [Federal Reserve Board] has been given explicit authority to prescribe regulations to carry out the purpose of the ECOA, the court should given substantial deference to the interpretations of the [Federal Reserve Board].")*; Roseman v. Premier Fin. Serv.—East, L.P.,* 1997 WL 570919, at *3 n. 3 (E.D.Pa. Sept.3, 1997) (Pollak, J.) (citing *Chevron* and concluding that the language of Regulation B "merits very substantial deference"). The regulations at issue in this case are not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron,* 467 U.S. at 844. Defendant complied with the requirements in the statute and Regulation B to provide the notice of counteroffer within thirty days from receipt of a completed application.

**\*5** This court may not usurp the legislative power of Congress by adding requirements to the statute or regulations. It is not the responsibility of this court to add a requirement that the notice of counteroffer must

be provided within thirty days after receipt of a completed application AND prior to the closing. *See Barnhart v.. Sigmon Coal Co., Inc.,* 534 U.S. 438, 462, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (Court cannot alter the text "of a statute to satisfy policy preferences" of one party to the detriment of the other); *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 733, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (Scalia, J., dissenting) ("Court may not exercise the ... power to legislate, and so may not uphold a regulation by adding to it even the most reasonable of elements it does not contain"); *Hanover Bank v. Comm'r of Internal Revenue,* 369 U.S. 672, 687–88, 82 S.Ct. 1080, 8 L.Ed.2d 187 (1962) (when the plain and ordinary language of the statute is clear, the Court "may not add to or alter the words employed to effect a purpose which does not appear on the face of the statute.... This Court [cannot] do what the legislative branch of the Government failed to do or elected not to do. This, of course, is not within our province.").

Adding a requirement to the ECOA or Regulation B that a notice of counteroffer must be provided before closing would open the door to numerous questions regarding how far prior to closing the notice of counteroffer must be provided. Would one day prior to closing be sufficient, or would five days be required? Would two hours prior to closing be sufficient if the borrower were able to leave the closing to consider his or her options, and then return? Congress could have chosen any of these possibilities when it enacted the ECOA, but did not. Nor did the Federal Reserve Board raise such issues in Regulation B. *See Barnhart,* 534 U.S. at 454 (declining to "read into" a statute an omitted term, noting that if Congress meant to include the provision, "it could have done so clearly and explicitly").

In the instant case, defendant provided plaintiff with a notice of counteroffer which plaintiff freely acknowledged he read and signed. Plaintiff also admitted he knew and understood the amount of interest being charged and the amount of his monthly payments, yet did not express concern or a desire to stop the transaction. Nor did plaintiff seek to rescind the loan within the appropriate time frame, of which he admitted know-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 739965 (E.D.Pa.)
**(Cite as: 2004 WL 739965 (E.D.Pa.))**

ledge.[FN6] The plain language of the ECOA, as further discussed by Regulation B, requires this court to find that defendant did not violate the ECOA.

> FN6. At his deposition, plaintiff explained that he proceeded with the loan even though the interest rate was greater than 7.25 percent, because he was paying his mortgage with his savings and was running out of money. Plaintiff testified as follows:

> Well, originally, I was hoping to get less than seven and-a-quarter, when I got to settlement I learned this and I was under extreme financial pressure, I had taxes that were coming up, I didn't have much, I was running out of money and this was the only way to keep myself afloat while I was looking for a job.

> (Pl.'s Dep. at 39.) Plaintiff also testified that he did not cancel the loan within the cancellation period for the same reason. *Id.* at 40. It was when plaintiff used up the cash he received from the loan, approximately four to five months after the loan was in place, that he considered his rights with respect to the loan. *Id.* at 40–42. Plaintiff further stated that the reason he wanted to rescind the loan was because the loan application contained false statements indicating that he was employed as an "internet advisor" and earning "$4,500 a month." *Id.* at 40.

V. *CONCLUSION*

For all the above reasons, this court finds that the undisputed evidence shows that this defendant did not violate the ECOA with respect to the loan in question, and makes the following:

RECOMMENDATION

AND NOW, this 15th day of March, 2004, upon consideration of defendant's motion in limine, which the parties agreed should be considered as a motion for summary judgment, and plaintiff's responses thereto, it is respectfully recommended that defendant's motion be granted and judgment be entered in favor of defendant

and against plaintiff with respect to Count III of the Complaint.

E.D.Pa.,2004.
Ricciardi v. Ameriquest Mortgage Co.
Not Reported in F.Supp.2d, 2004 WL 739965 (E.D.Pa.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2004 WL 739965 (E.D.Pa.)
**(Cite as: 2004 WL 739965 (E.D.Pa.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Alvin RICCIARDI
v.
AMERIQUEST MORTGAGE COMPANY

No. 03–2995.
March 15, 2004.

David A. Scholl, Newtown Square, PA, for Plaintiff.

Sandhya M. Feltes, Kaplin Stewart, Blue Bell, PA, for Defendant.

*REPORT AND RECOMMENDATION*
RUETER, Magistrate J.
   **\*1** Presently before this court is defendant Ameriquest Mortgage Company's ("defendant") motion in limine to preclude plaintiff's claim under the Equal Credit Opportunity Act ("ECOA") (Document No. 13). On February 17, 2004, this court held oral argument on defendant's motion, as well as other motions filed by the parties. At that hearing, the court notified the parties it would consider defendant's motion as a motion for summary judgment with respect to the ECOA claim.FN1

   FN1. At the oral argument, the court notified the parties that it considered plaintiff's motion in limine to be a dispositive motion and would review it pursuant to Fed.R.Civ.P. 56. Both parties informed the court that they did not object to the court considering the motion pursuant to Fed.R.Civ.P. 56, acknowledging it was appropriate for the court to decide the issue before trial.

   In his preliminary response to the motion, plaintiff complained that he had not been served properly with the motion and was prejudiced by the lack of time to provide an appropriate response. (Document No. 17.) At

oral argument, plaintiff handed up to the court and filed his formal response to the motion (Document No. 24), and withdrew his claim of prejudice. Moreover, the court allowed plaintiff additional time to supplement his response, which he did by letter dated February 19, 2004 attaching portions of plaintiff's deposition testimony and requesting that it be considered in opposition to the motion. The court accepted this additional evidence and considered it in deciding the motion. *See Bradley v. Pittsburgh Bd. of Educ.,* 913 F.2d 1064, 1069–70 (3d Cir.1990) (approving conversion of dispositive motion in limine to motion for summary judgment so long as sufficient notice given to non-movant).

*I. BACKGROUND*
   On August 29, 2002, plaintiff applied for a loan from defendant over the telephone. Plaintiff claims that defendant offered him a loan with an interest rate of 7.25 percent under a special program for unemployed persons. (Pl.'s Mem. Supp. ECOA Claim at 1.) According to a Conversation Log completed by Rhonda Droms, an agent for defendant, at the time of the call, defendant noted an initial interest rate of eight percent and a loan amount of $189,000. FN2 (Def.'s Mem. Supp. Mot. at 1 and Ex. A.) The Conversation Log identified that the purpose of the loan was to "consolidate." *Id* . Ex. A. On August 30, 2002, defendant provided plaintiff with a preliminary Truth–In–Lending Disclosure Statement, also dated August 30, 2002, reflecting an interest rate of 9.487 percent and a loan amount of $180,578.FN3 *Id.* at 2 and Ex. B. The interest rate and the amount of the loan were noted to be estimates. *Id.* Ex. B.

   FN2. No evidence in the record corroborates plaintiff's claim that he was offered an interest rate of seven and one-quarter percent. The Conversation Log, completed by defendant at the time of the telephone call between plaintiff and defendant's representative, indicated that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 739965 (E.D.Pa.)
**(Cite as: 2004 WL 739965 (E.D.Pa.))**

an initial interest rate of eight percent was discussed. For purposes of this motion, the court assumes plaintiff's recollection of the conversation was correct.

FN3. The August 30, 2002 Truth–In–Lending Disclosure Statement, although containing a line for plaintiff's signature, was not signed by plaintiff.

The loan closing took place on September 11, 2002, less than thirty days after plaintiff applied for the loan from defendant. At the loan closing, defendant provided plaintiff with a document titled: "Borrower's Acknowledgment of Final Loan Terms" (the "Borrower's Acknowledgment Form"). *Id.* Ex. C. The Borrower's Acknowledgment Form contained a two column chart which prominently listed the "original loan terms requested" and the "final loan terms" as follows:

| ORIGINAL LOAN TERMS REQUESTED | FINAL LOAN TERMS |
|---|---|
| ... | ... |
| Amount Financed: $180,578.00 | Amount Financed: $171,193.94 |
| Settlement Charges: $10,295.75 | Settlement Charges: $11,489.81 |
| (Includes all Prepaid Finance Charges) | (Includes all Prepaid Finance Charges) |
| Loan Amount: $189,000.00 | Loan Amount: $180,900.00 |
| Annual Percentage Rate: 9.487% | Annual Percentage Rate: 8.824% |
| Term: 360 | Term: 360 |
| Initial Interest Rate: 9.000% | Initial Interest Rate: 8.259% |
| ... | ... |

*Id.* Plaintiff executed the Borrower's Acknowledgment Form and the other loan documents on September 11, 2002.

On May 28, 2003, plaintiff filed the instant action against defendant alleging various claims including a claim that plaintiff violated the ECOA. Plaintiff claims that the first time he knew that the terms of the loan would be different from those discussed on the telephone, was when he arrived at the loan closing on September 11, 2002. In Count Three of his Complaint, plaintiff asserted as follows: "The Defendant significantly changed the terms of the instant credit transaction and substituted different, less favorable terms without so advising the Plaintiff, in violation of U.S.C. section 1691(d) of ECOA." (Complaint ¶ 20.)

II. *SUMMARY JUDGMENT STANDARD*

*2 Pursuant to Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court has ruled that Rule 56(c) requires "the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson,* 477 U.S. at 248. A factual dispute is material only if it might affect the outcome of the suit under governing law. *Id.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 739965 (E.D.Pa.)
**(Cite as: 2004 WL 739965 (E.D.Pa.))**

The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party cannot rest on the pleadings, but rather must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "If the evidence [offered by the non-moving party] is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50. On the other hand, "if reasonable minds can differ as to the import of the proffered evidence that speaks to an issue of material fact," summary judgment should not be granted. *Burkert v. Equitable Life Assurance Soc'y of the United States,* No. 99–CV–1, 2001 WL 283156, at *3 (E.D.Pa. Mar. 20, 2001). In considering a motion for summary judgment, the evidence must be considered in the light most favorable to the non-moving party, and all inferences must be drawn in that party's favor. *Celotex,* 477 U.S. at 322.

III. *REQUIREMENTS OF THE ECOA*

The section of the ECOA at issue is section 1691(d). This section states that "[w]ithin thirty days ... after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application." 15 U.S.C. § 1691(d)(1). The accompanying regulation, known as Regulation B, is found at 12 C.F.R., Part 202.[FN4] Regulation B provides: "A creditor shall notify an applicant of action taken within: (i) 30 days after receiving a completed application concerning the creditor's approval of, counteroffer to, or adverse action on the application." 12 C.F.R. § 202.9(a)(1)(i). A creditor must provide the applicant written notification if "adverse action" is taken. 15 U.S.C. § 1691(d)(2). Regulation B defines "adverse action" to mean, in pertinent part: "(i) A refusal to grant credit in substantially the amount or on substantially the terms requested in an application unless the creditor makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant uses or expressly accepts the credit offered." 12 C.F.R. § 202.2(c)(i). Clearly, a counteroffer made within the thirty days is not an adverse action

requiring an additional written notice. *See Diaz v. Virginia Housing Dev. Auth.,* 117 F.Supp.2d 500, 504 (E.D.Va.2000) (holding that denial coupled with a counteroffer is excluded from the ECOA's written notice requirement, where the applicant accepts the counteroffer).

> FN4. Regulation B is "issued by the Board of Governors of the Federal Reserve System pursuant to title VII (Equal Credit Opportunity Act) of the Consumer Credit Protection Act, as amended (15 U.S.C. 1601 *et seq.*)." 12 C.F.R. § 202.1(a).

*3 Neither the ECOA nor Regulation B mandates the form, content or manner in which a creditor must notify an applicant of a counteroffer. Defendant argues that the ECOA requires notice of the counteroffer within thirty days of receipt of the completed application, but does not specify that the notice of counteroffer must be provided at any particular period of time prior to closing.

The issue in the case *sub judice* is purely a question of law and is as follows: Whether the manner in which defendant notified plaintiff of its counteroffer to plaintiff's loan application, i.e. within thirty days of the date of the completed loan application and on the date of the loan closing in the Borrower's Acknowledgment Form, satisfied the notice requirements of the ECOA. This court finds that it does.

IV. *DISCUSSION*

The facts are not in dispute. Plaintiff applied for a loan on August 29, 2002. This court will assume that the application was completed on that same date. [FN5] On September 11, 2002, thirteen days after the loan application was completed, defendant provided plaintiff with the Borrower's Acknowledgment Form setting forth the terms of its counteroffer. Plaintiff signed the Borrower's Acknowledgment Form. As detailed above, the Borrower's Acknowledgment Form clearly identified the "original loan terms requested" and the "final loan terms." (Def.'s Mem. Supp. Mot. Ex. C.) On that same date, plaintiff also signed the loan documents to finalize the transaction.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 739965 (E.D.Pa.)
(Cite as: 2004 WL 739965 (E.D.Pa.))

Page 4

FN5. Defendant asserts that the loan application was not completed until September 11, 2002 when, apparently, plaintiff signed the final loan application forms. (Def.'s Mem. Supp. Mot. at 5 and Exs. F and G.) However, this date is not crucial to the determination of the issues presented because defendant provided the Borrower's Acknowledgment Form to plaintiff within thirty days of either date.

Plaintiff was deposed on September 29, 2003. He testified that he had the opportunity to review the documents at the closing before signing them. (Pl.'s Dep. at 22–23.) Plaintiff testified that he understood the fees and settlement charges being deducted from his loan proceeds. *Id.* at 35. When plaintiff saw the amount of fees and settlement charges, he did not inform defendant that he did not wish to proceed with the loan. *Id.* Plaintiff understood that he could cancel the loan within one week of the closing date. *Id.* at 36. Plaintiff acknowledged that he signed the note which reflected a fixed interest rate of 8.259 percent. *Id.* at 38. Plaintiff did not inform defendant that he did not wish to proceed with the loan because the interest rate was greater than 7.25 percent. *Id.* at 38–39. Plaintiff understood that his monthly payment of principal and interest would be $1,360.19. *Id.*

The requirements of the ECOA and Regulation B are clear. Notice of a counteroffer must be given within thirty days of receiving a completed application. Neither the ECOA nor Regulation B requires that the notice of counteroffer must be given at a time before the loan closing.

Plaintiff urges that *Newton v. United Companies Fin. Corp.,* 24 F.Supp.2d 444 (E.D.Pa.1998) requires a different result. In that case, four low income homeowners brought an action against a lender with whom they each entered into mortgage loans to finance home improvements. The complaint alleged violations of, *inter alia,* the ECOA. *Id.* at 446. In each of the transactions at issue in *Newton,* the lender, United, was contacted on the plaintiffs' behalf about extending them credit in the amount of their home improvement contracts. United ultimately extended credit in significantly higher amounts and did not provide the plaintiffs with counteroffer notices required by the ECOA. *Id.* at 457. The question at issue in *Newton,* as stated by the court, was "whether plaintiffs made 'completed applications' for credit in the lower amounts and thus triggered United's counteroffer notice duty." *Id.* The court concluded that the applications were completed for the purposes of the ECOA and Regulation B when United received the title reports for the properties. *Id.* at 461.

*4 In addressing the counteroffer requirement of the ECOA, the court stated as follows:

United contends that it is in full compliance with ECOA's notification requirement because each of these loans closed within 30 days of the loan package being sent to Baton Rouge, and therefore all the plaintiffs were notified of approval within 30 days as required by 15 U.S.C. § 1691(d)(1) and 12 C.F.R. § 202.9(a)(1)(i). By that logic, a lender would be relieved of its duty to notify the borrower of a counteroffer being made as long as that counteroffer is approved within the original 30–day period. This result is at odds with the language of the regulation, which is clear in requiring that the lender must notify the borrower of the making of a counteroffer, not just the ultimate approval or denial of that counteroffer.

*Id.* at 461–62. The borrowers in *Newton* received no notice of counteroffer at the closing of their loans, but received the final loan applications and documents which incorporated loan terms different from those they originally requested. The court concluded that the ECOA was "designed to give the borrower fair notice that a counteroffer for a larger loan was in the offing within a reasonable time after the lender knew this, which was before the closing." *Id.* at 462.

*Newton* does not require a different result here. The facts in the instant case are easily distinguishable from those in *Newton.* Here, defendant presented plaintiff with a notice of the counteroffer at the loan closing by way of the Borrower's Acknowledgment Form. As described above, the Borrower's Acknowledgment Form clearly set forth the originally requested terms and the final terms of the loan. Unlike in *Newton,* where the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 739965 (E.D.Pa.)
**(Cite as: 2004 WL 739965 (E.D.Pa.))**

borrowers received no notice of a counteroffer, one was provided to plaintiff in this case. Plaintiff signed the Borrower's Acknowledgment Form. The notice missing in *Newton* was present in this case.

Neither the ECOA nor Regulation B prohibits the notice of counteroffer from being provided at the time of closing. While the court in *Newton* stated that the notice of counteroffer should be provided before the closing, such a requirement is not to be found in the ECOA or Regulation B. The law is clear that regulations propounded by agencies at the delegation of Congress are entitled to substantial deference. The Supreme Court has made clear that where "there is an express delegation of authority to the agency to elucidate a specific provision of statute by regulation[,][s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (footnote omitted). Here, Congress has explicitly provided that "[t]he Board [of Governors of the Federal Reserve System] shall prescribe regulations to carry out the purposes of this subchapter." 15 U.S.C. § 1691b(a)(1). *See also Nevarez v. O'Connor Chevrolet, Inc.,* 2004 WL 318612, at *9 (N.D.Ill. Feb.5, 2004) ("Because the [Federal Reserve Board] has been given explicit authority to prescribe regulations to carry out the purpose of the ECOA, the court should given substantial deference to the interpretations of the [Federal Reserve Board]."); *Roseman v. Premier Fin. Serv.—East, L.P.,* 1997 WL 570919, at *3 n. 3 (E.D.Pa. Sept.3, 1997) (Pollak, J.) (citing *Chevron* and concluding that the language of Regulation B "merits very substantial deference"). The regulations at issue in this case are not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron,* 467 U.S. at 844. Defendant complied with the requirements in the statute and Regulation B to provide the notice of counteroffer within thirty days from receipt of a completed application.

**\*5** This court may not usurp the legislative power of Congress by adding requirements to the statute or regulations. It is not the responsibility of this court to add a requirement that the notice of counteroffer must

be provided within thirty days after receipt of a completed application AND prior to the closing. *See Barnhart v.. Sigmon Coal Co., Inc.,* 534 U.S. 438, 462, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (Court cannot alter the text "of a statute to satisfy policy preferences" of one party to the detriment of the other); *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 733, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (Scalia, J., dissenting) ("Court may not exercise the ... power to legislate, and so may not uphold a regulation by adding to it even the most reasonable of elements it does not contain"); *Hanover Bank v. Comm'r of Internal Revenue,* 369 U.S. 672, 687–88, 82 S.Ct. 1080, 8 L.Ed.2d 187 (1962) (when the plain and ordinary language of the statute is clear, the Court "may not add to or alter the words employed to effect a purpose which does not appear on the face of the statute.... This Court [cannot] do what the legislative branch of the Government failed to do or elected not to do. This, of course, is not within our province.").

Adding a requirement to the ECOA or Regulation B that a notice of counteroffer must be provided before closing would open the door to numerous questions regarding how far prior to closing the notice of counteroffer must be provided. Would one day prior to closing be sufficient, or would five days be required? Would two hours prior to closing be sufficient if the borrower were able to leave the closing to consider his or her options, and then return? Congress could have chosen any of these possibilities when it enacted the ECOA, but did not. Nor did the Federal Reserve Board raise such issues in Regulation B. *See Barnhart,* 534 U.S. at 454 (declining to "read into" a statute an omitted term, noting that if Congress meant to include the provision, "it could have done so clearly and explicitly").

In the instant case, defendant provided plaintiff with a notice of counteroffer which plaintiff freely acknowledged he read and signed. Plaintiff also admitted he knew and understood the amount of interest being charged and the amount of his monthly payments, yet did not express concern or a desire to stop the transaction. Nor did plaintiff seek to rescind the loan within the appropriate time frame, of which he admitted know-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 739965 (E.D.Pa.)
**(Cite as: 2004 WL 739965 (E.D.Pa.))**

ledge.[FN6] The plain language of the ECOA, as further discussed by Regulation B, requires this court to find that defendant did not violate the ECOA.

> FN6. At his deposition, plaintiff explained that he proceeded with the loan even though the interest rate was greater than 7.25 percent, because he was paying his mortgage with his savings and was running out of money. Plaintiff testified as follows:

> Well, originally, I was hoping to get less than seven and-a-quarter, when I got to settlement I learned this and I was under extreme financial pressure, I had taxes that were coming up, I didn't have much, I was running out of money and this was the only way to keep myself afloat while I was looking for a job.

> (Pl.'s Dep. at 39.) Plaintiff also testified that he did not cancel the loan within the cancellation period for the same reason. *Id.* at 40. It was when plaintiff used up the cash he received from the loan, approximately four to five months after the loan was in place, that he considered his rights with respect to the loan. *Id.* at 40–42. Plaintiff further stated that the reason he wanted to rescind the loan was because the loan application contained false statements indicating that he was employed as an "internet advisor" and earning "$4,500 a month." *Id.* at 40.

## V. *CONCLUSION*

For all the above reasons, this court finds that the undisputed evidence shows that this defendant did not violate the ECOA with respect to the loan in question, and makes the following:

### RECOMMENDATION

AND NOW, this 15th day of March, 2004, upon consideration of defendant's motion in limine, which the parties agreed should be considered as a motion for summary judgment, and plaintiff's responses thereto, it is respectfully recommended that defendant's motion be granted and judgment be entered in favor of defendant and against plaintiff with respect to Count III of the Complaint.

E.D.Pa.,2004.
Ricciardi v. Ameriquest Mortgage Co.
Not Reported in F.Supp.2d, 2004 WL 739965 (E.D.Pa.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Page 1

Not Reported in F.Supp.2d, 2007 WL 846658 (E.D.Pa.)
**(Cite as: 2007 WL 846658 (E.D.Pa.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
In re Ann R. WASHINGTON.

Civil Action No. 06-CV-1625.
Bankruptcy No. 04-30492.
Adversary No. 05-00021.
March 19, 2007.

Devon E. Sanders, Community Legal Services, Inc., Philadelphia, PA, for Ann R. Washington.

Dashika R. Wellington, Pelino & Lentz, P.C., Leslie Puida, Philadelphia, PA, for Mortgage Electronic Registration Systems, Inc., Countrywide Home Loans, Inc. and Goldbeck, McCafferty & McKeever.

### MEMORANDUM AND ORDER

JOYNER, J.

**\*1** This matter has been brought before this Court on appeal by the plaintiff debtor, Ann R. Washington, from the March 13, 2006 Opinion by United States Bankruptcy Judge Steven Raslavich granting the motion of defendants Mortgage Electronic Registration Systems, Inc. ("MERS") and Countrywide Home Loans, Inc. ("Countrywide") for summary judgment on all counts of the appellant's adversary complaint. For the reasons which follow, the appeal shall be denied.

### Factual Background

Plaintiff filed her adversary complaint commencing this action in January, 2005, alleging that the defendants had violated the Truth in Lending Act, 15 U.S.C. § 1601, et. seq. and Regulation Z, promulgated thereunder, 12 C.F.R. § 226, ("TILA" and "Reg. Z"), the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, et. seq. ("UTPCPL") and Act 6 of 1974, 41 P.S. § 101, et. seq., ("Act 6") and that they had

breached the contract which they had with her, *to wit,* her mortgage by, *inter alia,* charging her improper and unreasonable attorneys' and other fees, not disclosing a security interest in her personal property, charging her excessive and unauthorized amounts, failing to properly apply her payments against principal and improperly taking a judgment against her.[FN1] These claims have their genesis in Plaintiffs' purchase of her home at 3762 N. 18th Street in Philadelphia on September 15, 1983. Plaintiff financed that purchase by obtaining a $19,000 loan from the Philadelphia Savings Fund Society ("PSFS") in return for which she granted a mortgage and security interest in that property, along with Plaintiff's "appliances, machinery, furniture and equipment (whether fixtures or not)" to PSFS. It is the non-disclosure of the security interest in the "appliances, machinery, furniture and equipment ..." which forms the basis of Ms. Washington's TILA claim. (Adversary Complaint, ¶ s9-11).

> FN1. Ms. Washington's complaint also included a claim under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et. seq.,* ("FDCPA") against Goldbeck, McCafferty and McKeever, a law firm employed by the other defendants here to institute and prosecute mortgage foreclosure proceedings against her. As that claim has apparently since been resolved, we see no need to mention either it or the Goldbeck law firm further in this Memorandum Opinion.

Plaintiff's loan was assigned at least five times and defendant MERS is alleged to have become the holder on August 16, 1999. (Adversary Complaint, ¶ 15).[FN2] On February 13, 2004, foreclosure proceedings were commenced against the plaintiff; the mortgage foreclosure complaint alleged that the amount of $11,683.74 was then due and owing on the loan. (Adversary Complaint, ¶ 16). On August 2, 2004, Ms. Washington filed Chapter 13 Bank-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 846658 (E.D.Pa.)
(Cite as: 2007 WL 846658 (E.D.Pa.))

Page 2

ruptcy proceedings and on January 11, 2005, she filed the instant adversary complaint in an effort to save her home. (Adversary Complaint, ¶ 29).

> FN2. Countrywide is alleged to be the servicer on the loan. (Adversary Complaint, ¶ 31).

### Standard of Review

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a), which states:

The district courts of the United States shall have jurisdiction to hear appeals

(1) from final judgments, orders, and decrees;

(2) from interlocutory orders and decrees issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and

**\*2** (3) with leave of the court, from other interlocutory orders and decrees;

and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

Under Fed.R.Bankr.P. 8013,
On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside, unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

In considering such appeals from bankruptcy court decisions, the district courts are thus required to review the bankruptcy court's findings of fact for

clear error, its legal conclusions *de novo,* and its exercise of discretion for abuse thereof. *IRS v. Pransky,* 318 F.3d 536, 542 (3d Cir.2003); *Professional Insurance Management v. Ohio Casualty Group of Insurance Companies,* 285 F.3d 268, 282-283 (3d Cir.2002); *In re Krystal Cadillac Oldsmobile GMC Truck, Inc.,* 142 F.3d 631, 635 (3d Cir.1998). An abuse of discretion can be based on a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact. *In re Myers,* 334 B.R. 136, 142 (E.D.Pa.2005), citing *In re SGL Carbon Corp.,* 200 F.3d 154, 159 (3d Cir.1999).

### Discussion

Generally, in the bankruptcy context, the word "case" is a term of art which refers to "that which is commenced by the filing of a petition; it is the whole ball of wax, the Chapter 7, 9, 11, 12 or 13 case." *Blevins Electric v. First American National Bank,* 185 B.R. 250, 253-254 (Bankr.E.D. TN 1995), quoting 5 COLLIER ON BANKRUPTCY P. 1109.02 (15th ed.1993). "Adversary proceedings, on the other hand are subactions which are raised within a 'case' and are commenced by the filing of a complaint." *Id.,* citing, *inter alia,* 2 COLLIER ON BANKRUPTCY P. 301.03 (15th ed.1994) and Fed.R.Bankr.P. 7003. Under Fed.R.Bankr.P. 7056, " Rule 56 F.R.Civ.P. applies in adversary proceedings." In turn, Fed.R.Civ.P. 56(c) states, in relevant part:

"....The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."

Summary judgment is thus appropriate where, viewing the record in the light most favorable to the non-moving party, there is no genuine issue of ma-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 846658 (E.D.Pa.)
(Cite as: 2007 WL 846658 (E.D.Pa.))

Page 3

terial fact and the moving party is entitled to judgment as a matter of law. *Michaels v. New Jersey,* 222 F.3d 118, 121 (3d Cir.2000); *Jones v. School District of Philadelphia,* 198 F.3d 403, 409 (3d Cir.1999). It should be noted that "material" facts are those facts that might affect the outcome of the suit under the substantive law governing the claims made and that an issue of fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party" in light of the burdens of proof required by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 2510, 2512, 91 L.Ed.2d 202 (1986); *The Philadelphia Musical Society, Local 77 v. American Federation of Musicians of the United States and Canada,* 812 F.Supp. 509, 514 (E.D.Pa.1992). Hence, a non-moving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial. *Gleason v. Norwest Mortgage, Inc.,* 243 F.3d 130, 138 (3d Cir.2001).

**\*3** As noted, in his opinion dated March 13, 2006, Bankruptcy Judge Raslavich granted the motions for summary judgment filed by MERS and Countrywide as to all of the debtor's claims against them in her adversary action. By this appeal, Ms. Washington only challenges the Bankruptcy Court's rulings granting judgment to the appellees on Counts I and IV of the adversary complaint. We shall address each of these claims *seriatim.*[FN3]

> FN3. We note that Appellant-Debtor first argues that the Bankruptcy Court erred as a matter of law in allowing the appellees to raise affirmative defenses for the first time in their motion for summary judgment that were not previously pled in their answer to the adversary complaint. As the appellant has failed to provide us with a copy of either the answer to the adversary complaint or of the appellees' motion for summary judgment, we are hamstrung in our consideration of the merits of this argument. However, Third Circuit case law is

clear that the failure to raise an affirmative defense in a responsive pleading should be viewed in light of the federal policy of liberally allowing amendments if the issue was raised at a pragmatically sufficient time and the plaintiff was not prejudiced in its ability to respond. Therefore the failure to raise an affirmative defense in a responsive pleading does not always result in waiver. *Paramount Aviation Corp. v. Augusta,* 178 F.3d 132, 137 (3d Cir.1999); *Kleinknecht v. Gettysburg College,* 989 F.2d 1360, 1373 (3d Cir.1993); *Charpentier v. Godsil,* 937 F.2d 859, 863 (3d Cir.1991). While not the most appropriate way to raise a previously unpled defense, the Third Circuit has made it clear that it is loathe to deem an affirmative defense waived solely on the basis of its having been raised in a motion for summary judgment. *Eddy v. V.I. Water and Power Authority,* 256 F.3d 204, 209 (3d Cir.2001); *Kleinknecht,* 989 F.2d at 1374.

> Here, Plaintiff alleges only that she was "substantial[ly]" prejudiced because "the Bankruptcy Court specifically referred to and relied upon language in the Appellee's pleadings in granting Summary Judgment to Appellee on three of the four Counts based on affirmative defenses." Given that there is no evidence that the Bankruptcy Court's decision would have been any different had it not specifically referred to such language, we cannot find that the plaintiff suffered such prejudice as would justify a denial of a motion for leave to amend. Thus, assuming that Appellant had provided us with a copy of the appellees' pleadings and motion and that the defenses were not raised in the answer as alleged, we would agree with the Bankruptcy Court's conclusion that they were properly considered for the first time on summary

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 846658 (E.D.Pa.)
**(Cite as: 2007 WL 846658 (E.D.Pa.))**

judgment.

*1. Appellant's TILA Claim.*

After rejecting several of MERS' and Countrywide's arguments on the issue of their entitlement to summary judgment on Ms. Washington's claim that the original lender's failure to properly disclose the security interest taken in her personal property violated the Truth in Lending Act, Judge Raslavich did grant relief to the appellees on the grounds that, as assignees, they were immune from liability under Section 1641(e) of the Act, because the violation was not apparent from the face of the assigned disclosure documents. Plaintiff-Appellant now argues that "[a]lthough the Bankruptcy Court correctly stated that the relevant standard for 'apparent on the face of the documents' for transactions secured by real property is § 1641(e), it erred as a matter of law in its interpretation of the statutory language." (Appellant's Brief, at p. 13).

It is true that under 15 U.S.C. § 1638(a)(9), a creditor is required to disclose that a security interest has been taken in both "the property which is purchased as part of the credit transaction, or ... any property not purchased as part of the credit transaction identified by item or type." It also appears clear in this case that the original mortgagee, PSFS, did not reveal that it was taking a security interest in the plaintiff-appellant's appliances, machinery, furniture and equipment (whether fixtures or not) on the original disclosure statement itself. 15 U.S.C. § 1641(e) governs "[l]iability of assignee for consumer credit transactions secured by real property" and states the following:

**(1) In general**

Except as otherwise specifically provided in this subchapter, any civil action against a creditor for a violation of this subchapter, and any proceeding under section 1607 of this title against a creditor, with respect to a consumer credit transaction secured by real property may be maintained against any assignee of such creditor only if-

**(A)** the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement provided in connection with such transaction pursuant to this subchapter; and

**(B)** the assignment to the assignee was voluntary.

**(2) Violation apparent on the face of the disclosure described**

For the purpose of this section, a violation is apparent on the face of the disclosure statement if-

**(A)** the disclosure can be determined to be incomplete or inaccurate by a comparison among the disclosure statement, any itemization of the amount financed, the note, or any other disclosure of disbursement; or

**\*4 (B)** the disclosure statement does not use the terms or format required to be used by this subchapter.

Unfortunately, the statute nowhere defines the meaning of either "disclosure statement" or "disclosure of disbursement" nor does there appear to be any prior case law in this circuit or elsewhere which addresses the threshold issue of whether or not a mortgage is included within the meaning of a "disclosure statement" or "disclosure of disbursement" under 15 U.S.C. § 1641. The closest the statute and its implementing regulation come to defining these terms are in the general definitions section of Section 1602(u) and 12 C.F.R. § 226.31(b)(1). In this regard, 15 U.S.C. § 1602(u) states:

the term "material disclosures" means the disclosure, as required by this subchapter, of the annual percentage rate, the method of determining the finance charge and the balance upon which a finance charge will be imposed, the amount of the finance charge, the amount to be financed, the total of payments, the number and amount of payments, the due dates or periods of payments scheduled to repay the indebtedness, and the dis-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 846658 (E.D.Pa.)
**(Cite as: 2007 WL 846658 (E.D.Pa.))**

closures required by section 1639(a) of this title.

In turn, Regulation Z, Subpart E, governing certain home mortgage transactions, 12 C.F.R. § 226.31(b)(1) provides in general:

"[t]he creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep."

In holding that MERS had no requirement under § 1641(e) to compare the debtor's mortgage with the original TILA disclosure statement issued by PSFS, the Bankruptcy Court looked to the Third Circuit's decision in *Ramadan v. Chase Manhattan Corporation,* 229 F.3d 194 (3d Cir.2000). In that case, the plaintiff sued under 15 U.S.C. § 1641(a) for the harm which she allegedly suffered for the deceptive lending practices of a car dealer. Specifically, Plaintiff had financed the purchase of a used Hyundai through a Retail Installment Contract ("RIC") with the dealer. That contract was contemporaneously assigned to the Hyundai Motor Finance Corporation. At the time the RIC was assigned, other loan documents were also transmitted, which plaintiff alleged revealed the true cost of an extended warranty, the actual amount paid to the issuer and the payment of an undisclosed finder's fee to the assignee. Under § 1641(a), a civil action for a TILA violation may be brought against an assignee of the violating creditor

"only if the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement, except where the assignment was involuntary. For the purpose of this section, a violation apparent on the face of the disclosure statement includes, but is not limited to (1) a disclosure which can be determined to be incomplete or inaccurate from the face of the disclosure statement or *other documents assigned,* or (2) a disclosure which does not use the terms required to be used by this subchapter." (Emphasis added)

*5 In affirming the District Court's holding that the plaintiff could not state a claim under TILA § 1641(a) because there was no "violation on the face of the disclosure document," the Third Circuit Court of Appeals rejected the plaintiff's assertion that the related loan documents, including the accounting of distributions made pursuant to the contract should be considered to determine whether a violation was apparent on the face of the disclosure statement. Noting that Section 1641(a) specifically recited that the inaccuracies had to be apparent from either the disclosure statement itself or the other documents *assigned,* the Court held that a cause of action did not lie on the grounds that the TILA violation could be discerned from the other documents which were merely transferred or transmitted together with the disclosure statement but not formally assigned.

The Third Circuit went further, adopting the reasoning and holdings of the Fifth, Seventh and Eleventh Circuit Courts of Appeals in *Green v. Levis Motors, Inc.,* 179 F.3d 286 (5th Cir.1999), *Ellis v. GMAC,* 160 F.3d 703 (11th Cir.1998) and *Taylor v. Quality Hyundai, Inc.,* 150 F.3d 689 (7th Cir.1998):

Resort to the "but is not limited to" language in § 1641(a) is similarly unavailing. As noted, our sister circuits have uniformly held that "apparent on the face" means exactly that-for an assignee to be liable under TILA, the violation must be apparent on the face of the assigned disclosure documents. We agree. In *Taylor,* for example, plaintiff asserted the violation at issue was "apparent on the face" because the lender, given its experience in the field, must have known that a violation had occurred ... The *Taylor* Court rejected that argument because "the rule for which the plaintiffs are arguing would impose a duty of inquiry on financial institutions that serve as assignees." The *Taylor* Court correctly held that § 1641(a) creates no such duty and that "only violations that a reasonable person can spot on the face of the disclosure statement or other assigned documents will

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 846658 (E.D.Pa.)
**(Cite as: 2007 WL 846658 (E.D.Pa.))**

make the assignee liable under the TILA."
(Citation omitted) ...

As the *Green, Ellis* and *Taylor* courts have explained, looking beyond the documents assigned to determine whether a violation was "apparent on the face of the disclosure statement" is inconsistent with § 1641(a) ...

*Ramadan,* 229 F.3d at 198, 199.

In addition to *Ramadan,* several district courts in this Circuit have likewise concluded that assignee financial institutions have no duty to inquire or refer to evidence or documents extraneous to the disclosure documents in cases where the alleged violation is not apparent on the face of the disclosure documents assigned. *See, Jordan v. Chrysler Credit Corp.,* 73 F.Supp.2d 469 (D.N.J.1999). *See Also, McMaster v. CIT Group,* Civ. A. No. 04-339, 2006 U.S. Dist. LEXIS 28831 at *17 (E.D.Pa. May 11, 2006) (allegation that assignee bank could have been on notice of TILA violations because disbursement of money to lawyer not in accord with any disclosure to plaintiff in loan file not strong enough to impose TILA assignee liability on assignee bank as there were no apparent errors on the face of loan documents); *McNinch v. Mortgage America, Inc.,* 250 B.R. 848, 860-861 (Bankr.W.D.Pa.2000) (assignee's duty simply to ensure that the loan had a matching accurate TILA statement paired with it, and nothing more).[FN4] That the Third Circuit's holdings in *Ramadan* apply with equal force to § 1641(e) has been held by at least one other Court in this district. *See, Kane v. Equity One, Inc.,* Civ. A. No. 03-3931, 2003 U.S. Dist. LEXIS 23810 at *13, n. 3 (E.D.Pa. Nov. 21, 2003) (rejecting plaintiff's allegations that, through inspection of loan documents, assignee did or should have noticed that gas bill was improperly charged twice on grounds that assignee had no duty of additional inquiry and such violation was not apparent on face of the assigned loan documents).

FN4. For some reason not readily apparent to this Court, the *McMaster* and *McNinch*

cases were decided under § 1641(a) despite the fact that they appeared to involve consumer credit transactions secured by real property.

*6 In support of her appeal in this case, Plaintiff-Appellant argues that the Bankruptcy Judge erred in concluding that MERS had no duty to review the mortgage because under Pennsylvania law, notes and mortgages are interrelated documents that are incorporated into each other; since § 1641(e) designates a note as one of the documents to be compared with the disclosure statement to ascertain accuracy and completeness, Plaintiff submits that the failure to review the mortgage here gave rise to a valid TILA claim.

While it is true that notes and mortgages are often interrelated documents which refer to one another, it is also clear that they are separate and distinct documents and that one does not always necessarily accompany the other. Indeed, a "note" is "an instrument containing an express and absolute promise of signer (*i.e.,* maker) to pay to a specified person or order, or bearer, a definite sum of money at a specified time." BLACK'S LAW DICTIONARY 1060 (6th ed.1990). A mortgage, on the other hand, is "an interest in land created by a written instrument providing security for the performance of a duty or the payment of a debt." BLACK'S LAW DICTIONARY 1009 (6th ed.1990). Pennsylvania law recognizes this distinction by requiring that another action (or in some cases, separate counts in the same action) must be brought to obtain a judgment for personal liability separate and apart from that commenced to obtain a judgment of foreclosure. *See, e.g., Meco Realty Company v. Burns,* 414 Pa. 495, 200 A.2d 869 (1964) (recognizing that judgment entered in action of mortgage foreclosure is judgment against land only that imposes no personal liability upon mortgagors upon whom judgment is obtained); *Citicorp Mortgage, Inc. v. Morrisville Hampton Village Realty Limited Partnership,* 456 Pa.Super. 338, 690 A.2d 723 (1997) (same); *First Seneca Bank v. Greenville Distribut-*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 846658 (E.D.Pa.)
**(Cite as: 2007 WL 846658 (E.D.Pa.))**

*ing Co.,* 367 Pa.Super. 558, 533 A.2d 157 (1987) (mortgagee may obtain deficiency judgment in mortgage foreclosure action if mortgagor's complaint requests *in personam* and *in rem* judgment and if no objection is made by mortgagors); 42 Pa.C.S.A. § 8103(Deficiency Judgment Act). However, the note in this case clearly recites the following:

> Simultaneously with the execution of this Note, the Maker has executed and delivered to the Payee a Mortgage secured upon certain premises situated in the County of Philadelphia, Commonwealth of Pennsylvania, more particularly described in the Mortgage. All of the terms, covenants, provisions, conditions, stipulations and agreements contained in said Mortgage to be kept and performed by the Maker hereby made apart of this Note to the same extent and with the same force and effect as if they were fully set forth herein, and the Maker covenants and agrees to perform the same, or cause the same to be kept and performed, strictly in accordance with the terms and provisions thereof.

Thus, we find that the verbiage of the note in this case takes this matter outside the realm of *Ramadan* and its progeny, in that by making "[a]ll of the terms, covenants, provisions, conditions, stipulations and agreements contained in [the] Mortgage" a part of the Note itself, a duty was imposed on the assignee here to compare the mortgage with the TILA disclosure statement. Had the assignee done so, it arguably could have discovered the TILA violation and we therefore find that Judge Raslavich's decision to grant summary judgment to MERS on Count I of the adversary complaint was in error.[FN5]

> FN5. It is also clear that, under 15 U.S.C. § 1541(f)(1), loan servicers such as Countrywide are excluded from TILA's requirements unless they are or were the owners of the obligation. It does not appear that Appellant is challenging this ruling by the Bankruptcy Court.

*2. Appellant's Breach of Contract Claim.*

*\*7* Appellant next avers that the bankruptcy court erred in finding that her breach of contract claim was barred by the doctrine of *res judicata.* We disagree.

The gravamen of Appellant's breach of contract claim, which is set forth in Count IV of the adversary complaint, is that Appellant's mortgage is a contract which was breached by MERS and Countrywide's alleged charging of excessive and unauthorized amounts and failing to properly apply payments resulting in damages. Appellant argues that the second, third and fourth elements necessary to a finding of *res judicata* do not exist between her and Appellee MERS.

While federal law has developed its own set of preclusion principles, if the decision allegedly precluding a later action was issued by a state court, then the federal courts must apply the preclusion principles developed by that state. *Randall v. Bank One National Association,* 2006 Bankr.LEXIS 3696 at *38 (Bankr.E.D.Pa. Nov. 1, 2006), citing *Gregory v. Chehi,* 843 F.2d 111, 116 (3d Cir.1988). This derives from the Full Faith and Credit statute, 28 U.S.C. § 1738 requiring a court to give the same effect to a judgment that the issuing state would. *Id. See Also, Greenway Center, Inc. v. Essex Insurance Co.,* 475 F.3d 139 (3d Cir.2007) ("to determine whether Essex is barred by the doctrine of issue preclusion from disputing its liability to defend and indemnify GCI because of the state court order, we must look to the law of the adjudicating state, which is Pennsylvania").

Claim preclusion and issue preclusion are related, but distinct concepts. Whereas claim preclusion prevents a party from re-litigating claims she might have but did not assert in the first action, issue preclusion forecloses only a matter actually litigated and essential to the decision. *Hofman v. Pressman Toy Corp.,* 193 Fed. Appx. 121, 122 (3d Cir. July 7, 2006). In Pennsylvania, claim preclusion or *res judicata* provides that where there is a final judgment on the merits, future litigation

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 846658 (E.D.Pa.)
**(Cite as: 2007 WL 846658 (E.D.Pa.))**

between the parties on the same cause of action is prohibited. *McGill v. Southwark Realty Co.,* 828 A.2d 430, 435 (Pa.Cmwlth.2003). Invocation of the doctrine of *res judicata* requires that both the former and latter suits possess the following common elements:

(1) identity in the thing being sued upon or for;

(2) identity of the cause of action;

(3) identify of the persons and parties to the action; and

(4) identity of the quality or capacity of the parties being sued.

*Yamula Trucking & Excavating Co. v. Justofin,* 771 A.2d 782, 784 (Pa.Super.2001); *Chada v. Chada,* 756 A.2d 39, 41 (Pa.Super.2000). A default judgment is *res judicata* with regard to transactions occurring prior to entry of judgment. *McGill, supra.,* citing *Zimmer v. Zimmer,* 457 Pa. 488, 326 A.2d 318 (1974) and *Quaker City Chocolate & Confectionary Co. v. Warnock Building Association,* 347 Pa. 186, 32 A.2d 5 (1943).

In arguing that the second, third and fourth elements were not satisfied here, Appellant contends that Appellee's claim of *res judicata* is based solely on its *in rem* mortgage foreclosure judgment, as it has never exercised its rights to bring an *in personam* action on the note. Therefore, according to Appellant, the only "thing sued upon" was the mortgage and the only "capacity of the parties" in that action were as "mortgagee" and "mortgagor." Since MERS still has, according to Appellant, the opportunity to bring an action on the note, so does the Appellant retain the opportunity to bring a cause of action for breach.

**\*8** At page 19 of his opinion, Judge Raslavich found that the second and fourth elements were demonstrated because "[t]he same parties appear and in the same capacity. Likewise, the thing sued upon in both proceedings is the mortgage and note." In carefully scrutinizing the complaint and

default judgment in the mortgage foreclosure action, however, we find that Appellant is correct in her assertions: she was sued solely in her capacity as mortgagor and real owner of the mortgaged property and the only thing sued upon was the mortgage. We therefore cannot agree with the Bankruptcy Court's findings on this point either and we believe that remand for a re-examination of this issue is appropriate.

For all of the above-stated reasons, we reverse the decision of the Bankruptcy Court and remand this matter to it for all appropriate further proceedings. An order follows.

### ORDER

AND NOW, this 15th day of March, 2007, upon consideration of Plaintiff-Debtor's Appeal from the March 13, 2006 Opinion and Order of the Bankruptcy Court for the United States District Court for the Eastern District of Pennsylvania, it is hereby ORDERED that the Decision rendered therein granting the Defendants' Motion for Summary Judgment is REVERSED for the reasons set forth in the preceding Memorandum Opinion and this matter is REMANDED to the Bankruptcy Court for all appropriate further proceedings.

E.D.Pa.,2007.
In re Washington
Not Reported in F.Supp.2d, 2007 WL 846658 (E.D.Pa.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

## CERTIFICATE OF SERVICE

I, Thomas M. Brodowski, hereby certify that on May 9, 2014, I filed the

foregoing Motion to Dismiss and supporting Memorandum of Law with the Clerk of the Court

using the ECF system.  These documents are available for reviewing and downloading from the

ECF system by the following:


Matthew B. Weisberg, Esquire
Weisberg Law, P.C.
7 South Morton Avenue
Morton, PA 19070

Attorney for Plaintiff


s/ Thomas M. Brodowski_____
Thomas M. Brodowski